## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
:
In re:                                          :      Chapter 11
                                                :
CAL DIVE INTERNATIONAL, INC., *et al.*,[1]      :      Case No. 15-10458 (   )
                                                :
                              Debtors.          :
                                                :      Joint Administration Requested
-------------------------------------------------------x

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS; (II) WAIVING CERTAIN UNITED STATES TRUSTEE REQUIREMENTS; (III) AUTHORIZING CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS; AND (IV) GRANTING RELATED RELIEF

Cal Dive International, Inc. ("**Cal Dive**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") respectfully request entry of interim and final orders (i) authorizing the Debtors to continue to use their centralized cash management system (the "**Cash Management System**") and bank accounts, as set forth below; (ii) waiving certain bank account and related requirements of the Office of the United States Trustee (the "**U.S. Trustee**"); (iii) authorizing the Debtors to continue their existing deposit practices under the Cash Management System (subject to certain reasonable changes to the Cash Management System that the Debtors may implement, including as required under the DIP Facility Agreement (as defined below)); (iv) extending time to comply with Bankruptcy Code section 345(b); and (v) authorizing Intercompany Transactions (as defined below) consistent with historical practice and granting administrative expense priority to Intercompany Transactions.  In support of this Motion, the Debtors rely on and incorporate by reference *Quinn Hébert's Declaration in Support*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Cal Dive International, Inc. (0501), Cal Dive Offshore Contractors, Inc. (4878), Affiliated Marine Contractors, Inc. (8678), Fleet Pipeline Services, Inc. (2104), Gulf Offshore Construction, Inc. (2106), and CDI Renewables, LLC (4985).  The Debtors' corporate headquarters is at 2500 CityWest Boulevard, Suite 2200, Houston, TX 77042.

*of the Debtors' Chapter 11 Petition and First Day Pleadings* (the "**First Day Declaration**"), filed concurrently with this Motion. In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION & VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and venue is proper under 28 U.S.C. §§ 1408 and 1409 and Local Rules 2015-2 and 4001-3. This is a core proceeding under 28 U.S.C. § 157(b).[2]

## BACKGROUND

2. On March 3, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code sections 1107 and 1108.

3. The Debtors and their non-debtor foreign affiliates (collectively, the "**Cal Dive Group**") constitute a marine contractor that provides highly specialized manned diving, pipelay and pipe burial, platform installation and salvage, and well-intervention services to a diverse customer base in the offshore oil and gas industry. Headquartered in Houston, the Cal Dive Group operates in the Gulf of Mexico Outer Continental Shelf, the United States, Latin America, Southeast Asia, China, Australia, West Africa, the Middle East, and Europe.

4. Only the Cal Dive Group's U.S.-based entities are Debtors in these cases. The foreign members of the Cal Dive Group, including operating companies in Mexico, Australia, the United Kingdom, Indonesia, Malaysia, and Singapore, have not filed chapter 11

---

[2] Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors hereby confirm their consent to the entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

petitions or foreign insolvency proceedings and continue to conduct their businesses in the ordinary course.

5. Additional information on the Debtors' business and capital structure, as well as a description of the reasons for filing these cases and the Debtors' goals for these cases, is set forth in the First Day Declaration.

## RELIEF REQUESTED

6. By this Motion, the Debtors request entry of interim and final orders—as proposed in Exhibit A (the "**Interim Order**") and Exhibit B (the "**Final Order**") respectively— under Bankruptcy Code sections 105(a), 345, and 363(c) and Federal Rules of Bankruptcy Procedure 6003 and 6004 authorizing the Debtors to continue to use their Cash Management System in the ordinary course and granting them related relief.

7. Specifically, the Debtors seek authority to (i) maintain and continue to use the bank accounts listed on Exhibit C to this Motion (the "**Debtor Bank Accounts**"), in the same manner and with existing account numbers, styles, and document forms; (ii) deposit funds in, and withdraw funds from, the Debtor Bank Accounts by usual means, including check, wire transfer, automated clearinghouse transfer, draft, electronic fund transfer, or other items presented, issued, or drawn on the Debtor Bank Accounts; (iii) pay prepetition and ordinary course bank fees for the Debtor Bank Accounts; (iv) perform their obligations under the Debtor Bank Accounts' governing documents and agreements; and (v) treat the Debtor Bank Accounts for all purposes as "debtor in possession" accounts ("**DIP Accounts**").

8. To maintain the efficient operation of the Cash Management System during these cases, the Debtors also request their banks be authorized and directed to continue to administer, service, and maintain the Debtor Bank Accounts, as they were prepetition, without

interruption and in the ordinary course, and to receive, process, honor, and pay any and all checks, drafts, wires, automated clearinghouse transfers, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Accounts (collectively, the "**Disbursements**") on account of any claim arising before the Petition Date that this Court has granted the Debtors approval to pay, and in reliance on the Debtors' representations of such authority, provided the applicable Debtor Bank Accounts contain sufficient funds.

9.      Continuity of the Cash Management System is critical, but so is a measure of flexibility.  To that end, the Debtors also request authority to implement reasonable changes to the Cash Management System that they deem necessary or appropriate in the ordinary course, in consultation with the DIP Agent and Pre-Petition Junior Agent and subject to the DIP Order and the DIP Facility Documents,[3] including closing any Debtor Bank Account and establishing a new deposit account with Bank of America, N.A. as the Restricted Cash Collateral Account under the DIP Facility Agreement, and that the applicable banks be authorized to honor such changes.

10.      Both here and in other first-day motions, the Debtors seek authority to pay certain prepetition obligations.  For some of these obligations, the Debtors issued checks before the Petition Date that have yet to clear.  For others, the Debtors will issue a Disbursement once they have Court authority to do so.  The Debtors request that their banks be authorized and directed to accept and honor all representations from the Debtors as to which of these Disbursements should be honored.  If any banks nevertheless dishonor Court-approved

---

[3] "**DIP Order**" means, collectively, the *Interim Order (i) Authorizing Debtors to (a) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (b) Grant Senior Liens and Superpriority Administrative Expense Status, and (c) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363; (ii) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364; (iii) Scheduling Final Hearing; and (iv) Granting Related Relief*; and any order granting such relief on a final basis.  The "**DIP Agent**" means Bank of America, N.A. (the "**DIP Agent**"), in its capacity as agent under the Debtors' post-petition financing arrangements (as further described in the DIP Order, the "**DIP Facility Documents**," and the financing provided thereunder, the "**DIP Loans**").  Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Order.

Disbursements, the Debtors request authority to issue replacement Disbursements consistent with the orders of this Court.  And because the banks are not in position to independently verify or audit whether they may honor a particular Court-approved prepetition Disbursement, the Debtors further request that the Court's orders specify that no bank will be liable to the Debtors or their estates, or otherwise be in violation of such orders, for honoring a prepetition Disbursement or other Disbursement at the Debtors' direction.

11.     Finally, the Debtors request authority to continue, in the ordinary course, certain transactions between and among members of the Cal Dive Group (the "**Intercompany Transactions**").  The Intercompany Transactions, as described below, are necessary to maintaining control over cash management among the members of the Cal Dive Group and avoiding substantial disruption to the Cal Dive Group's business, and provide substantial benefits to the Debtors, their estates, and the non-debtor members of the Cal Dive Group (the "**Non-Debtor Affiliates**").

12.     The Debtors have filed the First Day Declaration, which establishes that the Debtors will suffer immediate and irreparable harm if the relief requested in this Motion is not granted.

## BASIS FOR RELIEF REQUESTED

## I. FACTS SPECIFIC TO RELIEF REQUESTED

## A.     Overview of the Cash Management System

13.     The Cash Management System is an integrated, global network of bank accounts that is critical to the Debtors' operations during these cases and, in turn, maximizing the value of the Debtors' estates.  Like typical chapter 11 debtors, the Debtors use the Cash Management System to collect cash from operations and to make cash disbursements—primarily payroll and payments to vendors—to manage their businesses.  The Cash Management System

- 5 -

also serves a strategic function, facilitating the Debtors' cash monitoring, forecasting, and reporting, and enabling the Debtors to control administration of their bank accounts. Recognizing the importance of the Cash Management System, the Debtors take care to record all collections, transfers, and disbursements made through the Cash Management System as and when made.

14.     The Debtor Bank Accounts, held by Cal Dive and Cal Dive Offshore Contractors, Inc. ("**CDOCI**"), are the hub of the Cash Management System.  But the Non-Debtor Affiliates also maintain bank accounts integral—and even directly linked—to the Debtors' business (the "**Non-Debtor Affiliate Bank Accounts**").

15.     We discuss the Debtor Bank Accounts, the Non-Debtor Affiliate Bank Accounts, and other important features of the Cash Management System below.   For demonstrative purposes, a diagram illustrating the Cash Management System is attached as Exhibit E hereto.

**B.     The Debtor Bank Accounts**

16.     There are seven Debtor Bank Accounts: five at Amegy Bank of Texas ("**Amegy**") and two at Wells Fargo Bank, N.A ("**Wells Fargo**").  Each Debtor Bank Account is insured by the Federal Deposit Insurance Corporation ("**FDIC**").

17.     *The Holding Account*:  The Debtors' main deposit account (the "**Holding Account**"), held by Debtor Cal Dive, is maintained at Amegy.  The Holding Account funds each of the three zero balance accounts maintained at Amegy that the Debtors use to operate their day-to-day business:   the Operating Account, the Checking Account, and the Domestic Payroll Account (each defined below).  From the Holding Account, the Debtors pay Bank Fees (defined below), 401(k)-related payments, insurance premiums, and principal payments on debt.  Cash receipts, other than sweeps from the Operating Account, are limited to deposits from

longstanding customers who historically made deposits into this account. As of the Petition Date, the Holding Account contains approximately $50,000.

18.     *The Operating Account*:  The Debtors' primary operating account (the "**Operating Account**"), held by Debtor CDOCI, is a zero-balance account that serves three critical functions.  First, the Debtors use the Operating Account to make nearly all domestic non-payroll-related payments and disbursements related to their business operations (including interest on indebtedness).  Electronic payments are made directly from the Operating Account; where vendors or suppliers present hard-copy checks issued by the Debtors, those checks are honored via funds transferred from the Operating Account to a linked Amegy zero-balance checking account (the "**Checking Account**").  Second, the Operating Account receives as deposits most revenue the Debtors generate.  These deposits largely consist of customer payments received as wires, checks, or transfers from automated clearinghouses.[4]  Third, as described more fully below, the Debtors use the Operating Account to make Intercompany Transactions to and from the Non-Debtor Affiliates.

19.     *The Domestic Payroll Account*:  The Debtors fund domestic payroll and payroll taxes from a dedicated zero-balance account maintained by CDOCI at Amegy (the "**Domestic Payroll Account**").  To make these payments, CDOCI initiates electronic transfers or issues manual disbursements to employees and taxing authorities from the Domestic Payroll Account.  Funds are automatically transferred from the Holding Account to the Domestic Payroll Account as requests for payment are presented.[5]

---

[4] In a few cases, as discussed above, customers deposit funds into the Holding Account.

[5] The Debtors' payroll obligations are described in greater detail in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits, (B) Maintain and Continue Such Benefits and Other Employee-Related Programs, and (C) Pay Prepetition Claims of Independent Contractors and (II) Authorizing Financial Institutions to Honor and Process All Related Checks and Transfers*, filed contemporaneously with this Motion.

20.    *Cash Purchase Accounts*:  Cal Dive maintains two related accounts at Wells Fargo to facilitate cash purchases to support the Debtors' administrative and operational functions.  One is a purchase-card account (the "**Wells Fargo Purchase Card Account**"), operated and maintained under a certain Wells One Commercial Credit Card Agreement (the "**Wells Fargo Card Agreement**").  As set forth in the Wells Fargo Card Agreement, Wells Fargo is authorized to make advances on behalf of Cal Dive with a maximum exposure to Cal Dive of $100,000.  Only three employees are authorized signatories on the Wells Fargo Purchase Card Account, which contains no funds as of the Petition Date.  As security for all indebtedness owed by Cal Dive to Wells Fargo under the Wells Fargo Card Agreement, Cal Dive granted to Wells Fargo a security interest in a second Wells Fargo account (the "**Wells Fargo Collateral Account**"). Cal Dive is required to maintain a collective minimum deposit balance of $100,000 in the Wells Fargo Collateral Account.  The Wells Fargo Collateral Account has a balance of $100,000 as of the Petition Date.[6]

21.    *Inactive Deposit Account*:  Finally, Debtor Gulf Offshore Construction, Inc. ("**GOCI**") also maintains an inactive deposit account at Amegy.

## C.    Bank Fees

22.    The Debtors pay, honor, or allow the deduction from the Debtor Bank Accounts service charges and other fees, costs, and expenses arising in the ordinary course (collectively, the "**Bank Fees**").  The Debtors estimate that they pay average monthly Bank Fees of approximately $7,000 and that they owe prepetition Bank Fees of approximately $4,000.  The Debtors' inability to pay prepetition or postpetition Bank Fees in the ordinary course could disrupt the Cash Management System and harm the Debtors' estates.

---

[6] Collectively, Cal Dive's obligations in connection with the Wells Fargo Card Agreement and the security agreement governing the Wells Fargo Collateral Account are the "**Wells Fargo Commercial Card Obligations**."

### D.    Key Non-Debtor Affiliate Bank Accounts

23.    The Non-Debtor Affiliates maintain their international and domestic accounts, listed on Exhibit D, at Amegy, HSBC Holdings plc and its international affiliates ("**HSBC**"), Citibank and its international affiliates, including Banco Nacional de México ("**Banamex**"), and Santander Bank ("**Santander**").    By and large, the Non-Debtor Affiliates maintain the Non-Debtor Affiliate Bank Accounts to facilitate deposits and disbursements for the Cal Dive Group's foreign operations.    Some serve simple yet important functions.    For example, Cayman-based Cal Dive Offshore Contractors Ltd. maintains an international payroll account at Amegy, funded from the Operating Account, to pay Debtor employees serving in expatriate positions.

24.    Others connect the Debtors with the Non-Debtor Affiliates.    Although the Non-Debtor Affiliates collect their own revenue and are largely responsible for meeting their own obligations, in some circumstances the Debtors transfer funds to the Non-Debtor Affiliates to ensure sufficient liquidity for working capital needs.    And, from time to time, where they hold excess cash, the Non-Debtor Affiliates transfer funds to the Debtors to repay intercompany balances advanced by the Debtors.

25.    An account held by Cayman-based Non-Debtor Affiliate Cal Dive Offshore International Ltd. is central to transfers between the Debtors and Non-Debtor Affiliates. Maintained at Amegy, this holding account (the "**International Holding Account**") facilitates payments between the Debtors and the Non-Debtor Affiliates based in Singapore, Mauritius, Malaysia, Indonesia, and Australia.    Where a Non-Debtor Affiliate holds excess cash based on forecasted needs, the Non-Debtor Affiliate transfers funds from its local Non-Debtor Affiliate Bank Account to the International Holding Account.    The funds are then manually transferred to the Operating Account.    Once in the Operating Account, the funds are swept to the Holding

Account for the Debtors' use.  Where Non-Debtor Affiliates lack sufficient liquidity to meet short-term working capital needs, the reverse occurs: funds move from the Holding Account to the Operating Account, on to the International Holding Account, and then to the target local Non-Debtor Affiliate Bank Account.

26.     For tax-related reasons, the Mexican and United Kingdom ("**U.K.**") Non-Debtor Affiliates do not use the International Holding Account to transfer funds to or receive funds from the Debtors.  The Mexican Non-Debtor Affiliates maintain both U.S. dollar ("**USD**") and Mexican peso ("**MXN**") accounts.  Their MXN-denominated customer deposits are made into an account maintained at Banamex (MXN).  The cash is then transferred to one of three operating accounts at Santander (MXN) for use in operations.  The Mexican Non-Debtor Affiliates' USD-denominated customer deposits are made into accounts maintained at Santander (USD) and Amegy (USD) (collectively, with the Santander (MXN) accounts, the "**Mexican Operating Accounts**").  In some cases, upon receipt of these USD-denominated deposits, MXN are purchased through a third-party exchange and transferred to the relevant Santander (MXN) account.

27.     At times, a Mexican Non-Debtor Affiliate's cash on hand may exceed its forecasted needs.  In these circumstances, the Mexican Non-Debtor Affiliate transfers cash to the Operating Account (via direct USD transfers or MXN foreign currency exchanges flowing through the Amegy (USD) account).  Conversely—where Mexican Non-Debtor Affiliates lack liquidity to meet short-term working capital needs—the Debtors transfer funds from the Holding Account to the Operating Account, and then manually to the Mexican Non-Debtor Affiliates' Amegy (USD) account.  Once in the Amegy (USD) account, the funds are used in operations (for

payments to vendors in USD) or further transferred to the Santander Bank (MXN) accounts through a third-party exchange (for disbursements in MXN).

28.     Similarly, the U.K. Non-Debtor Affiliate makes transfers to, and receives transfers from, the Debtors directly via the Operating Account instead of the International Holding Account.  Third-party cash—in British pounds—comes into and out of the U.K. Non-Debtor Affiliate through a local Non-Debtor Affiliate Bank Account at HSBC.  The U.K. Non-Debtor Affiliate holds its cash in that account.  When it has excess cash, the U.K. Non-Debtor Affiliate transfers funds to the Operating Account through a third-party exchange.  When the U.K. Non-Debtor Affiliate requires liquidity, the Debtors transfer funds from the Holding Account to the Operating Account, and then to the U.K. Non-Debtor Affiliate Bank Account (through a third-party exchange).

**E.     Intercompany Transactions**

29.     Historically, the Debtors have engaged in Intercompany Transactions largely to centralize cash management and maintain control over the funds moving within the Cal Dive Group.  As their financial position has deteriorated and consistent with requirements in their credit documents, however, the Debtors have borrowed excess cash from the Non-Debtor Affiliates to fund the Debtors' critical operating needs and meet the Debtors' debt obligations.  In addition to the other negative economic and business factors discussed in the First Day Declaration, these cash sweeps have depleted the Non-Debtor Affiliates' cash on hand, which, in turn, has required the Debtors to routinely provide the Non-Debtor Affiliates liquidity for operations.

30.     To preserve their equity interests in the Non-Debtor Affiliates, the Debtors believe that continuing these Intercompany Transactions is necessary.[7]  If the Debtors do not replenish the funds they have swept, the Non-Debtor Affiliates' businesses will be disrupted, damaging one of the estates' valuable assets.  Moreover, should any Non-Debtor Affiliate cease operations, the Debtors, which guarantee some Non-Debtor Affiliates' obligations, may face claims or causes of action.  In any event, not only would continuing the Intercompany Transactions during these cases preserve the Debtors' equity interests in the Non-Debtor Affiliates, but over the course of these cases the estates will likely benefit from anticipated cash inflows from the Non-Debtor Affiliates (including the Mexican Non-Debtor Affiliates' anticipated receipts).  The Debtors accordingly believe that continuing the Intercompany Transactions in the ordinary course is critical to preserving value.

31.     The Debtors also engage in Intercompany Transactions with a Non-Debtor Affiliate through vessel-leasing, or "charterparty," agreements.  Under these agreements, Debtor Affiliated Marine Contractors, Inc. ("**AMC**") charters vessels owned by CDOCI to HOC Offshore S de RL de CV ("**HOC**"), the Cal Dive Group's Mexican operating entity.  In exchange, HOC pays a charter fee to CDOCI (for the benefit of AMC).  This arrangement is beneficial to the estates because it compensates CDOCI for the use of its vessels while supporting the business operations of a critical subsidiary.

32.     The charterparty agreements between HOC and AMC also require Intercompany Transactions for foreign tax compliance.  The charterparty agreements create income tax obligations from AMC to the Mexican government, but because AMC is not a Mexican taxpayer, HOC pays the taxes on AMC's behalf.  HOC receives the funds to pay those

---

[7] Historically, the Debtors have only intermittently netted or partially repaid the intercompany balances created by these Intercompany Transactions.

tax obligations from the Debtors only as those tax obligations come due.  The failure to permit the Debtors to continue remitting payments to fund these foreign tax liabilities (and similar arrangements with Australian Non-Debtor Affiliates) could result in penalties against the Non-Debtor Affiliates, which might in turn assert claims against the Debtors.

33.    Just as the Debtors can ascertain, trace, and account for all external fund transfers in their accounting system, they also carefully and accurately track Intercompany Transactions.  Indeed, during these cases, the Debtors intend to segregate and separately track postpetition Intercompany Transactions and include a detailed accounting of such Intercompany Transaction in the Debtors' monthly operating reports.

34.    If the Intercompany Transactions were discontinued, the Cash Management System and the operations of the Debtors and Non-Debtor Affiliates alike would be harmed, all to the detriment of the Debtors and their estates.

**F.    DIP Facility Agreement**

35.    The DIP Facility Agreement includes certain provisions that would impact the Cash Management System.  The Debtors, the DIP Agent and the other parties to the DIP Facility Documents have agreed that, if, (i) as of any Friday, the aggregate Cash Balance in Domestic Accounts (other than the Restricted Cash Collateral Account) exceeds $7,500,000, on the following business day, the Debtors will cause the excess to be used to repay DIP Loans incurred under the DIP Order and other obligations in accordance with the DIP Facility Agreement, and (ii) at the end of any four consecutive business days, the aggregate Cash Balance in Foreign Accounts exceeds $5,000,000, on the following business day, the Debtors will cause the excess in such Foreign Accounts to be transferred to one or more of the Debtor Bank

Accounts.   The Debtors will provide evidence reasonably satisfactory to the DIP Agent of compliance with the foregoing.

36.     In addition, the DIP Facility Agreement requires Cal Dive to establish a deposit account at Bank of America, N.A. as a Restricted Cash Collateral Account that is under the dominion and control of the DIP Agent at all times while the DIP Loans are outstanding. Under the DIP Facility Agreement, the Restricted Cash Collateral Account will be funded as part of the waterfall of net cash proceeds required to be prepaid by the Debtors under the DIP Facility Agreement.  Funds maintained in the Restricted Cash Collateral Account may only be released to the Debtors upon the satisfaction of the conditions set forth in the DIP Facility Agreement, including the lack of any default under the DIP Facility Agreement, and may be used to fund disbursements and other expenditures in accordance with the Approved Budget (as defined in the DIP Facility Agreement), subject to the Permitted Variance (as defined in the DIP Facility Agreement).

## II.  LEGAL BASIS FOR RELIEF REQUESTED

### A.     The Debtors Should Be Authorized to Continue to Use Their Existing Cash Management System and Bank Accounts Under Bankruptcy Code Sections 363(c) and 105(a)

37.     Bankruptcy Code section 363(c)(1) permits a debtor to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) is to provide a debtor flexibility to operate its businesses without unnecessary creditor or court oversight.  *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets." (internal quotation omitted)).  Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" a debtor's

- 14 -

cash management system require.  *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996) (indicating that a debtor is "generally authorized to continue operating its business," including performing "routine transactions necessitated by the [existing] cash management system"); *Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (indicating that an order authorizing the debtor to employ a cash management system that was "usual and customary in the past" was "entirely consistent" with section 363(c)(1)).  Additionally, Bankruptcy Code section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

38.     The relief this Motion requests is consistent with these Bankruptcy Code provisions.  The Debtors seek authority to continue to use their Cash Management System and the Debtor Bank Accounts consistent with prepetition practices.  The Cash Management System is an ordinary-course and essential business practice that provides the Debtors significant benefits.  Through the Cash Management System, the Debtors maintain the ability to control corporate funds, ensuring maximum availability of funds when and where necessary.  The Cash Management System also reduces administrative burden expense by facilitating the global movement of funds across the Cal Dive Group.  Continued use of the Cash Management System and the Debtor Bank Accounts during these chapter 11 cases is essential to the Debtors' businesses and maximizing value of their estates.  Requiring the Debtors to adopt new cash management systems and open new bank accounts would be expensive, onerous, and disruptive.  As one court in this District recognized, a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash

accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part, rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).

39.     The Debtors represent that if the Court grants this Motion, they will not pay, and each of the banks will be directed not to pay, any prepetition claims, except as the Court authorizes.   Maintaining the Cash Management System and Debtor Bank Accounts without disruption is in the best interests of the Debtors, their estates, and all interested parties.   Based on the foregoing, the Court should grant the Debtors the authority under Bankruptcy Code sections 363(c) and 105(a) to continue the collection, concentration, and disbursement of cash under their Cash Management System.

**B.     The Debtors Should Be Granted a Waiver of Certain Requirements of the U.S. Trustee Under Bankruptcy Code Sections 363 and 105(a)**

40.     The Debtors further request that this Court grant a waiver of certain bank account and related U.S. Trustee requirements.   The U.S. Trustee has established operating guidelines for debtors in possession to supervise the administration of chapter 11 cases.   These guidelines require a chapter 11 debtor to, among other things (the requirements set forth in (a) through (e) below collectively, the "**UST Requirements**"):

(a)     close all existing bank accounts;

(b)     open new bank accounts in a depositary approved by the U.S. Trustee that are designated as DIP Accounts, with separate DIP Accounts established for an operating account, a tax account, and a payroll account;

(c)     obtain and utilize new checks for all DIP Accounts that bear the designation "Debtor In Possession" and contain other information about the debtor's chapter 11 case;

(d)     deposit all business revenues into the general operating DIP Account, with amounts needed to fund the other accounts being transferred to those accounts as necessary; and

(e)     deposit to the tax DIP Account sufficient funds to pay any tax liability (when incurred) associated with the debtor's payroll.

The UST Requirements are designed to provide a clear line of demarcation between a debtor's prepetition and postpetition transactions and operations, and to prevent inadvertent postpetition payment of prepetition claims.

41.    Under Bankruptcy Code sections 363 and 105(a), the Debtors seek a waiver of the UST Requirements that they close the Debtor Bank Accounts and open new DIP Accounts.   As discussed above, continued use of the Debtor Bank Accounts is essential to maximizing value of the Debtors' estates and is in the best interests of all parties.   Among other things, the continued use of the Debtor Bank Accounts prevents disruption to direct customer payments into these accounts and facilitates speed of collection for accounts receivables.   As set forth above, the Debtors do, however, request the authority to open any new bank accounts or close any existing bank accounts as they may deem necessary and appropriate in the ordinary course, in consultation with the DIP Agent and the Pre-Petition Junior Agent, and subject in all instances to the DIP Order and the DIP Facility Documents, provided that the Debtors give notice within 15 days after such opening of a new bank account or closing of an existing bank account to the U.S. Trustee and any statutory committees appointed in these chapter 11 cases, and provided further that the Debtors open any such new bank account at banks that have executed a Uniform Depositary Agreement with the U.S. Trustee, or at such banks willing to immediately execute such an agreement.

42.    The Debtors also seek a waiver of the UST Requirement to establish specific DIP Accounts for payroll and for tax payments and to deposit into the tax accounts sufficient funds to pay any payroll tax liability (when incurred).   The Debtors believe that their payroll and tax obligations are most efficiently met through the Debtor Bank Accounts in accordance with existing practices, and that requiring new payroll and tax DIP Accounts would

- 17 -

be both unnecessary and highly disruptive to their businesses.  The Debtors are—and expect to remain—current on all payroll taxes.[8]  Requiring the Debtors to change their existing practices and deposit sufficient funds to pay any tax liability associated with the Debtors' payroll would, therefore, be unnecessary and inefficient.  Further, the Debtors will ensure that the U.S. Trustee can appropriately monitor that the Debtors' payroll taxes are satisfied.

43.     To minimize expense, the Debtors seek authority to continue using checks, substantially in the forms existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession.  The Debtors also seek authority to use all correspondence and other business forms, including, but not limited to, purchase orders, multicopy checks, letterhead, envelopes, promotional materials, and other business forms, substantially in the forms existing immediately before the Petition Date without reference to the Debtors' status as debtors in possession.[9]

44.     As required, the Debtors are providing notice of the commencement of these cases to creditors and parties in interest.  Parties doing business with the Debtors, therefore, should be aware of the Debtors' status as debtors in possession.  Changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates.  Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.  For these reasons, the Debtors request that they be authorized to use existing check stocks and all correspondence and business forms without being required to label them "Debtor In Possession;"

---

[8] As noted above, the Debtors have also filed a motion for authority to continue paying employee wages, benefits, and related taxes.

[9] Although the UST Requirements would require the Debtors to obtain and use new checks bearing the "Debtor In Possession" designation, the Debtors do not believe that the UST Requirements impose any limitation on the Debtors' other correspondence and business forms.  Nevertheless, out of an abundance of caution, the Debtors seek authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.

- 18 -

provided that once the Debtors' existing checks have been used, the Debtors will, when reordering checks, require the designation "Debtor in Possession" and the corresponding bankruptcy case number on all checks; provided further that, with respect to electronic checks that the Debtors or their agents print themselves, the Debtors will begin printing the "Debtor in Possession" legend on such items within 10 days of entry of the Interim Order.

45.     As indicated above, the Cash Management System is an ordinary course and essential business practice. Compelling the Debtors to alter their current cash management practices and to modify the Cash Management System to comply with the UST Requirements outlined above would risk disruption to the Debtors' businesses and jeopardize the Debtors' ability to maximize value for any parties in interest.

## C.     The Debtors Should Be Authorized to Continue Their Deposit Practices Under Bankruptcy Code Section 345

46.     Bankruptcy Code section 345(a) governs a debtor's deposit of cash during a chapter 11 case and authorizes deposits of estate money that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit." 11 U.S.C. § 345(a). If a deposit is not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," Bankruptcy Code section 345(b) requires the debtor to obtain from the entity with which the money is deposited a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety. *Id.* § 345(b). Alternatively, the estate may require the entity to deposit governmental securities under 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may provide a governmental obligation.

RLF1 11599056v.1

47.     While the Debtors believe they are in compliance with Bankruptcy Code section 345(b), to the extent they are not, the Debtors submit that given their limited liquidity and need to conserve cash, incurring administrative expense complying with section 345(b) would unnecessarily drain scarce resources.  As noted above, each of the Debtor Bank Accounts are insured by the FDIC and, as such, other than the Holdings Account (which has a balance above $250,000), comply with Bankruptcy Code section 345(b).  The Debtors also believe that, under their investment practices, all deposits and investments are made into deposit accounts, money market accounts, and other investment vehicles that in turn invest only in assets, securities or other instruments insured or guaranteed or collateralized by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States.   The Debtors request that such deposit practices be deemed to satisfy Bankruptcy Code section 345(b).

48.     The Debtors understand that Amegy has signed a Uniform Depositary Agreement with the U.S. Trustee, but to the extent that any banks have not signed such an agreement and to the extent the Debtors as of the Petition Date do not otherwise comply with deposit and investment guidelines under Bankruptcy Code section 345(b), the Debtors request a 30-day extension (or such further extension as the U.S. Trustee may agree to) to do so.  During the extension period, the Debtors propose to engage the U.S. Trustee in discussions to determine if compliance with section 345(b)—to the extent not already met—and other U.S. Trustee requirements (to the extent not waived) is necessary or appropriate.

49.     The Debtors believe that the benefits of the requested extension far outweigh any harm to the estates.  *See generally In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (noting that some of the factors to consider in determining whether

RLF1 11599056v.1

cause exists for "relief from the strictures of § 345(b)" is whether benefits to the debtor outweigh the harm, if any, to the estate).  During the extension period, the Debtors will contact each of their banks that is a party to a Uniform Depository agreement with the U.S. Trustee, provide such banks with each of the Debtors' tax identification numbers, and identify each of their bank accounts at the banks as being held by a debtor in possession.  For banks that are not party to a Uniform Depository agreement with the U.S. Trustee, the Debtors will use good-faith efforts to cause the banks to execute a Uniform Depository agreement in a form prescribed by the U.S. Trustee.  The Debtors' deposits and investments are prudent and designed to yield the maximum reasonable net return on the funds deposited or invested, taking into account the safety of such deposits and investments.  The Debtors operate sophisticated businesses and hold their funds at reputable, stable banking institutions and monitor their cash flows and positions on a daily basis.

50.     Similar extensions have been granted in other chapter 11 cases in this District and elsewhere.[10]  Requiring the Debtors to modify their Cash Management System to strictly adhere with the deadline to comply with the requirements established by Bankruptcy Code section 345(b) will only distract the Debtors' management and cause the Debtors' estates to incur potentially substantial costs unnecessarily to the detriment of all creditors.  Based on the foregoing, the Debtors submit that the relief requested is in the best interests of their estates and any interested parties, and, therefore, should be granted.

---

[10] *See*, *e.g.*, *In re Endeavour Operating Corporation*, No. 14-12308 (KJC) (Bankr. D. Del. Nov. 6, 2014) (D.I. 149) (granting 30-day extension);  *In re Energy Futures Holding Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Apr. 29, 2014) (D.I. 304) (granting 60-day extension); *In re Brookstone Holdings Corp.*, No. 14-10752 (BLS) (Bankr. D. Del. Apr. 4, 2014) (D.I. 77) (granting 60-day extension); *In re Quantum Foods, LLC,* No. 14-10318 (KJC) (Bankr. D. Del. Feb. 20, 2014) (D.I. 38) (granting 45-day extension); *In re Event Rentals Inc.*, No. 14-10282 (PJW) (Bankr. D. Del. Feb. 20, 2014) (D.I. 48) (granting 60-day extension).

**D.    The Debtors Should Be Authorized to Continue Intercompany Transactions in the Ordinary Course of Business, and Such Transactions Should Be Granted Administrative Expense Priority**

51.    As noted above, the Intercompany Transactions are made between and among the Debtors and Non-Debtor Affiliates in the ordinary course.  As a result, at any given time there may be intercompany claims between a Debtor and a Non-Debtor Affiliate.  Because the Debtors engage in the Intercompany Transactions regularly and such transactions are common among enterprises like the Debtors, the Intercompany Transactions are ordinary course transactions under Bankruptcy Code section 363(c)(1) and do not require Court approval.  Nonetheless, out of an abundance of caution, the Debtors seek authority to engage in such transactions postpetition.

52.    Moreover, ordinary-course Intercompany Transactions are integral to ensure the Debtors are able to operate their businesses as debtors in possession and to preserve valuable estate assets.  Absent the Intercompany Transactions, the Cash Management System would be severely disrupted, and the Debtors' businesses in turn would be materially harmed.  The Debtors would be unable to centralize and control cash management, exposing the Debtors to the risks of cash leakage and misallocation of critical resources.  Moreover, the Intercompany Transactions provide the Debtors access to liquidity that may be necessary to fund ongoing operations.    Accordingly,  the  Debtors  respectfully  submit  that  the  authority  to  make Intercompany Transactions in the ordinary course is in the best interest of their estates.

53.    Likewise, permitting the Debtors to fund Non-Debtor Affiliates where necessary is vital to the preserving of the value of the Debtors' estates.  The Debtors' direct and indirect equity interests in the Non-Debtor Affiliates are among the estates' most valuable assets.  The Non-Debtor affiliates contribute substantial value to the Debtors' estates through ongoing

- 22 -

projects worldwide—projects they have heavily invested in and may not be able to complete without Intercompany Transactions from the Debtors.

54.     Ceasing the Intercompany Transactions also could dramatically disrupt the Non-Debtor Affiliates' operations.  This would then deprive the Debtors of cash flow and profits from the Non-Debtor Affiliates, and could diminish, if not eviscerate, the value of the Debtors' equity investments in the Non-Debtor Affiliates.  Moreover, shutting down certain of the Non-Debtor Affiliates could lead to claims against the Debtors for obligations that they have guaranteed on behalf of the Non-Debtor Affiliates and tax obligations that the Non-Debtor Affiliates remit to foreign governments on the Debtors' behalf.  And, critically, the Debtors anticipate that continuing the Intercompany Transactions will result in an aggregate net inflow of cash to the Debtors' estates from the Non-Debtor Affiliates (including the Mexican Non-Debtor Affiliates' anticipated receipts) during these cases.  In sum, failure to permit Intercompany Transactions likely would lead to a substantial diminution in the value of the Debtors' estates and significant dilution to the recoveries of the Debtors' creditors.

55.     Finally, the Debtors respectfully request, under Bankruptcy Code section 503(b)(1), that all payments between any Debtor and any other member of the Cal Dive Group on account of a postpetition Intercompany Transaction be accorded administrative expense priority, subject, in all instances, to the claims granted superpriority administrative expense status under the DIP Order.  This relief will ensure that each member of the Cal Dive Group will continue to bear ultimate repayment responsibility for such ordinary course transactions.[11]

---

[11] The Bankruptcy Code also provides a debtor in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without a notice and a hearing.  11 U.S.C. § 364(a); *In re Amdura Corp.*, 75 F.3d at 1453; *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 247 B.R. 38, 45 (S.D.N.Y. 2000); *Mulligan v. Sobiech*, 131 B.R. 917, 921 (S.D.N.Y. 1991).  The Debtors, therefore, seek authorization, to the extent necessary, to obtain unsecured credit in connection with the Intercompany Transactions and in the ordinary operation of their Cash Management System.

- 23 -

56.     Similar relief has been granted in other multi-debtor chapter 11 cases in this and other Districts.[12]

**E.      Interim Relief Is Necessary to Avoid Immediate and Irreparable Harm**

57.     Under Federal Rule of Bankruptcy Procedure 6003, the Court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within 21 days after the chapter 11 case's commencement to the extent "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as set forth in the First Day Declaration, and relief on an interim basis is therefore appropriate under Federal Rule of Bankruptcy Procedure 6003, if applicable.[13]

58.     The urgency of the relief requested justifies immediate relief.  To ensure the relief requested is implemented immediately, the Debtors request that the Court waive the notice requirements under Federal Rule of Bankruptcy Procedure 6004(a), if applicable, and the 14-day stay of an order authorizing the use, sale, or lease of property under Federal Rule of Bankruptcy Procedure 6004(h).

<u>RESERVATION OF RIGHTS</u>

59.     Nothing contained in this Motion is an admission of the validity of any claim against the Debtors, a waiver of the Debtors' or any other party's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code section 365.  If this Court grants the relief requested in this Motion, any Court-authorized

---

[12] *See, e.g. In re Endeavour Operating Corporation*, No. 14-12308 (KJC) (Bankr. D. Del. Nov. 6, 2014) (D.I. 149); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 27, 2014) (D.I. 99); *In re the Dolan Company*, No. 14-10614 (BLS) (Bankr. D. Del. Mar. 25, 2014) (D.I. 82); *In re QCE Finance LLC*, No. 14-10543 (PJW) (Bankr. D. Del. Mar. 17, 2014) (D.I. 41); *In re ICL Holding Co. (f/k/a LCI Holding Co.)*, No. 12-13319 (KG) (Bankr. D. Del. Dec. 14, 2012) (D.I. 84).

[13] See the First Day Declaration filed concurrently with this Motion.

payment is not an admission of the validity of any claim or a waiver of the Debtors' or any other party's rights to subsequently dispute such claim.  In addition, authorization to pay the claims described in this Motion will not be deemed a direction to the Debtors to pay such claims.

## NOTICE

60.    The Debtors will provide notice of this Motion by facsimile, e-mail, overnight delivery, or hand delivery to: (i) Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to Bank of America, N.A., as the Pre-Petition Senior Agent under the Pre-Petition Senior Loan Agreement and the DIP Facility Agreement (as defined in the DIP Order); (iv) counsel to ABC Funding, LLC, as the Pre-Petition Junior Agent under the Pre-Petition Junior Loan Agreement; (v) Bank of New York Mellon Trust Company, N.A., as the Indenture Trustee for the Convertible Notes; and (vi) the Internal Revenue Service.  Following the hearing, a copy of this Motion and any order entered with respect to it will be served on the foregoing parties and all parties having filed requests for notice in these chapter 11 cases.  A copy of the Motion is also available on the Debtors' case website at https://www.kccllc.net/caldive.

61.    As this Motion is seeking "first day" relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the relief requested, the Debtors submit that no other or further notice is necessary.

## NO PRIOR MOTION

62.    The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other.

- 25 -

The Debtors respectfully request entry of interim and final orders granting the relief requested in its entirety and any other relief as is just and proper.

Dated:      March 3, 2015
            Wilmington, Delaware

                                    */s/ Mark D. Collins*
                                    **RICHARDS, LAYTON & FINGER, P.A.**
                                    Mark D. Collins (No. 2981)
                                    Michael J. Merchant (No. 3854)
                                    One Rodney Square
                                    920 North King Street
                                    Wilmington, Delaware 19801
                                    Telephone:  (302) 651-7700
                                    Facsimile:  (302) 651-7701

                                    - and -

                                    **O'MELVENY & MYERS LLP**
                                    George A. Davis (*pro hac vice* pending)
                                    Andrew M. Parlen* (*pro hac vice* pending)
                                    Daniel S. Shamah (*pro hac vice* pending)
                                    Times Square Tower
                                    Seven Times Square
                                    New York, NY 10036
                                    Telephone:  (212) 326-2000
                                    Facsimile:  (212) 326-2061

                                    Suzzanne S. Uhland (*pro hac vice* pending)
                                    Two Embarcadero Center
                                    28th Floor
                                    San Francisco, CA 94111
                                    Telephone:  (415) 984-8700
                                    Facsimile:  (415) 984-8701

                                    Proposed Attorneys for the
                                    Debtors and Debtors in Possession

                                    *Admitted in CA; Not Admitted to Practice in NY

## Exhibit A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x

In re:

CAL DIVE INTERNATIONAL, INC., *et al*.,[1]

Debtors.

-------------------------------------------------------------x

: Chapter 11
:
: Case No. 15-10458 (   )
:
:
: Joint Administration Requested
:
: Related Docket No. ___

**INTERIM ORDER (I) AUTHORIZING CONTINUED USE OF EXISTING
CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS; (II) WAIVING
CERTAIN UNITED STATES TRUSTEE REQUIREMENTS;
(III) AUTHORIZING CONTINUED PERFORMANCE OF INTERCOMPANY
TRANSACTIONS; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the Debtors for entry of an interim order (this

"**Order**"):   (i) authorizing the Debtors to continue to use their centralized cash management

system (the "**Cash Management System**") and bank accounts located at various banks, as more

fully set forth in the Motion; (ii) waiving certain bank account and related requirements of the

Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**");

(iii) authorizing the Debtors to continue their existing deposit practices under the Cash

Management System (subject to certain reasonable changes to the Cash Management System that

the Debtors may implement, including as required under the DIP Facility Agreement);

(iv) extending time to comply with Bankruptcy Code section 345(b); and (v) authorizing

Intercompany Transactions (as defined below) consistent with historical practice and granting

administrative expense priority to Intercompany Transactions, all as more fully set forth in the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Cal Dive International, Inc. (0501), Cal Dive Offshore Contractors, Inc. (4878), Affiliated Marine Contractors, Inc. (8678), Fleet Pipeline Services, Inc. (2104), Gulf Offshore Construction, Inc. (2106), and CDI Renewables, LLC (4985).  The Debtors' corporate headquarters is at 2500 CityWest Boulevard, Suite 2200, Houston, TX 77042.

[2] Capitalized terms used but not defined in this Order have the meanings used in the Motion.

Motion; and due and sufficient notice of the Motion having been provided under the particular circumstances, and it appearing that no other or further notice need be provided; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and a hearing having been held to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the First Day Declaration, the record of the Hearing, and all the proceedings before the Court; and the Court having found and determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Federal Rule of Bankruptcy Procedure 6003, and that such relief is in the best interests of the Debtors, their estates and creditors, and any parties in interest; and that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation thereon and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The final hearing (the "**Final Hearing**") on the Motion will be held on _____, 2015, at__:__ _.m. (prevailing Eastern Time).  Any objections or responses to entry of a final order on the Motion must be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2015, and served on the following parties:   (i) Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to Bank of America, N.A., as the Pre-Petition Senior Agent under the Pre-Petition Senior Loan Agreement and the DIP Facility Agreement (as defined in the DIP Order); (iv) counsel to ABC Funding, LLC, as the Pre-Petition

Junior Agent under the Pre-Petition Junior Loan Agreement; (v) Bank of New York Mellon Trust Company, N.A., as the Indenture Trustee for the Convertible Notes; and (vi) the Internal Revenue Service. A copy of the Motion and this Order will be served on the foregoing parties and all parties having filed requests for notices in these chapter 11 cases. Due to the nature of the relief requested in the Motion, no other or further notice need be given. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3.      Except as otherwise provided herein, the Debtors are authorized and empowered to continue to maintain and use their Cash Management System and bank accounts consistent with their prepetition practices, subject to the DIP Order and the DIP Facility Documents.

4.      The Debtors are authorized to implement such changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, opening any new bank accounts or closing any of the bank accounts in consultation with the DIP Agent and the Pre-Petition Junior Agent, and to the extent that such changes to the Cash Management System do not violate the DIP Order and the DIP Facility Documents. The banks are authorized to honor the Debtors' requests to close such bank accounts in connection with authorized changes to the Cash Management System. Without limiting the foregoing, the Debtors shall designate and maintain the Restricted Cash Collateral Account in a manner consistent with the DIP Order and DIP Facility Documents.

5.      The Debtors are authorized but not directed to (i) maintain and continue to use their existing bank accounts that are listed on Exhibit C to the Motion (the "**Debtor Bank Accounts**"), in the same manner and with existing account numbers, styles, and document forms

as are currently employed; (ii) deposit funds in, and withdraw funds from, the Debtor Bank Accounts by usual means, including check, wire transfer, automated clearinghouse transfer, draft, electronic fund transfer, or other items presented, issued, or drawn on the Debtor Bank Accounts; (iii) pay prepetition and ordinary course bank fees for the Debtor Bank Accounts; (iv) perform their obligations under the Debtor Bank Accounts' governing documents and agreements; and (v) treat the Debtor Bank Accounts for all purposes as "debtor in possession" accounts ("**DIP Accounts**").

6.      Wells Fargo is authorized under the Wells Fargo Collateral Account to make advances from time to time on behalf of Cal Dive with a maximum aggregate exposure of $100,000.  Cal Dive will continue to maintain at all times a minimum of $100,000 in the Wells Fargo Collateral Account.  Wells Fargo has and will continue to have a valid and perfected, non-avoidable first-priority lien on the funds in the Wells Fargo Collateral Account to secure the Wells Fargo Commercial Card Obligations.  Such lien is a Permitted Prior Lien (as defined in the DIP Order), and may not be primed by any lien granted to any post-petition lender or other person.

7.      All banks are authorized and directed to continue to administer, service, and maintain the Debtor Bank Accounts, as they were prepetition, without interruption and in the ordinary course, and to receive, process, honor, and pay any and all checks, drafts, wires, automated clearinghouse transfers, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Accounts (collectively, the "**Disbursements**") on account of any claim arising before the Petition Date that this Court has granted the Debtors approval to pay, provided the applicable Debtor Bank Accounts contain sufficient funds and such payments are

RLF1 11599056v.1

consistent with the budget attached to the order approving the Debtors' post-petition financing facility.

8.    All banks are authorized and directed to accept and honor all representations from the Debtors as to which of these Disbursements should be honored.  If any banks nevertheless dishonor Court-approved Disbursements, the Debtors are authorized to issue replacement Disbursements consistent with the orders of this Court.  No bank will be liable to the Debtors or their estates, or otherwise be in violation of the orders of this Court, for honoring a prepetition Disbursement or other Disbursement at the Debtors' direction.

9.    Notwithstanding anything to the contrary set forth herein, the Debtors are authorized to continue performing Intercompany Transactions arising from or related to the operation of their businesses in the ordinary course, subject to, and in accordance with, the DIP Order.

10.    All payments from any postpetition Intercompany Transactions authorized hereunder are hereby accorded administrative expense priority under Bankruptcy Code section 503(b), subject and subordinate, in all instances, to the claims granted superpriority administrative expense status under the DIP Order.  In connection with the Intercompany Transactions (including, without limitation, with respect to the charterparty arrangements between HOC and AMC described in the Motion), the Debtors must continue to maintain current records with respect to all transfers of cash so that all transactions, including Intercompany Transactions, may be readily ascertained, traced, properly recorded, and distinguished between prepetition and postpetition transactions on intercompany accounts, shall make such records available to the DIP Agent upon reasonable request, and must include a detailed accounting of such Intercompany Transactions in the Debtors' monthly operating reports.

RLF1 11599056v.1

11.     The UST Requirement that the Debtors close all existing bank accounts and open new DIP Accounts is hereby waived.  The Debtor Bank accounts are deemed to be DIP Accounts.

12.     The UST Requirement that the Debtors open separate DIP Accounts for payroll and taxes is hereby waived.

13.     The Debtors are authorized to continue using all checks, correspondence, and other business forms, including, but not limited to, purchase orders, multicopy checks, letterhead, envelopes, promotional materials, and other business forms, substantially in the forms existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession; provided that once the Debtors' existing checks have been used, the Debtors will, when reordering checks, require the designation 'Debtor in Possession' and the corresponding bankruptcy case number on all checks; provided further that, with respect to electronic checks and checks which the Debtors or their agents print themselves, the Debtors will begin printing the 'Debtor in Possession' legend on such items within 10 days of the date of entry of this Order.

14.     For cash management banks that have not signed a Uniform Depository Agreement with the U.S. Trustee, the Debtors have 30 days (or such additional time as the U.S. Trustee may agree to) from the Petition Date (the "**Extension Period**") within which to comply with Bankruptcy Code section 345(b) or to make such other arrangements as agreed with the U.S. Trustee, and that such extension is without prejudice to the Debtors' right to request a further extension of the Extension Period or waiver of the requirements of Bankruptcy Code section 345(b) in these cases. For cash management banks that have signed a Uniform Depository Agreement with the U.S. Trustee, all Debtor Bank Accounts with such banks are deemed to satisfy Bankruptcy Code section 345(b).

15.    Within 15 days of the date of entry of this Order, with respect to banks at which the Debtors hold bank accounts that are party to a Uniform Depository agreement with the U.S. Trustee, the Debtors must (i) contact each bank; (ii) provide the bank with each of the Debtors' tax identification numbers; and (iii) identify each of their bank accounts held at such bank as being held by a debtor in possession in a bankruptcy case.

16.    Within 30 days of the date of entry of this Order, with respect to banks at which the Debtors hold accounts that are not party to a Uniform Depository agreement with the U.S. Trustee, the Debtors must use their good-faith efforts to cause the banks to execute a Uniform Depository agreement in a form prescribed by the U.S. Trustee.  The Debtors will promptly direct such banks to internally code the Debtors' bank accounts as DIP Accounts.  The U.S. Trustee's rights to seek relief from this Court on notice in the event that the aforementioned banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully reserved.

17.    To the extent the Debtors seek to open any new bank accounts or close any existing bank accounts as permitted pursuant to paragraph 4 hereof, the Debtors shall give notice within 15 days after such opening of a new bank account or closing of an existing bank account to the U.S. Trustee and any statutory committees appointed in these chapter 11 cases; **provided**, **further**, however that the Debtors open any such new bank account at banks that have executed a Uniform Depository agreement with the U.S. Trustee, or at such banks that are willing to immediately execute such an agreement.

18.    Despite the use of a consolidated cash management system, the Debtors will calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on disbursements made for the benefit of each Debtor, regardless of whether such Debtor actually makes such disbursements.

19.     Notwithstanding anything to the contrary contained herein, any payment authorized under this Order will be subject to the DIP Order, including, but not limited to the Budget (as defined in the DIP Order).

20.     Nothing in the Motion or this Order or the relief granted (including any actions taken or payments made by the Debtors) will be construed as (i) an admission of the validity of any claim against the Debtors; (ii) an admission with respect to the validity, extent, or perfection of any lien; (iii) a waiver of the Debtors' rights or those of any party in interest to dispute, contest, setoff, or recoup any claim, or assert any rights, claims, or defenses related thereto; (iv) a waiver of the Debtors' rights or those of any party in interest over the validity, extent, perfection, or possible avoidance of any lien; or (v) an approval or assumption of any agreement, contract, program, policy or lease under Bankruptcy Code section 365.

21.     The requirements set forth in Federal Rule of Bankruptcy Procedure 6004(a) are hereby waived.

22.     Notwithstanding the applicability of Federal Rule of Bankruptcy Procedure 6004, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

23.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

24.     This Court will retain jurisdiction over all matters arising from or related to the implementation or interpretation of this Order.

Dated: _____, 2015
      Wilmington, Delaware

_____
            United States Bankruptcy Judge

## Exhibit B

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------x

|   |   |
|---|---|
| In re: | : Chapter 11 |
|   | : |
| CAL DIVE INTERNATIONAL, INC., *et al.*,[1] | : Case No. 15-10458 (   ) |
|   | : |
| Debtors. | : (Jointly Administered) |
|   | : |
|   | : Related Docket No. ___ |

------------------------------------------------------------x

**FINAL ORDER (I) AUTHORIZING CONTINUED USE OF EXISTING
CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS; (II) WAIVING
CERTAIN UNITED STATES TRUSTEE REQUIREMENTS;
(III) AUTHORIZING CONTINUED PERFORMANCE OF INTERCOMPANY
TRANSACTIONS; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the Debtors for entry of a final order (this

"**Order**"):  (i) authorizing the Debtors to continue to use their centralized cash management

system (the "**Cash Management System**") and bank accounts located at various banks, as more

fully set forth in the Motion; (ii) waiving certain bank account and related requirements of the

Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**");

(iii) authorizing the Debtors to continue their existing deposit practices under the Cash

Management System (subject to certain reasonable changes to the Cash Management System that

the Debtors may implement, including as required under the DIP Facility Agreement);

(iv) extending time to comply with Bankruptcy Code section 345(b); and (v) authorizing

Intercompany Transactions (as defined below) consistent with historical practice and granting

administrative expense priority to Intercompany Transactions, all as more fully set forth in the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Cal Dive International, Inc. (0501), Cal Dive Offshore Contractors, Inc. (4878), Affiliated Marine Contractors, Inc. (8678), Fleet Pipeline Services, Inc. (2104), Gulf Offshore Construction, Inc. (2106), and CDI Renewables, LLC (4985).  The Debtors' corporate headquarters is at 2500 CityWest Boulevard, Suite 2200, Houston, TX 77042.

[2] Capitalized terms used but not defined in this Order have the meanings used in the Motion.

Motion; and due and sufficient notice of the Motion having been provided under the particular circumstances, and it appearing that no other or further notice need be provided; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and that this Court may enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and hearings having been held to consider the relief requested in the Motion on an interim basis and on a final basis (together the "**Hearings**"); and the Court having entered an order granting the Motion on an interim basis; and upon the First Day Declaration, the record of the Hearings, and all the proceedings before the Court; and the Court having found and determined that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and any parties in interest; and that the legal and factual bases set forth in the Motion and at the Hearings establish just cause for the relief granted herein; and after due deliberation thereon and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein on a final basis.

2.      Except as otherwise provided herein, the Debtors are authorized and empowered to continue to maintain and use their Cash Management System and bank accounts consistent with their prepetition practices, subject to the DIP Order and the DIP Facility Documents.

3.      The Debtors are authorized to implement such changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, opening any new bank accounts or closing any of the bank accounts, in consultation

with the DIP Agent and the Pre-Petition Junior, and to the extent that such changes to the Cash Management System do not violate the DIP Order and the DIP Facility Documents. The banks are authorized to honor the Debtors' requests to close such bank accounts in connection with authorized changes to the Cash Management System. Without limiting the foregoing, the Debtors shall designate and maintain the Restricted Cash Collateral Account in a manner consistent with the DIP Order and the DIP Facility Documents.

4.    The Debtors are authorized but not directed to (i) maintain and continue to use their existing bank accounts that are listed on Exhibit C to the Motion (the "**Debtor Bank Accounts**"), in the same manner and with existing account numbers, styles, and document forms as are currently employed; (ii) deposit funds in, and withdraw funds from, the Debtor Bank Accounts by usual means, including check, wire transfer, automated clearinghouse transfer, draft, electronic fund transfer, or other items presented, issued, or drawn on the Debtor Bank Accounts; (iii) pay prepetition and ordinary course bank fees for the Debtor Bank Accounts; (iv) perform their obligations under the Debtor Bank Accounts' governing documents and agreements; and (v) treat the Debtor Bank Accounts for all purposes as "debtor in possession" accounts ("**DIP Accounts**").

5.    Wells Fargo is authorized under the Wells Fargo Collateral Account to make advances from time to time on behalf of Cal Dive with a maximum aggregate exposure of $100,000. Cal Dive will continue to maintain at all times a minimum of $100,000 in the Wells Fargo Collateral Account. Wells Fargo has and will continue to have a valid and perfected, non-avoidable first-priority lien on the funds in the Wells Fargo Collateral Account to secure the Wells Fargo Commercial Card Obligations. Such lien is a Permitted Prior Lien (as defined in the

- 3 -

DIP Order), and may not be primed by any lien granted to any post-petition lender or other person.

6.      All banks are authorized and directed to continue to administer, service, and maintain the Debtor Bank Accounts, as they were prepetition, without interruption and in the ordinary course, and to receive, process, honor, and pay any and all checks, drafts, wires, automated clearinghouse transfers, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Accounts (collectively, the "**Disbursements**") on account of any claim arising before the Petition Date that this Court has granted the Debtors approval to pay, provided the applicable Debtor Bank Accounts contain sufficient funds and such payments are consistent with the budget attached to the order approving the Debtors' post-petition financing facility.

7.      All banks are authorized and directed to accept and honor all representations from the Debtors as to which of these Disbursements should be honored.  If any banks nevertheless dishonor Court-approved Disbursements, the Debtors are authorized to issue replacement Disbursements consistent with the orders of this Court.  No bank will be liable to the Debtors or their estates, or otherwise be in violation of the orders of this Court, for honoring a prepetition Disbursement or other Disbursement at the Debtors' direction.

8.      Notwithstanding anything to the contrary set forth herein, the Debtors are authorized to continue performing Intercompany Transactions arising from or related to the operation of their businesses in the ordinary course, subject to, and in accordance with, the DIP Order.

9.      All payments from any postpetition Intercompany Transactions authorized hereunder are hereby accorded administrative expense priority under Bankruptcy Code section

- 4 -

503(b), subject and subordinate, in all instances, to the claims granted superpriority administrative expense status under the DIP Order.  In connection with the Intercompany Transactions (including, without limitation, with respect to the charterparty arrangements between HOC and AMC described in the Motion), the Debtors must continue to maintain current records with respect to all transfers of cash so that all transactions, including Intercompany Transactions, may be readily ascertained, traced, properly recorded, and distinguished between prepetition and postpetition transactions on intercompany accounts, shall make such records available to the DIP Agent upon reasonable request, and must include a detailed accounting of such Intercompany Transactions in the Debtors' monthly operating reports.

10.    The UST Requirement that the Debtors close all existing bank accounts and open new DIP Accounts is hereby waived.  The Debtor Bank accounts are deemed to be DIP Accounts.

11.    The UST Requirement that the Debtors open separate DIP Accounts for payroll and taxes is hereby waived.

12.    The Debtors are authorized to continue using all checks, correspondence, and other business forms, including, but not limited to, purchase orders, multicopy checks, letterhead, envelopes, promotional materials, and other business forms, substantially in the forms existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession; provided that once the Debtors' existing checks have been used, the Debtors will, when reordering checks, require the designation 'Debtor in Possession' and the corresponding bankruptcy case number on all checks; provided further that, with respect to electronic checks and checks which the Debtors or their agents print themselves, the Debtors will begin printing

the 'Debtor in Possession' legend on such items within ten (10) days of the date of entry of this Order.

13.    For cash management banks that have not signed a Uniform Depository Agreement with the U.S. Trustee, the Debtors have 30 days (or such additional time as the U.S. Trustee may agree to) from the Petition Date (the "**Extension Period**") within which to comply with Bankruptcy Code section 345(b) or to make such other arrangements as agreed with the U.S. Trustee, and that such extension is without prejudice to the Debtors' right to request a further extension of the Extension Period or waiver of the requirements of Bankruptcy Code section 345(b) in these cases. For cash management banks that have signed a Uniform Depository Agreement with the U.S. Trustee, all Debtor Bank Accounts with such banks are deemed to satisfy Bankruptcy Code section 345(b).

14.    Within 15 days of the date of entry of this Order, with respect to banks at which the Debtors hold bank accounts that are party to a Uniform Depository agreement with the U.S. Trustee, the Debtors must (i) contact each bank; (ii) provide the bank with each of the Debtors' tax identification numbers; and (iii) identify each of their bank accounts held at such bank as being held by a debtor in possession in a bankruptcy case.

15.    Within 30 days of the date of entry of this Order, with respect to banks at which the Debtors hold accounts that are not party to a Uniform Depository agreement with the U.S. Trustee, the Debtors must use their good-faith efforts to cause the banks to execute a Uniform Depository agreement in a form prescribed by the U.S. Trustee. The Debtors will promptly direct such banks to internally code the Debtors' bank accounts as DIP Accounts. The U.S. Trustee's rights to seek relief from this Court on notice in the event that the aforementioned

banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully reserved.

16.     To the extent the Debtors seek to open any new bank accounts or close any existing bank accounts as permitted pursuant to paragraph 3 hereof, the Debtors shall give notice within 15 days after such opening of a new bank account or closing of an existing bank account to the U.S. Trustee and any statutory committees appointed in these chapter 11 cases; **provided**, **further**, however that the Debtors open any such new bank account at banks that have executed a Uniform Depository agreement with the U.S. Trustee, or at such banks that are willing to immediately execute such an agreement.

17.     Despite the use of a consolidated cash management system, the Debtors will calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on disbursements made for the benefit of each Debtor, regardless of whether such Debtor actually makes such disbursements.

18.     Notwithstanding anything to the contrary contained herein, any payment authorized under this Order will be subject to the DIP Order, including, but not limited to the Budget (as defined in the DIP Order).

19.     Nothing in the Motion or this Order or the relief granted (including any actions taken or payments made by the Debtors) will be construed as (i) an admission of the validity of any claim against the Debtors; (ii) an admission with respect to the validity, extent, or perfection of any lien; (iii) a waiver of the Debtors' rights or those of any party in interest to dispute, contest, setoff, or recoup any claim, or assert any rights, claims, or defenses related thereto; (iv) a waiver of the Debtors' rights or those of any party in interest over the validity, extent, perfection, or possible avoidance of any lien; or (v) an approval or assumption of any agreement, contract, program, policy, or lease under Bankruptcy Code section 365.

20.     The requirements set forth in Federal Rule of Bankruptcy Procedure 6004(a) are hereby waived.

21.     Notwithstanding the applicability of Federal Rule of Bankruptcy Procedure 6004, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

22.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

23.     This Court will retain jurisdiction over all matters arising from or related to the implementation or interpretation of this Order.


Dated: _____, 2015
       Wilmington, Delaware


_____
          United States Bankruptcy Judge

RLF1 11599056v.1

**Exhibit C**

**Debtor Bank Accounts List**

| Account Holder | Bank | Account Number | Description |
|---|---|---|---|
| Cal Dive | Amegy | -3955 | Holding Account |
| CDOCI | Amegy | -5492 | Operating Account |
| CDOCI | Amegy | -5876 | Zero-balance account linked to Operating Account to honor hard-copy checks |
| CDOCI | Amegy | -7557 | Domestic Payroll Account |
| GOCI | Amegy | -9900 | Inactive |
| Cal Dive | Wells Fargo | -8915 | Purchase card account |
| Cal Dive | Wells Fargo | -5186 | Purchase card cash collateral account |

C-1

**Exhibit D**

**Non-Debtor Affiliate Bank Accounts List**

| Account Holder | Bank | Account Number | Description | Currency |
|---|---|---|---|---|
| **Cayman Accounts** | | | | |
| Cal Dive Offshore Contractors Ltd | Amegy | -5530 | International payroll account | USD |
| Cal Dive Offshore International, ltd | Amegy | -5549 | International holding account | USD |
| **Australian Accounts** | | | | |
| Cal Dive International (Australia) Pty Ltd | Amegy | -6443 | Domestic account for Australian operations | USD |
| Cal Dive International (Australia) Pty Ltd | HSBC | -7001 | Local operating account | AUD |
| Cal Dive International (Australia) Pty Ltd | HSBC | -7171 | Account used to receive intercompany transfers | USD |
| **Southeast Asian Accounts** | | | | |
| Cal Dive International Pte Ltd (Singapore) | Amegy | -6400 | Domestic account for Singapore operations | USD |
| Cal Dive International Pte Ltd (Singapore) | HSBC | -4178 | Local operating account | USD |
| Cal Dive International Pte Ltd (Singapore) | HSBC | -3001 | Local operating account | SGD |
| Cal Dive Marine Contractors (Malaysia) Sdn Bhd | Amegy | -5611 | Domestic account for Malaysian operations | USD |
| Cal Dive Marine Contractors (Malaysia) Sdn Bhd | Citibank | -5015 | Local operating account | USD |

RLF1 11599056v.1

| Account Holder | Bank | Account Number | Description | Currency |
|---|---|---|---|---|
| Cal Dive Marine Contractors (Malaysia) Sdn Bhd | Citibank | -3028 | Local operating account | MYR |
| PT Cal Dive Offshore Indonesia | Amegy | -5581 | Domestic account for Indonesian operations | USD |
| PT Cal Dive Offshore Indonesia | Citibank | -2528 | Local operating account | USD |
| PT Cal Dive Offshore Indonesia | Citibank | -2803 | Local operating account | SGB |
| PT Cal Dive Offshore Indonesia | Citibank | -2048 | Local operating account | IBR |
| Marine Leasing (Labuan) Pte Ltd | Amegy | -5638 | Account used for tax-efficient transfers of funds to vessel-owning company | USD |
| **African Accounts** | | | | |
| Horizon Marine Construction, Ltd. | Amegy | -5557 | Domestic account for West African operations | USD |
| Cal Dive Marine Construction (Mauritius) Ltd | Amegy | -5603 | Domestic account for Mauritian operations | USD |
| Cal Dive Marine Construction (Mauritius) Ltd | Citibank | -0017 | Local operating account | USD |
| Cal Dive Marine Construction (Mauritius) Ltd | HSBC | -0020 | Local operating account | USD |
| Cal Dive Marine Construction (Mauritius) Ltd | Citibank | -0009 | Local operating account | SGB |
| Cal Dive Offshore Contractors (Mauritius), Ltd | HSBC | -7020 | Local operating account | USD |

RLF1 11599056v.1

| Account Holder | Bank | Account Number | Description | Currency |
|---|---|---|---|---|
| Cal Dive Offshore Contractors (Mauritius), Ltd | Amegy | -8950 | Second domestic account for Mauritian operations | USD |
| **Mexican Accounts** | | | | |
| HOC Offshore S de RL de CV | Amegy | -5573 | Domestic account for Mexican operations | USD |
| HOC Offshore S de RL de CV | Banamex | -4009 | Local operating account that accepts MXN deposits | MXN |
| HOC Offshore S de RL de CV | Santander | -2322 | Local operating account that accepts USD deposits | USD |
| HOC Offshore S de RL de CV | Santander | -7446 | Local operating account | MXN |
| Tiburon Ingenieria y Construccion, S de RL de CV | Santander | -6935 | Local operating account | MXN |
| Mojarra Costa Afuera S de RL de CV | Santander | -6880 | Local operating account | MXN |
| **U.K. Accounts** | | | | |
| CDIE (United Kingdom) | HSBC | -5433 | Local operating account | GBP |
| CDIE - Collateral | HSBC | -7369 | Cash collateral account | GBP |

D-3

**<u>Exhibit E</u>**

**Debtors' Cash Management System**

**Cal Dive International, Inc. & Subsidiaries**
**Bank Accounts Schematic**





Debtor Bank Accounts

Non-Debtor Affiliate Bank Accounts

\*      Other U.S. Based Accounts

| | |
|---|---|
| Cal Dive | Cal Dive International, Inc. |
| CDOCI | Cal Dive Offshore Contractors, Inc. |
| GOCI | Gulf Offshore Construction, Inc. |
| CDOCL | Cal Dive Offshore Contractors Ltd. |
| CDOIL | Cal Dive Offshore International, Ltd. |
| HMCL | Horizon Marine Construction, Ltd. |