**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x

In re:                                               :        Chapter 11

                                                     :
CAL DIVE INTERNATIONAL, INC., *et al*.,              :        Case No. 15-10458 (   )

                                                     :
                              Debtors.               :        Joint Administration Requested

                                                     :

-------------------------------------------------------------x

**QUINN J. HÉBERT'S DECLARATION IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Quinn J. Hébert, declare under penalty of perjury:

1.     I am the Chairman of the Board of Directors, President, Chief Executive Officer, and acting Chief Financial Officer of Cal Dive International, Inc. ("**Cal Dive**"), an offshore marine contracting corporation organized under the laws of Delaware, and Chairman, President, and Chief Executive Officer of each of Cal Dive's affiliated debtors and debtors in possession (collectively, the "**Debtors**").[1]

2.     I have served as President and CEO since I joined Cal Dive in 2005.  I have been a member of Cal Dive's Board of Directors since 2006, becoming Chairman in 2010. I have been acting CFO of Cal Dive since June 2014.  I also sit on the boards of directors of each of the other Debtors and am an officer of each.  Before joining Cal Dive, I was President of Acergy US Inc. (formerly Stolt Offshore), an international marine construction company.  I hold a J.D. from Boston College Law School and a bachelor's degree from Louisiana State University.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Cal Dive International, Inc. (0501), Cal Dive Offshore Contractors, Inc. (4878), Affiliated Marine Contractors, Inc. (8678), Fleet Pipeline Services, Inc. (2104), Gulf Offshore Construction, Inc. (2106), and CDI Renewables, LLC (4985).  The Debtors' corporate headquarters is at 2500 CityWest Boulevard, Suite 2200, Houston, TX 77042.

3.       Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.       On today's date (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**").

5.       I submit this Declaration to describe the Debtors' background, the circumstances that led to the Debtors' chapter 11 filings, and the Debtors' goals in these cases.  I also submit this Declaration in support of relief the Debtors have requested in "first day" applications and motions filed with the Court (collectively, the "**First Day Pleadings**").  The relief sought in the First Day Pleadings is intended to help keep the Debtors operating effectively, minimize potential adverse effects of filing bankruptcy, and ease the administrative burden of operating in chapter 11.

6.       With the First Day Pleadings, the Debtors seek to, among other things:

a) establish administrative procedures to promote a seamless transition into and through these chapter 11 cases;

b) allow for the continued payment of utility, wage, insurance, and tax obligations;

c) ensure the continuation of the Debtors' and their subsidiaries' operations and cash management system without interruption;

d) pay critical vendors;

e) ensure that the Debtors' foreign creditors, contract counterparties, and vendors understand the implications of this bankruptcy filing, including the imposition of the automatic stay; and

f) obtain debtor-in-possession financing and use cash collateral in the operation of the Debtors' businesses.

7.     I am familiar with each of the First Day Pleadings, and I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, relief sought in the First Day Pleadings is critical to the Debtors' efforts to transition into chapter 11 efficiently and with minimized disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all their stakeholders while they pursue the strategic and financial objectives these cases were filed to achieve.

8.     **Part I** of this Declaration provides a brief description of the Debtors' businesses, organizational structure, and prepetition indebtedness.  **Part II** describes the circumstances giving rise to the commencement of these chapter 11 cases and the Debtors' goals and intentions in these cases.  And **Part III** summarizes the First Day Pleadings and explains why the relief requested is appropriate and necessary.

## PRELIMINARY STATEMENT

9.     The Debtors and their non-debtor foreign affiliates (the "**Non-Debtor Affiliates**," and together with the Debtors, the **"Cal Dive Group"**) constitute a global marine contractor that provides highly specialized manned diving, pipelay and pipe burial, platform installation and salvage, and well-intervention services to a diverse customer base in the offshore oil and gas industry.  Headquartered in Houston, the Cal Dive Group operates in the Gulf of Mexico Outer Continental Shelf, the United States, Latin America, Southeast Asia, China,

Australia, West Africa, the Middle East, and Europe.  Its 2014 revenue was approximately $394 million.

10.    Only the Cal Dive Group's U.S.-based entities are Debtors in these cases. The foreign members of the Cal Dive Group, including operating companies in Mexico, Australia, the United Kingdom, Indonesia, Malaysia, and Singapore, have not filed chapter 11 petitions or foreign insolvency proceedings and continue to conduct their businesses in the ordinary course.

11.    The Debtors' decision to commence these cases was prompted by two principal factors—one developing over the past year, the other more recently.  During 2014, the Cal Dive Group's utilization levels and, in turn, liquidity suffered as a result of delays in projects outside the Cal Dive Group's control.  Above all, unusually adverse and sustained weather disruptions—a special concern for a business that operates in water depths of up to 1,000 feet— forced the postponement of anticipated construction projects, impeding the Cal Dive Group's ability to invoice, collect for work performed, and recoup capital outlays.

12.    Meanwhile, other offshore contractors, whose tasks must be completed before the Cal Dive Group can complete its projects, fell behind schedule and deprived the Cal Dive Group of valuable workdays.  The consequences of these delays are most evident in the Cal Dive Group's construction operations in Mexico, where two major projects with Petróleos Mexicanos ("**Pemex**"), the Cal Dive Group's largest customer, were repeatedly put on hold because of weather disruptions and performance issues with other contractors.  Given that the Cal Dive Group has outlaid substantial capital for the Pemex projects, the delay—in both completing and receiving payment for them—has dramatically impacted liquidity, restricted the

Debtors' ability to fund their business activities, and ultimately led to a covenant default under their lending facilities in summer 2014.

13.     Determined not to allow these events to dictate the Cal Dive Group's fate, the Debtors in summer 2014 initiated negotiations to obtain replacement financing to improve liquidity.  Engaging with creditors across their capital structure and numerous potential third-party capital providers, the Debtors worked continuously to achieve a refinancing solution to their liquidity constraints, which were exacerbated by contractual step-downs in the availability under their Pre-Petition Senior Revolver (defined below) as well as over $100 million in working capital outlays tied up in four Pemex projects.  In the midst of these exhaustive efforts, oil prices plummeted.  The ensuing uncertainty about future oil prices introduced an additional, unexpected obstacle that impeded refinancing efforts.  Unable to secure the financial flexibility they required, the Debtors commenced these chapter 11 cases.

14.     The Debtors intend in this bankruptcy to maximize value for their stakeholders through two main initiatives.  First, the Debtors plan to sell certain underutilized vessels (the "**Non-Core Assets**") under Bankruptcy Code section 363.  Second, the Debtors aim to maintain their remaining subsea contracting business (the "**Core Business**") as a going concern, either through a sale to a third party or a reorganization of the Debtors' capital structure. The Core Business enjoys healthy margins, steady cash flow from its oil well inspection, maintenance, and repair activities, an exceptional talent pool, and an international market-leading reputation.  The Debtors believe that, delevered through a plan of reorganization or sale, the Core Business will emerge from chapter 11 as a more stable enterprise, with a more profitable future.

I.      **DESCRIPTION OF THE DEBTORS**

      A.      **History of the Cal Dive Group**

      15.      Cal Dive traces its origins to California Divers, Inc., a company that pioneered the use of mixed-gas diving in the early 1960s when oilfield exploration off the Santa Barbara coast moved to water depths below 250 feet.  Cal Dive commenced operations on the Gulf of Mexico Outer Continental Shelf in 1975, and since then, the Cal Dive Group's principal business has been centered in that region.  Over time, however, the Cal Dive Group's business outside the Gulf of Mexico has steadily increased and now accounts for more than 50% of its revenues.

      16.      During the 1990s, Cal Dive expanded and diversified, closing numerous strategic transactions and investing in new technology and assets.  Most importantly, in the mid-1990s, Cal Dive developed deep-water, or "saturation," diving capabilities, acquiring many of the vessels that remain in its fleet today.  Fueled by this growth, Cal Dive became a publicly traded company on Nasdaq in 1997.

      17.      In December 2006, after a series of corporate transactions, Cal Dive was spun off as a standalone offshore marine contractor.  Its common stock traded on the New York Stock Exchange, until shortly before this bankruptcy filing.

      18.      In December 2007, Cal Dive acquired Horizon Offshore, Inc. ("**Horizon**"), a marine construction services company with operations in the Gulf of Mexico, Latin America and Southeast Asia.  This acquisition significantly enhanced the Cal Dive Group's offshore construction capabilities, while complementing the Cal Dive Group's existing diving business.

### B.    The Debtors' Current Corporate Structure

19.    Today, the Cal Dive Group comprises a publicly traded holding company, a domestic operating company, numerous foreign operating companies, and multiple other entities, which together provide diving and construction services to the international offshore oil and gas industry.

20.    In the United States, the Cal Dive Group operates primarily through Debtor Cal Dive Offshore Contractors, Inc. ("**CDOCI**").  CDOCI owns the vast majority of the Debtors' vessels and other core assets and provides critical back-office and administrative support for the Cal Dive Group's business operations.  All of the Debtors' U.S. employees are employed by CDOCI.  CDOCI onshore employees are based at Cal Dive's Houston headquarters, a shipyard in Port Arthur, Texas, or an office in Broussard, Louisiana; an offshore contingent is stationed on CDOCI's vessels.  In a few instances, CDOCI assigns employees to work for one of the Non-Debtor Affiliates.

21.    The Debtors other than CDOCI are domestic entities that are either dormant (CDI Renewables, LLC) or provide chartering services to support the Cal Dive Group's operations (Affiliated Marine Contractors, Inc., Fleet Pipeline Services, Inc., and Gulf Offshore Construction, Inc.).

22.    The following chart depicts the Debtors' organizational structure:



A more detailed organizational chart of the Debtors and the Non-Debtor Affiliates is attached to this Declaration as Exhibit A.

23.    The Cal Dive Group also has substantial offshore operations largely run through Non-Debtor Affiliate subsidiaries of CDOCI.  The Non-Debtor Affiliates that are direct subsidiaries of CDOCI include Cal Dive International Pte Limited (the principal Singapore operating company and 100% owner of the Australian operating entity), HOC Offshore S de RL de CV (the principal Mexican operating company), and Cal Dive Offshore International, Ltd. (the primary international holding company for non-Mexican and non-Singapore/Australian operations).  Cal Dive Offshore International, Ltd., in turn, directly and indirectly owns operating companies based in Nigeria, the United Kingdom, Malaysia, the Cayman Islands, Mauritius, and Indonesia.  Collectively, these Non-Debtor Affiliates of the Cal Dive Group provide marine contracting services around the world.

C.        **The Cal Dive Group's Business**

24.        The Cal Dive Group's services support every facet of the offshore oil and natural gas industry, from exploration and installation to production and salvage.  Specifically, the Cal Dive Group provides three distinct phases of service:

- **Infrastructure installation**.  During the early phase of infrastructure installation, services include pipeline installation and trenching, shore approaches, tie-ins, and platform installations.

- **Production and well remediation**.  During the middle phase of production and well remediation, services include inspection, repairs, maintenance, and well intervention.

- **Decommissioning and salvage**.  During the late phase of decommissioning and salvage, services include pipeline plug, abandonment, and removal, platform removal, and well plug and abandonment.

25.        To perform these offshore services, the Cal Dive Group relies on a fleet of specialized vessels.  The Cal Dive Group's fleet comprises 18 vessels, 15 of which are owned by CDOCI and three of which are owned by Non-Debtor Affiliate Cal Dive International (Australia) Pty Ltd.  A schedule identifying the Cal Dive Group's vessels is attached as <u>Exhibit B</u>.

a.        <u>Diving Business</u>

26.        The Cal Dive Group's primary business is its manned diving operations. With a global workforce of approximately 400 divers, crew, and dive support staff, the Cal Dive Group provides saturation diving services in the United States, both saturation and surface diving services in Southeast Asia, Australia, and Mexico, and surface diving services in the United Kingdom.  In surface diving, divers are tended—deployed and monitored via oxygen lines— from the surface down to a depth typically less than 300 feet.  In saturation diving, divers live in pressurized saturation diving systems for several weeks at a time and are deployed via a diving bell to the worksite, typically in water depths up to 1,000 feet.

27.      Customers around the world engage the Cal Dive Group for dive projects at the beginning, middle, and end of a well's lifecycle.  Projects on new wells—mainly pipeline, platform, and other infrastructure installations—form the core of the diving business.  These jobs offer high margins and growth opportunities, but achieving milestones required for payment often depends on offshore weather conditions and other contractors completing their jobs. Demand for these early-phase services is also highly dependent on commodity prices, whose fluctuations are beyond the Cal Dive Group's control.  Meanwhile, the middle phase of the well lifecycle—when a well is producing—generally affords the diving business more stability than other phases of the well lifecycle.  During this phase, the Cal Dive Group inspects, repairs, and maintains existing wells, pipelines, and platforms.  This work generally provides steady cash flow and serves as a buffer against the effects of commodity price fluctuations.  During the late phase of decommissioning and salvage, the Cal Dive Group removes pipelines, platforms, and plugs and abandons pipelines and wells.  Due to the Bureau of Safety and Environmental Enforcement's "idle iron" regulations[2] and similar directives, demand for these later services is less discretionary and, therefore, more stable than for early-phase services.

28.      To place divers where its customers need them, the Cal Dive Group maintains one of the world's largest and most technically advanced fleets of dive support vessels. CDOCI owns eight of the fleet's 11 dive support vessels and five of its eight portable saturation diving systems, while the Australian Non-Debtor Affiliate owns the fleet's other three dive support vessels and one portable saturation diving system.  The Singapore Non-Debtor Affiliate owns two portable saturation diving systems.  Domestically, CDOCI contracts directly with

---

[2] "Idle iron" infrastructure consists of any offshore operation that is severely damaged or inactive.  I understand that for both safety and environmental reasons, idle iron policies are designed to keep inactive facilities and structures from littering the Gulf of Mexico by requiring companies to dismantle and responsibly dispose of infrastructure after they plug non-producing wells.

customers for manned diving projects in the U.S. Gulf of Mexico. Abroad, Non-Debtor Affiliates contract directly with their customers and largely perform their own projects, occasionally relying on the Debtors for administrative and operational support. To perform their international diving projects, the Non-Debtor Affiliates (other than the Australian Non-Debtor Affiliate, which often uses its own vessels) either charter dive vessels from CDOCI or a third-party vessel owner, or provide diving services as a subcontractor off another contractor's vessel.

29.     Given the highly technical and skilled nature of diving services in all phases of the well lifecycle and the demands of working in unpredictable waters, employee retention and safety are of paramount importance. The Debtors have historically invested, and continue to invest, significant resources in their workforce. Moreover, to ensure the welfare of these offshore workers, the Debtors must maintain strong relationships with a host of vendors that supply critical equipment and services, without which the Debtors could not safely operate their business.

b.     Construction Business

30.     The Cal Dive Group's construction business is largely a function of the 2007 Horizon deal. The construction business operates in the U.S. Gulf of Mexico through CDOCI. It also operates in the Mexican Gulf of Mexico through Mexican Non-Debtor Affiliate HOC Offshore S de RL de CV and in Southeast Asia waters through Singapore and Mauritian Non-Debtor Affiliates. The construction business consists of a fleet of seven pipelay/pipebury and derrick barges, all of which CDOCI owns. These barges install, bury, and repair pipelines with outside diameters up to three feet. In addition, the Cal Dive Group deploys jet sleds to bury pipelines, and where environmental concerns restrict the use of jet sleds, it buries pipelines with a pipeline plow. The construction business also provides platform installation and pipeline and platform decommissioning and salvage services using its derrick barges.

### D. Prepetition Indebtedness and Capital Structure

31.     As of December 31, 2014, the Debtors had funded debt outstanding of approximately $286.05 million, consisting of the principal balance under the Pre-Petition Senior Revolver and the Pre-Petition Junior Facility and the principal amount of the Convertible Notes (each as defined below).  The following table summarizes the Debtors' prepetition indebtedness and capital structure:

| Indebtedness | Principal Amount (as of Petition Date) | Maturity Date |
|---|---|---|
| Pre-Petition Senior Revolver | $99.8 million | April 26, 2016 |
| Pre-Petition Junior Facility | $100 million | May 9, 2019 |
| Convertible Notes | $86.25 million | July 15, 2017 |

The Debtors other than Cal Dive guarantee this indebtedness.  The Debtors also incur unsecured debt in the ordinary course of their operations.  The primary components of the Debtors' capital structure are described in greater detail below.

32.     *Pre-Petition Senior Revolver.*    The Debtors are party to a Credit Agreement, dated April 26, 2011 (as amended, waived, modified, or supplemented, the "**Pre-Petition Senior Loan Agreement**"), among Cal Dive as borrower, the Debtors other than Cal Dive as guarantors, Bank of America, N.A., as administrative agent (the "**Pre-Petition Senior Agent**"), and the lenders party thereto (the "**Pre-Petition Senior Lenders**").  The Pre-Petition Senior Loan Agreement originally provided for a variable-interest $125.0 million revolving credit facility maturing on April 26, 2016 (the "**Pre-Petition Senior Revolver**").  Before May 9, 2014, the Pre-Petition Senior Loan Agreement also provided for a variable-interest term loan (the "**Pre-Petition Senior Term Loan**"), under which $29.7 million was outstanding.  Cal Dive repaid the Pre-Petition Senior Term Loan in May 2014 from the proceeds of the Pre-Petition Junior Facility (defined and discussed below).  The Pre-Petition Senior Revolver is secured by (i)

vessel mortgages on all of the Debtors' domestically owned vessels, (ii) a pledge of all the stock of every Cal Dive domestic subsidiary (i.e., the other Debtors), (iii) 66% of the stock of three of the Debtors' foreign affiliates, and (iv) a security interest in, among other things, all of the Debtors' equipment, inventory, accounts receivable, and general tangible assets.

33.    When the Debtors entered into the Pre-Petition Junior Facility on May 9, 2014, they also amended the Pre-Petition Senior Loan Agreement to, among other things, provide for the reduction of the Debtors' commitment on the Pre-Petition Senior Revolver by $5 million a month for eight months (from May 31, 2014, to December 31, 2014), bringing it down to $85 million.  As of September 30, 2014—five months into the amended agreement— availability under the Pre-Petition Senior Revolver was therefore $100 million.

34.    The following month's scheduled $5 million reduction, however, would have deprived the Debtors of important liquidity at a critical juncture.  Accordingly, the Pre-Petition Senior Lenders agreed to waive the financial covenant default and amend the facility to delay that reduction through December 2, 2014, when the Pre-Petition Senior Revolver commitment would step down to $90 million.  With $99.8 million outstanding under the Pre-Petition Senior Revolver, the Debtors were thus obligated to pay $9.8 million in principal reduction (plus a waiver fee of $500,000) to the Pre-Petition Senior Agent on December 2, 2014. But to conserve liquidity, the Debtors elected not to make the payment, causing a payment default under the Pre-Petition Senior Loan Agreement.  Although in default, the Debtors continued to make monthly interest payments due under the Pre-Petition Senior Loan Agreement, until the payment that was due on January 2, 2015.  No further interest payments have been made since.

35.    *Pre-Petition Junior Facility*.  On May 9, 2014, the Debtors entered into an Amendment and Restatement to Credit Agreement among Cal Dive as borrower, the Debtors other than Cal Dive as guarantors, ABC Funding, LLC, as administrative agent (the "**Pre-Petition Junior Agent**"), and the lenders from time to time party thereto (as amended, waived, modified, or supplemented, the "**Pre-Petition Junior Loan Agreement**").  The Pre-Petition Junior Loan Agreement provides for a $100 million second lien term loan facility (the "**Pre-Petition Junior Facility**").  The Pre-Petition Junior Facility consists of two tranches: a first-out $20 million term loan (converted from a preexisting unsecured term loan) and an $80 million term loan funded at the closing.  Both tranches of the Pre-Petition Junior Facility mature on May 9, 2019, with no scheduled amortization prior to maturity.  The net proceeds of the Pre-Petition Junior Facility were used to repay the Pre-Petition Senior Term Loan in full and approximately $45 million of outstanding borrowings under the Pre-Petition Senior Revolver.  The Pre-Petition Junior Facility is secured on a junior basis by (i) vessel mortgages on all of the Debtors' domestically owned vessels, (ii) a pledge of all the Debtors' (other than Cal Dive's) stock, (iii) 66% of the stock of three Non-Debtor Affiliates, and (iv) a security interest in, among other things, all of the Debtors' equipment, inventory, accounts receivable, and general intangible assets.

36.    As of the Petition Date, the principal amount outstanding under the Pre-Petition Junior Facility is $100 million.  Cal Dive has not paid interest due under the Pre-Petition Junior Facility since making the interest payment due on August 31, 2014, and certain events of default resulting from failure to comply with financial covenants have occurred and are continuing under the Pre-Petition Junior Facility.

37.    _Unsecured Convertible Notes_.  Cal Dive issued $86.25 million aggregate principal amount of 5% convertible senior notes due 2017 (the "**Convertible Notes**") under an indenture dated July 18, 2012 (as amended from time to time, the "**Indenture**"), among Cal Dive as issuer, the other Debtors as guarantors, and The Bank of New York Mellon as trustee (the "**Indenture Trustee**").  Cal Dive used the net proceeds of the Convertible Notes to repay a substantial portion of the then-outstanding Pre-Petition Senior Term Loan.  The Convertible Notes, which are unsecured obligations, mature on July 15, 2017, and bear interest at a rate of 5% per year, payable semiannually in arrears on January 15 and July 15 of each year.

38.    As of the Petition Date, Cal Dive had $86.25 million aggregate principal amount of Convertible Notes outstanding.  On December 8, 2014, Cal Dive's stock was delisted, causing a "Fundamental Change" default under the Indenture and, in turn, triggering a repurchase obligation that the Debtors did not satisfy.  In addition, the Debtors decided not to make the approximately $2.2 million interest payment due on January 15, 2015.

39.    _Equity Interests_.  Cal Dive is a publicly traded company.  As of December 31, 2014, Cal Dive had 98,261,320 shares of common stock outstanding.  Before being suspended from trading on October 29, 2014, and being delisted on December 8, 2014, Cal Dive's stock was traded on the New York Stock Exchange under the symbol "DVR."  Cal Dive's stock now trades on the OTC under the symbol "CDVI."

## II.    EVENTS LEADING TO COMMENCEMENT OF THE CASES AND THE DEBTORS' GOALS IN THESE CASES

### A.    The Debtors' Business Performance Declines Amid an Industry Downturn

40.    The Debtors' bankruptcy filings are principally driven by unseasonably adverse weather and third-party contractor delays, which together have impeded the Debtors' ability to complete certain contracts and collect significant receivables.  These delays constrained

the Debtors' liquidity and significantly impaired the Debtors' ability to pay their debt obligations, both of which were already negatively impacted by an industry-wide downturn. The recent drop in oil prices, and the surrounding uncertainty over future oil prices, have further hindered the Debtors' ability to refinance their prepetition indebtedness.

41.     *Unseasonable weather and other contractor delays constrain the Debtors' liquidity.*  Delays beyond the Debtors' control—caused by disruptive weather in early 2014 and third-party contractors—are the principal factors behind the Debtors' decision to file for bankruptcy.  As a result of those unanticipated delays, the Debtors faced numerous obstacles completing contracts and earning significant milestone payments from the Cal Dive Group's largest customer, Pemex, which accounted for approximately 37% of its revenue in 2013.

42.     The Debtors' businesses are highly capital intensive and largely dependent on the condition of the oil and natural gas industry.  In particular, the construction business depends on the willingness of oil and natural gas companies to make capital expenditures for offshore exploration, development, and production operations.  Given the size and complexity of their construction projects, the Debtors are at the outset often required to incur substantial working capital outflows for payroll and material procurement.  As a result, there is often a lag between when the Debtors must commit capital to perform a project and when the Debtors actually collect payment on that project.[3]

43.     At the same time, because of the nature of the Debtors' contracts and the work the Debtors perform, much of the Debtors' cash flow has historically been uneven, requiring the Debtors to rely on their Pre-Petition Senior Revolver and other indebtedness to fund working capital needs.  As a result, the weather and contractor delays described above had a

---

[3] An exception to this pattern is the maintenance and repair component of the Debtors' diving business, which is relatively stable and mostly immune to external market pressures.

direct and adverse impact on the Debtors' liquidity, which was exacerbated by contractual step-downs in the availability under the Pre-Petition Senior Revolver.

44.     In recent years, the Debtors have faced additional strains on their working capital needs as they implemented a strategy to increase their international presence. That effort required the Debtors to make advance purchases of pipe and other project materials for the larger construction projects typical of the international markets, where customers require contractors to procure all materials. The contracts for those large projects also typically allow the Debtors to invoice and receive payment only when certain milestones are achieved. This creates a lag between the Debtors' performance of the work, including procurement of materials, and the Debtors' ability to invoice and collect payment.

45.     These issues came to a head last year, as the Cal Dive Group worked to complete four large projects in Mexico for Pemex. The Pemex contracts (a mix of diving and construction tasks) contain billing provisions under which the Debtors may invoice Pemex only when the overall project has met certain milestones, creating a lag between the period during which the Debtors' performance of the work occurs and the date when the Debtors are contractually permitted to invoice for services and collect payment. Following the completion of the first of these projects in the second quarter 2014, significant and unanticipated weather patterns delayed work on the remaining projects. These weather patterns caused delays in two ways. First, given the hazards of providing offshore services, some of the Debtors' work requires appropriate weather conditions to perform. When unanticipated weather disruptions occurred, the Debtors had no choice but to put these aspects of the Pemex projects on hold, and simply wait until the weather improved. Second, other contractors—whose work had to be completed before the Debtors could continue their own projects—faced similar delays as a result

of these weather patterns and other factors.  Slowed by these obstacles, the Debtors were unable to complete the second of the four Pemex contracts until early November 2014.

46.    Pemex then suspended work on the remaining two projects due to problems with other contractors.  These suspensions impeded the Debtors' ability to meet the milestones on these two projects and, as a consequence, also impeded the Debtors' ability to invoice and collect payment for the work the Debtors had already completed.  This significantly constrained the Debtors' liquidity.  The Debtors have already commenced work on the remaining two projects and anticipate that once the other contractor completes the installation of the platform for the final project, the Debtors will be able to complete their remaining work.  Based on current work schedules, the Debtors expect to complete the final two projects by May 2015, and finish collecting payment for the work by August 2015.  Over the course of these cases, the Debtors expect to collect approximately $72.5 million for completion of the work (plus potentially additional amounts for change orders and extra work claims).  After payments to vendors and other costs to complete the projects of about $30 million, the Debtors expect to net about $42.5 million from the Pemex projects over the next six months.

47.    *The marine contracting industry suffers industry-wide decline*.  The unanticipated weather patterns in 2014 occurred in the midst of a prolonged industry-wide dislocation in the marine contracting industry.  This dislocation began in mid-2008, when the prolonged worldwide recession reduced demand for hydrocarbon-based products, causing many oil and gas companies to curtail capital spending for exploration and development.  In 2009 and 2010, competition in Southeast Asia and other international markets increased significantly due to new vessel capacity coming into service.  The catastrophic April 2010 Macondo well blowout in the U.S. Gulf of Mexico further hindered exploration and development in the region—and in

the years that followed, continued to create uncertainty in the U.S. market and regulatory environment for the Debtors' industry.  Meanwhile, the recent increase in U.S. onshore drilling for shale gas has suppressed natural gas prices and thus the appetite for oil and gas companies to drill for natural gas offshore.

48.    In the face of these negative conditions, the Debtors, like some of their competitors, have been hard hit by declining revenues.  Moreover, as discussed below, the recent plummet in oil prices, and the surrounding uncertainty about future oil prices, have impeded the Debtors' refinancing efforts.

**B.     The Debtors Attempt to Address Their Immediate Liquidity Needs by Consummating a Refinancing**

49.    As a result of their decline in earnings, the Debtors have been unable to comply with the financial covenants contained in their Pre-Petition Senior Loan Agreement and Pre-Petition Junior Loan Agreement, and were also unable to comply with their contractual step-downs in the Pre-Petition Senior Loan Agreement.  In a good-faith effort to honor those obligations, the Debtors attempted to refinance their Pre-Petition Senior Revolver in order to provide the liquidity necessary to continue their business operations until the Debtors could start work again on the remaining Pemex contracts and achieve the milestones necessary to receive payment.  A combination of factors, however, including uncertainty about future oil prices, prevented the Debtors from achieving an out-of-court refinancing.

**C.     The Debtors' Goals in Chapter 11: Divest the Non-Core Assets and Reorganize Around or Pursue Strategic Alternatives for the Core Business**

50.    Faced with severe liquidity constraints and numerous defaults under their credit agreements, the Debtors have concluded in their business judgment that the course of action that will maximize recoveries to their creditors is to avail themselves of chapter 11's protections.  Most immediately, the Debtors are seeking this Court's approval of a $120 million

postpetition financing facility (the "**DIP Facility**"). The DIP Facility will provide the Debtors with incremental liquidity necessary not only to operate in the ordinary course in chapter 11, but also to complete ongoing projects in Mexico and a recently awarded project in Peru that will bring millions of dollars into their estates.

51.     While the Cal Dive Group's operations continue around the globe, the Debtors intend to engage in two concurrent initiatives. First, the Debtors will divest the Non-Core Assets through an orderly marketing and sale process. Second, the Debtors will pursue strategic alternatives to continue the Core Business as a going concern. The specific type of Core Business transaction the Debtors pursue will depend on numerous factors, including buyer interest, the willingness of a sponsor to fund a plan of reorganization, and the emergence of another value-maximizing transaction. The Debtors and their advisors are currently considering these alternatives.

## III.     SUMMARY OF THE FIRST DAY PLEADINGS[4]

52.     Concurrently with the filing of these chapter 11 cases, the Debtors have filed the following First Day Pleadings:

a) Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("**Joint Administration Motion**");

b) Debtors' Application for Entry of an Order Authorizing Employment and Retention of Kurtzman Carson Consultants, LLC as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date ("**KCC Application**");

c) Debtors' Motion for Entry of Interim and Final Orders Establishing (I) Notice and Hearing Procedures for Transferring, or Claiming a Worthless Stock Deduction for, Equity Securities of Cal Dive International, Inc. and (II) An Effective Date for Notice and Sell-Down Procedures for Transferring Claims Against the Debtors ("**Trading Procedures Motion**");

---

[4] Any capitalized term in this Part III not expressly defined in this Declaration has the meaning used in the relevant First Day Pleading.

d) Debtors' Motion for Entry of an Order Confirming the Protections of Sections 362 and 365 of the Bankruptcy Code and Restraining Any Action in Contravention Thereof ("**Automatic Stay Motion**");

e) Debtors' Motion for Entry of an Order Authorizing Quinn J. Hébert to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505 ("**Foreign Representative Motion**");

f) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and (II) Granting Related Relief ("**Taxes Motion**");

g) Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities; and (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance ("**Utilities Motion**");

h) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain, Continue, and Renew Their Insurance Policies and Pay All Obligations in Respect Thereof and (B) Continue Their Premium Financing Program; and (II) Granting Related Relief ("**Insurance Motion**");

i) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs and (II) Authorizing Financial Institutions to Honor and Process All Related Checks and Transfers ("**Wages and Benefits Motion**");

j) Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors and Granting Related Relief ("**Critical Vendors Motion**");

k) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief ("**Cash Management Motion**");

l) Debtors' Motion (i) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 Authorizing the Debtors to (a) Obtain Postpetition Financing, (b) Grant Senior Liens and Superpriority Administrative Expense Status, and (c) Utilize Cash Collateral of Pre-Petition Secured Parties; (ii) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364; (iii) Scheduling a Final Hearing; and (iv) Granting Related Relief ("**DIP Motion**"); and

m) Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal Certain Schedules to the DIP Facility Agreement ("**Seal Motion**")

53.     I have reviewed each of the First Day Pleadings or had their contents explained to me, and I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to sell the Non-Core Assets and to reorganize or pursue strategic alternatives for the Core Business, and otherwise conduct these cases efficiently, permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

54.     Several of the First Day Pleadings request authority to pay prepetition claims.  I am told by the Debtors' advisors that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein.

### A.     Joint Administration Motion

55.     The Debtors seek entry of an order directing joint administration of their chapter 11 cases for procedural purposes only.  The six Debtors in these chapter 11 cases include Cal Dive, its wholly owned subsidiary CDOCI, and four subsidiaries wholly owned by CDOCI.

56.     Given the integrated nature of the Debtors' operations, I believe that joint administration of these chapter 11 cases would provide significant administrative convenience

without harming the substantive rights of any parties in interest.  Many of the motions, hearings, and orders in these cases will affect each Debtor, and joint administration would eliminate the need for duplicate pleadings and orders in each of the respective dockets.  This, in turn, would save the Court, the Debtors, and any parties in interest substantial time and expense when preparing and filing such documents.  Furthermore, joint administration would protect any parties in interest by ensuring that they will be apprised of the various motions filed with the Court with respect to each Debtor.

57.    Because the Debtors seek only administrative, not substantive, consolidation of the estates, I do not believe joint administration would adversely affect the Debtors' respective constituencies.  The relief requested will not only preserve individual creditors' rights, but also provide those creditors the benefit of cost reductions associated with joint administration.

### B.    KCC Application

58.    The Debtors seek entry of an order authorizing the employment and retention of Kurtzman Carson Consultants ("**KCC**") as the Claims and Noticing Agent, effective *nunc pro tunc* to the Petition Date.  I understand that the Debtors and their advisors obtained and reviewed engagement proposals from three court-approved claims and noticing agents to ensure selection through a competitive process.  Following that review, and in consideration of the number of anticipated notice parties, the nature of the Debtors' business, and KCC's competitive and reasonable rates given their quality of services and expertise, the Debtors selected KCC to act as the Debtors' Claims and Noticing Agent.  I believe that the retention of KCC as Claims and Noticing Agent is necessary and in the best interest of the estates.  Indeed, KCC will relieve the Debtors of the burdens associated with claims and noticing services, allowing them to devote

their full attention and resources to maximize value for their stakeholders and facilitate the orderly administration of these chapter 11 cases.

59.    I have also reviewed KCC's engagement letter and the description of the services that KCC has agreed to render and the compensation and other terms of the engagement as provided in the KCC Application.  Based on that review, I believe that the Debtors' estates, creditors, parties in interest, and this Court will benefit as a result of KCC's experience and cost-effective methods.

60.    I further believe that no parties in interest would be prejudiced by the granting of the *nunc pro tunc* employment because KCC will provide valuable services to the Debtors' estates in the interim period.

### C.    Trading Procedures Motion

61.    The Debtors seek entry of interim and final orders establishing (i) notice and hearing procedures for transferring, or claiming a worthless stock deduction for, equity securities of Cal Dive or any beneficial interest therein; and (ii) a record date (the "**Record Date**") for notice and sell-down procedures for transferring claims against the Debtors ("**Claims**").  I understand that these procedures are designed to protect and preserve the Debtors' net operating losses ("**NOLs**") and other tax attributes (the NOLs, collectively with any capital losses, unrealized built-in losses, and certain other tax and business credits, the "**Tax Attributes**").

62.    As a result of past losses from operation of their businesses, the Debtors have estimated that their available NOLs, as of December 31, 2014, are approximately $182.5 million, a figure that could grow by the time the Debtors emerge from chapter 11.  I understand that the NOLs are valuable assets of the Debtors' estates because the Debtors can carry forward the NOLs to offset future taxable income and, in turn, reduce tax liability.

63.    I have reviewed the proposed procedures for transferring of equity securities of Cal Dive, and I believe that the relief sought will enable the Debtors to closely monitor certain transfers of equity securities and thereby preserve the Debtors' ability to seek the necessary relief at the appropriate time if it appears that such transfers may jeopardize the Debtors' use of their Tax Attributes.

64.    I have also reviewed the proposed procedures for the claiming of a worthless stock deduction, and I believe that the relief sought is necessary to ensure that the claiming of a worthless stock deduction by a holder owning 50% or more of Cal Dive's stock does not jeopardize use of the Debtors' NOLs.  To my knowledge, Cal Dive's stock is, and within the past three years has been, diffusely held, with no person owning more than 19.68% as of the Petition Date or since February 13, 2015, the date of the last required Schedule 13G filings with the SEC.  But with Cal Dive's stock trading at $0.06 on the Petition Date, I understand that a 50% or greater position could be accumulated, leaving the Debtors vulnerable to a shareholder taking a worthless stock deduction that limits use of the NOLs.  Accordingly, I believe that implementing the worthless stock deduction procedures is in the best interests of the estates.

65.    In addition, I understand that creditors acquiring Claims—particularly of Cal Dive's $86.25 million tradable convertible notes—postpetition could hinder the Debtors' use of their Tax Attributes.  Thus, I believe that it is critical to establish the Record Date for notice and sell-down procedures, which will ensure that claimholders receive sufficient notice that any claims purchased after such date may ultimately be subject to certain sell-down procedures in the event the Debtors seek, and the Court approves, an order authorizing such procedures to preserve the Debtors' Tax Attributes.

### D.    Automatic Stay Motion

66.    The Debtors seek entry of an order enforcing and restating the automatic stay protections and *ipso facto* prohibitions of the Bankruptcy Code.  I believe that such an order is appropriate in the these cases because the Debtors have customers, vendors, and contract counterparties around the world, including in Europe, Australia, Mexico, Nigeria, Peru, Singapore, Indonesia, China, Malaysia, and Saudi Arabia.  Many of the Debtors' non-U.S. creditors and contract counterparties may be unfamiliar with the automatic stay, the prohibition on enforcement of *ipso facto* contract provisions, and the Bankruptcy Code's antidiscrimination protections.  I thus believe that an order outlining these provisions, which the Debtors could transmit to foreign creditors, would maximize the protection the Bankruptcy Code affords the Debtors.

### E.    Foreign Representative Motion

67.    The Debtors seek entry of an order authorizing me, in my capacity as CEO and member of the board of each Debtor, to act as the foreign representative (the "**Foreign Representative**") on behalf of the Debtors' estates in any judicial or other proceeding in Mexico.  Because CDOCI is party to certain contracts in Mexico with the Debtors' largest customer, Pemex, the Debtors intend to commence insolvency proceedings in Mexico to protect the Debtors' interests there and to ensure an orderly chapter 11 process.

68.    I understand from my legal advisors that in order for Mexican courts to recognize these chapter 11 cases as "foreign proceedings," the Debtors must make a showing to the Mexican courts that I am authorized to act for the Debtors' estates in Mexican proceedings.  As noted above, I am CEO and a board member of each Debtor.  I also have frequent dealings with Pemex, a Mexican company.  Accordingly, I believe that I am well-versed in the Debtors affairs and amply qualified to represent the Debtors' interests in Mexico.

F.      **Taxes Motion**

69.     The Debtors seek entry of interim and final orders authorizing payment in full, and in cash, of all prepetition sales, use, income, and property taxes, annual report fees and regulatory fees, and all other similar obligations, including any related penalties and interest (collectively, the "**Prepetition Taxes**") that accrued prior to the Petition Date and that will become payable during these chapter 11 cases.

70.     The Debtors incur various tax liabilities and fees and in the past have generally paid such liabilities to the relevant federal, state, and local authorities (the "**Taxing Authorities**") as they have become due in the ordinary course of business.  Based on discussions with the Debtors' finance personnel, I understand that the Debtors estimate that approximately $910,000 in Prepetition Taxes are currently outstanding or will become due and payable following the Petition Date.   The Debtors are seeking authority to pay $515,000 of such Prepetition Taxes, $30,000 of which the Debtors are seeking authority to pay during the first 21 days of these cases.

71.     _Sales and Use Taxes_.  During the ordinary course of business, the Debtors collect and remit certain taxes related to the sale, use, and consumption of goods and services arising from the sale, use, and purchase of products, inventory, supplies, or other goods in the Debtors' businesses.  Specifically, the Debtors collect and remit sales and consumption taxes to the Taxing Authorities in connection with the operation of their businesses and distribution of products.  The Debtors also incur use taxes when they purchase materials and services from a vendor that is not registered to collect sales taxes for the state where the property is delivered or the services are provided.  In this circumstance, the vendors are not obligated to charge or remit sales taxes.  As purchasers, however, the Debtors must self-assess and pay the use taxes, when applicable, to the appropriate Taxing Authority.  I understand that the Debtors estimate that as of

the Petition Date, approximately $30,000 in sales and use taxes has accrued and remains unpaid for the prepetition period.

72.     *Property Taxes*.   Where the Debtors have operations and real and personal property, the Debtors are subject to property tax levied by state and local governments.   The Debtors typically pay property taxes for the prior year or quarter depending on how the relevant tax is assessed.I understand that the Debtors estimate that as of the Petition Date, approximately $395,000 in property taxes has accrued and remains unpaid for the prepetition period.

73.     *Federal and State Income Taxes*.   The Debtors incur federal and state income tax liabilities.   These corporate income taxes are assessed on each Debtor entity's income and either withheld and remitted monthly or paid annually to the applicable Taxing Authority depending on the jurisdiction.   I understand that as of the Petition Date, the Debtors estimate that there will be no accrued and unpaid income taxes.

74.     *State Franchise Taxes; Business License, Reporting, and Regulatory Fees*. Many state and local Taxing Authorities require the payment of certain franchise taxes, as well as business license, reporting, and regulatory fees, for the Debtors to remain in good standing for purposes of conducting business within the applicable jurisdiction.   I understand that as of the Petition Date, the Debtors estimate that $20,000 in franchise taxes and business license, reporting, and regulatory fees has accrued and remains unpaid for the prepetition period.

75.     *Expatriation Taxes*.   Under the Debtors' expatriate program, United States employees accepting a foreign assignment are normally put on a tax equalization plan, which requires the Debtors to pay all U.S. income taxes applicable to the additional compensation related to the foreign assignment.   I understand that as of the Petition Date, the Debtors estimate that $250,000 in expatriation taxes has accrued and remains unpaid for the prepetition period.

76.    *Unemployment Taxes*.    Federal and state Taxing Authorities impose unemployment taxes for employer-funded unemployment and compensation programs.    The Taxing Authorities calculate the unemployment taxes based on various tax rates assessed against the amount of wages paid in those jurisdictions in which the Debtors operate.    I understand that as of the Petition Date, the Debtors estimate $215,000 in unemployment taxes has accrued and remains unpaid for the prepetition period.

77.    I believe that the Debtors' ability to pay Prepetition Taxes is critical to their continued and uninterrupted operations and would ultimately preserve the resources of the Debtors' estates and going-concern values.    It is my understanding from various members of the Debtors' tax and legal departments that the Debtors' failure to pay the Prepetition Taxes could materially and adversely impact the Debtors' business operations in several ways.    Among other things, I understand that failure to timely pay the Prepetition Taxes would require the Debtors to spend time and money to resolve whether (i) the obligations are priority, secured, or unsecured; (ii) the obligations are proratable or fully prepetition or postpetition; and (iii) penalties, interest, attorneys' fees, and costs can continue to accrue on a postpetition basis, and if so, whether the penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured.

78.    In addition, I understand that many federal, state, and local statutes also impose personal liability on officers and directors of companies for certain Prepetition Taxes such entities owe.    To the extent that the relevant Prepetition Taxes remain unpaid by the Debtors, the Debtors' directors, officers, and executives may be subject to lawsuits or criminal prosecution during the pendency of these chapter 11 cases.    Any such lawsuit or criminal prosecution (and the ensuing potential liability) would, in my opinion, distract the Debtors and their officers, directors, and executives from devoting their full attention to the Debtors'

businesses and the orderly administration of these chapter 11 cases.  Accordingly, I believe that the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### G.    Utilities Motion

79.    The Debtors seek entry of interim and final orders (i) prohibiting Utility Companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors solely on the basis of the commencement of these chapter 11 cases, a debt owed by the Debtors for services rendered prior to the Petition Date, or any perceived inadequacy of the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services; (ii) approving the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services; and (iii) approving procedures for resolving objections to the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services.

80.    In the ordinary course of business, the Debtors incur utility expenses for electricity, water, waste disposal, telephone and internet services, including mobile and satellite communications services, and other similar services (collectively, the "**Utility Services**") from a number of Utility Companies.  I understand that, on average, the Debtors pay approximately $202,794 each month for third-party Utility Services, calculated as a historical average for the twelve-month period ending December 31, 2014.

81.    I anticipate that the Debtors will have sufficient cash on hand to timely pay in full, and in cash, all undisputed postpetition obligations owed to Utility Companies during these chapter 11 cases.  Nevertheless, I have reviewed the Proposed Adequate Assurance procedures and believe that those procedures provide the Utility Companies with adequate assurance of payment, and I do not believe that other or further assurance of payment to Utility Companies for postpetition Utility Services is necessary.  However, I understand that the Debtors

have also proposed procedures to resolve requests for additional or alternative assurance of payment in an orderly and fair manner.

82.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of these cases.    Indeed, any interruption in Utility Services, even for a brief period, would disrupt the Debtors' ability to continue operations.

### H.     Insurance Motion

83.     The Debtors seek entry of interim and final orders authorizing the Debtors to (a) maintain, supplement, amend, extend, renew, or replace their Insurance Policies, (b) pay any obligations, whether arising before or after the Petition Date, under the Insurance Policies, including premiums, deductibles, self-insured retentions amounts, broker fees, and administrative fees (collectively, the "**Insurance Obligations**"), and (c) maintain their Premium Financing Program, pay related prepetition insurance premium financing obligations (collectively, the "**Premium Financing Obligations**"), and enter into new premium financing programs.

84.     The Debtors maintain approximately 39 insurance policies through a variety of insurance carriers that provide coverage for, among other things, general commercial liability, commercial umbrella liability, automobile liability, aircraft liability, pollution liability, and commercial crime liability (the "**Insurance Policies**").

85.     The Debtors' businesses involve a high degree of operational risk. Potential hazards—such as vessels sinking, colliding, grounding, and sustaining damage from severe weather conditions—are inherent in marine operations.    These hazards can result in damage to and destruction of property, personal injury, pollution or environmental damage, and suspension of operations.    I believe that it is thus vitally important that the Debtors protect

themselves against the prospect of disaster, and the Debtors' Insurance Policies are designed to safeguard against such contingencies.

86. To this end, the Debtors maintain a group of Insurance Policies tailored to protect them against the risks inherent in the marine industry (the "**Marine Package**"). Additionally, the Debtors maintain protection and indemnity policies, also called Maritime Employer Liability Policies (the "**MEL Policies**"), which guard the Debtors against the perils of their business by providing coverage against liabilities for personal injuries incurred by crew and other employees.

87. The annual premiums due under the Insurance Policies range from $6.5 to $7 million.  I understand that Cal Dive has financed $5,207,638 of insurance premiums and related fees for 27 of the Insurance Policies under a Premium Finance Agreement with Prime Rate Premium Finance Corporation, Inc. ("**Prime Rate**") dated July 3, 2014 (the "**Premium Financing Program**").  Cal Dive's obligation to pay Prime Rate under the Premium Financing Program is secured by all unearned or return premiums and dividends related to the financed Insurance Policies.  Under the Premium Financing Program, Prime Rate also has the right to cancel the financed Insurance Policies if Cal Dive defaults on its payment obligations.  To date, Cal Dive has paid $5,166,930 under the Premium Financing Program.  The next monthly installment of $525,310 is due on April 1, 2015, and has not yet been paid.  The remaining obligations under the Premium Finance Program equal $1,050,619.  I believe that it is vitally important that Cal Dive continue to satisfy its obligations under the Premium Financing Program so that the financed Insurance Polices remain in effect.

88. Under two insurance policies, the Debtors pay premiums that are not included in the Premium Financing Program.  First, the Premium Finance Program covers only

about 40% of the Marine Package premium; the Debtors pay the balance quarterly, with the specific amount based on prior-quarter vessel utilization levels.  I understand that the second quarterly Marine Package installment, in the amount of $71,217, was paid in February.  Second, the Debtors pay a monthly premium of approximately $21,000 for a "stop loss" policy (the **"Stop Loss Policy"**) that insures them against catastrophic medical claims.  I believe that it is critical that the Debtors continue to timely pay the premiums under the Marine Package and Stop Loss Policy so that these policies remain effective and there is no lapse in coverage.

89.      Under certain Insurance Policies, the Debtors also pay deductibles or self-insured retention amounts.  Most notably, under the MEL Policies the Debtors must meet a per-claim deductible as well as an aggregate annual deductible for all claims made under the applicable policy.  Until they reach these deductibles, the Debtors are responsible for crew member injury claims, most of which fall under the Jones Act and  require the Debtors to pay "maintenance and cure" to injured seamen during recovery.  I understand from my staff that the "maintenance and cure" payments are paid biweekly and average $135,000.  A third-party administrator, Shuman Consulting, pays these claims on behalf of the Debtors and then invoices the Debtors biweekly.

90.      If the Debtors do not continue to honor their Insurance Obligations or Premium Financing Obligations, their coverage under the Insurance Policies could be void, potentially causing immediate and irreparable harm to the Debtors' estates.  I believe that any lapse in coverage would leave the Debtors exposed to significant—potentially crippling—liability, and it is therefore essential that the Debtors maintain their Insurance Policies throughout these cases.  Accordingly, I believe that the relief requested in the Insurance Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and would enable the Debtors to operate their businesses throughout these cases.

### I.        Wages and Benefits Motion

91.        The Debtors seek entry of interim and final orders authorizing the Debtors, in consultation with the DIP Agent (defined below) and in the exercise of their business judgment, as deemed necessary to continue to operate and preserve value, to (a) pay all prepetition wages, salaries, commissions, other compensation, and related administration and other incidental costs (all as described below and collectively, the "**Employee Compensation Obligations**") and prepetition employee benefits (the "**Employee Benefit Obligations**"), (b) withhold all federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations as required by applicable law, (c) pay all employment, unemployment, Social Security, and similar federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "**Payroll Taxes**"), and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, garnishments, and voluntary deductions (collectively with the Payroll Taxes, the "**Payroll Deduction Obligations**," and collectively with the Employee Compensation Obligations and Employee Benefit Obligations, the "**Prepetition Employee Obligations**"), and (d) honor and continue their prepetition programs, policies, and practices as described in the Wages and Benefits Motion with respect to the Prepetition Employee Obligations in the ordinary course of business.  The Debtors also seek entry of interim and final orders authorizing all financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on the Debtors' accounts in satisfaction of the Prepetition Employee Obligations.

92.     As of the Petition Date, the Debtors employ 407 people across North America.  Of the Debtors' full-time employees, 112 are salaried (the "**Salaried Employees**"), of whom 12 hold the position of vice president or above, and 295 are paid on an hourly basis (the "**Hourly Employees**," together with the Salaried Employees, the "**Employees**").  The number of Hourly Employees fluctuates because some, including vessel crew and divers, work only when assigned to a particular job.  When not on a job, these Hourly Employees are not paid wages, but, as discussed below, for administrative purposes, the Debtors advance them Employee Benefit Obligations for periods of up to six months.

93.     I believe that to remain competitive in the marine contracting industry, it is essential that the Debtors maintain a highly skilled workforce.  Most of the Hourly Employees have special skills developed through intensive training and years of experience.  As a result, the Debtors' competitors often seek to recruit Hourly Employees, typically by offering more attractive compensation packages.  To prevent constant—and harmful—turnover, I believe that the Debtors must offer competitive wages and benefits to their Employees.

94.     *Wage and Salary Obligations.*  Before the Petition Date and in the ordinary course of their businesses, the Debtors typically paid Employee Compensation Obligations to their Hourly Employees biweekly, and to their Salaried Employees semimonthly, with payments to Salaried Employees occurring on the 15th and the last days of the calendar month.  The Debtors estimate that their accrued but unpaid biweekly gross payroll as of the Petition Date is approximately $487,000 and their semimonthly gross payroll is approximately $113,000, for a total of accrued but unpaid gross wages of approximately $600,000.

95.     *Payroll Taxes.*  The Debtors withhold funds from Employees' wages and salaries and also make certain Payroll Tax payments from their own funds.  As of the Petition

Date, the Debtors estimate that they have approximately $50,000 in accrued Payroll Taxes, including amounts outstanding and amounts withheld from the Employees and not yet remitted, all of which will become due and owing during the 21 days following the Petition Date.

96.     *Garnishments*.   In the ordinary course of processing payroll checks for their Employees, the Debtors may be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered obligations (collectively, the "**Garnishments**").   When required, the Debtors withhold Garnishments from certain Employees' paychecks and remit the same to the appropriate governmental authorities on a monthly basis.   I understand that as of the Petition Date, all Garnishments have been remitted to the appropriate governmental authorities.

97.     *Leave Policies*.   The Debtors offer certain eligible Employees other forms of compensation, including vacation and personal days, holidays, civic duties leave, and bereavement days.   I believe that these forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified Employees to operate their businesses.   Failure to provide these benefits could, in my opinion, harm Employee morale and encourage the premature departure of Employees.

98.     *Vacation and Sick Time*.   All Full-Time Employees are entitled to a "reasonable" amount of vacation and ten sick days per year.   Unused vacation and sick time do not roll over from year to year, and Employees who are terminated are not compensated for unused vacation or sick days.

99. _Holidays_.  The Debtors offer ten holiday days and one floating holiday day to Employees.  The Debtors generally observe the holidays listed on the chart below:

| Holiday | Day |
|---|---|
| New Year's Day | January 1 |
| Spring Holiday (Good Friday) | The Friday preceding Easter |
| Memorial Day | Last Monday in May |
| Independence Day | July 4 |
| Labor Day | First Monday in September |
| Thanksgiving Day | Fourth Thursday in November |
| Day after Thanksgiving | Friday after the Fourth Thursday in November |
| Christmas Eve | December 24 |
| Christmas Day | December 25 |
| New Year's Eve | December 31 |
| *Additional Floating Holiday (chosen by employee) ||

100. _Civic Duties_.  Employees who are obligated to perform certain civic duties, including jury duty and witness duty, or who need time off to exercise their right to vote, are granted leave to fulfill these obligations.

101. _Bereavement_.  With some exceptions, each Employee is entitled to take up to three paid bereavement days per year in the event of an immediate family member's death and one paid bereavement day per year in the event of a non-immediate family member's death.

102. _Health and Welfare Benefits_.  The Debtors offer their eligible Employees various standard employee benefits, which include: medical coverage, pharmaceutical benefits, dental insurance, vision coverage, COBRA coverage, workers' compensation coverage, and other benefit programs provided to Employees in the ordinary course of business (collectively, the "**Health and Welfare Benefits**").   Employees must work 30 hours or more per week to be eligible for Health and Welfare Benefits.

103. When offshore Hourly Employees do not work for up to six months, they continue to receive Health and Welfare Benefits.  In those circumstances, the Debtors advance the cost of those nonworking Hourly Employees' Health and Welfare Benefits and, once the

Hourly Employee returns to work, the Debtors deduct the amount paid from those Hourly Employees' wages to recoup the cost.  As of the Petition Date, the Debtors estimate that they have advanced $115,000 in Health and Welfare Benefit costs for Hourly Employees who continue to receive coverage but who are not currently working offshore for the Debtors.

104.    *Medical Plans*. The Debtors offer medical benefits to eligible Employees and eligible members of Employees' families (collectively, the "**Plan Participants**") through self-insurance administered by a third-party administrator, Allied Benefit Systems, Inc. ("**Allied**").  As of the Petition Date, Allied has not presented the Debtors any prepetition accrued claims under the Medical Plans; however, due to the nature of the self-insured medical plans, it remains possible that certain services may have been provided prepetition for which claims have not yet been presented to the Debtors.  The Debtors estimate that approximately $375,000 in prepetition medical claims will come due during the first 21 days of the case.  Additionally, the Debtors offer certain expatriate Employees international medical insurance coverage under a separate medical plan, administered by Cigna Global.  The Debtors share the cost of these benefits with covered Employees.

105.    The Debtors employ a third party, Ellis Consultants ("**Ellis**"), to assist with mitigating the cost of large claims against the Debtors' medical plans through two main services: Conservative Care Review and Large Claim Consulting.  Through Conservative Care Review, Ellis assists the Debtors by identifying circumstances where conservative care may be more effective and safer than more expensive treatments for all Plan Participants.  Through Large Claim Consulting, Ellis works with the Debtors to shift the cost of approximately 12 high-usage and high-risk Employees (described below) onto other plans, ensuring continued coverage for these Employees while reducing overall costs to the Debtors.  The Debtors believe continuing

to utilize Ellis and its services are in the estates' best interests, because Ellis's services allow the Debtors to mitigate their health plan costs and avoid the potential liability and financial burden of high-cost claims.  As of the Petition Date, the Debtors do not owe any outstanding fees to Ellis.

a.    Medical Plan Gold

106.    The Medical Plan Gold (the "**Gold Plan**") consists of a self-insured PPO medical plan for eligible Employees.  The cost of the Gold Plan is borne primarily by the Debtors, but Employees also contribute to the plan through payroll deductions that help fund claim payments.  The Debtors pay claims every week, as they come due, through an automated clearinghouse (the "**ACH**").  I understand from my staff that the Debtors last paid claims through the ACH on or around February 26, 2015.  As of the Petition Date, the Debtors have paid all claims that Allied has presented to them under the Gold Plan.  Consequently, the Debtors do not believe that any claims remain owing and unpaid to Allied on account of services provided under the Gold Plan before the Petition Date; however, due to the nature of the self-insured medical plans, it remains possible that certain services may have been provided prepetition for which claims have not yet been presented to the Debtors.  The Debtors do not believe they hold any amounts that have been collected from Employees that remain unprocessed through the ACH on account of the Gold Plan.

b.    Medical Plan Platinum

107.    The Medical Plan Platinum (the "**Platinum Plan**") consists of a self-insured PPO medical plan for eligible Employees.  The cost of the Platinum Plan is borne primarily by the Debtors, but Employees also contribute to the plan through payroll deductions that help fund claim payments.  The Debtors pay claims every week, as they come due, through the ACH.  I understand from my staff that the Debtors last paid claims through the ACH on or

around February 26, 2015. As of the Petition Date, the Debtors have paid all claims that Allied has presented to them under the Platinum Plan. Consequently, the Debtors do not believe that any claims remain owing and unpaid to Allied on account of services provided under the Platinum Plan prior to the Petition Date, however, due to the nature of the self-insured medical plans, it remains possible that certain services may have been provided prepetition for which claims have not yet been presented to the Debtors. The Debtors do not believe they hold any amounts that have been collected from Employees that remain unprocessed through the ACH on account of the Platinum Plan.

c.    <u>International Insurance Plan</u>

108. The Debtors' Employees who work internationally receive medical benefits under an international insurance plan maintained by Cigna ("**International Insurance Plan**"). The cost of the International Insurance Plan is borne primarily by the Debtors, but international Employees contribute to the plan through payroll deductions. Between the 15th and the 20th of each month, Cigna provides the Debtors with a check request to satisfy claims previously submitted and approved. I understand that the Debtors last paid claims under the Cigna plan on or around February 3, 2015. As of the Petition Date, the Debtors' next payment of $12,777 is due and owing.

d.    <u>Medical Coverage for High-Risk Employees</u>

109. Approximately 12 of the Debtors' Employees have chronic health conditions that qualify them as "high-risk" Employees. Because the Debtors are self-insured, it would be prohibitively expensive to include these Employees in the risk pool with the Employees who receive coverage under the Gold or Platinum Plans. The Debtors, however, are committed to ensuring that all their Employees have access to health insurance. Accordingly, the Debtors subsidize these Employees' health coverage by advancing them funds to pay the

premiums for private health insurance the Employees acquire on the federal health insurance exchanges established under the Affordable Care Act. As of the Petition Date, there are no accrued but unpaid amounts owed to these Employees in connection with securing alternative health coverage.

110. *Pharmaceutical Plans.* The Debtors offer eligible Employees Gold and Platinum Pharmaceutical Plans (the "**Pharmaceutical Plans**") through Express Scripts. As of the Petition Date, 160 Employees participate in the Gold Plan, and 192 Employees participate in the Platinum Plan. The costs of the Pharmaceutical Plans are borne primarily by the Debtors, but Employees also contribute to the plans through payroll deductions that help fund claim payments. The Debtors pay claims on a semimonthly basis on or before the 15th and the last days of each calendar month. The Debtors' last claim payment was paid to Express Scripts on February 27, 2015. Because of the changing composition of the Debtors' workforce and the nature of claim-based pharmaceutical plans, claims amounts can fluctuate wildly, even within a given month. The Debtors' next claims payment of $90,000 is due and owing as of February 28, 2015.

111. *Dental Plan.* The Debtors offer eligible Employees a DPPO dental plan (the "**Dental Plan**") administered by Guardian. As of the Petition Date, the Dental Plan has 347 participants. The cost of the Dental Plan is borne primarily by the Debtors, but Employees also contribute to the Dental Plan through payroll deductions. The Debtors pay an average monthly premium of approximately $22,000 under the Dental Plan and, for each coverage period, withhold from participating Employees' wages amounts related to the Employees' contributions toward the premiums. I understand that the Debtors' last invoice was received from Guardian on February 15, 2015, and the payment has not yet been processed. Consequently, the Debtors hold

approximately $22,000 that remains owing and unpaid to Guardian on account of services provided under the Dental Plan prior to the Petition Date.

112.    *Vision Plan.*  The Debtors offer vision coverage to Employees through a fully insured vision care plan with VSP (the "**Vision Plan**").  I understand that as of the Petition Date, the Vision Plan has 284 participants.  The average monthly cost of premiums for the Vision Plan is approximately $2,900, the entirety of which is paid by Employees.

113.    *COBRA Program.*  The Debtors also offer eligible Employees the option to retain COBRA medical, dental, vision coverage, and employee-assistance programs at their own expense, for 18 to 36 months after termination of employment.

114.    *Workers' Compensation Program.*    The Debtors maintain workers' compensation insurance for Employees at the statutorily required level in Texas and Louisiana, the states where the Debtors conduct business (the "**Workers' Compensation Program**").  All onshore Employees who work in those states are entitled to participate in the Workers' Compensation Program.  The Workers' Compensation Program is fully insured, so the Debtors do not incur any additional costs on account of claims brought under the Workers' Compensation Program.  The Workers' Compensation Program is maintained through Liberty Mutual Fire Insurance Co. ("**Liberty Mutual**") and runs through June 30, 2015.  I understand that the Debtors pay approximately $90,000 in annual premiums to Liberty Mutual for maintaining the Workers' Compensation Program.  The Debtors do not have any obligations outstanding to Liberty Mutual as of the Petition Date.

115.    The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without

regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.

116.    _Other Benefit Programs_.  The Debtors also offer other customary benefits to their Employees, including: basic life and accidental insurance coverage, short-term and long-term disability insurance, an employee-assistance program (which offers confidential counseling to eligible Employees and their eligible dependents), and an educational assistance program.  I understand that the Debtors pay a monthly average of approximately $29,000 on behalf of these benefit programs.  The Debtors cannot estimate the amount of these customary benefits outstanding as of the Petition Date because the time for submission for required reports has not come due as of the Petition Date.

117.    The Debtors also offer the Employees Flexible Spending Accounts (the "**FSA Plan**") administered through Discovery Benefits ("**Discovery**").  The Debtors maintain Employees' FSA contributions in the Debtors' bank accounts.  When an Employee withdraws funds from his or her FSA account, Discovery advances those funds to the Employee.  Discovery then submits an invoice to the Debtors for reimbursement.  The Debtors reimburse Discovery for FSA advances by automatic draft.  I understand that the Debtors' last invoice was received from Discovery on February 24, 2015, and the automatic draft was processed on February 25, 2015.  Consequently, the Debtors do not believe that they hold any amounts that remain owing and unpaid to Discovery on account of services provided under the FSA Plan prior to the Petition Date; however, the Debtors currently hold approximately $14,000 collected from the Employees that remains unpaid to Discovery under the FSA Plan.

118.    _401(k) Plan_.  The Debtors sponsor a retirement investment plan and withhold from the wages of participating Employees contributions toward the Cal Dive 401(k)

Plan (the "**401(k) Plan**").  Eligible Employees may make pre-tax or post-tax contributions to the 401(k) Plan ranging from 0% to 100% of their annual compensation, up to the maximum amount allowed by the Internal Revenue Service.  The Debtors do not offer any matching program for Employees who participate in the 401(k) Plan.  As of the Petition Date, 385 Employees participate in the 401(k) Plan (the "**Participating Employees**").  On average, the Debtors withhold approximately $95,000 per month from Participating Employees' paychecks for the 401(k) Plan and an additional $25,000 from certain of the Participating Employees' paychecks to repay loans those Employees drew against the 401(k) Plan, which is then forwarded to the 401(k) Plan administrator, Fidelity Management Trust Company ("**Fidelity**").  I understand that as of the Petition Date, the Debtors the Debtors hold approximately $101,000 in contributions under the 401(k) Plan, that have been collected from the Employees and remain unpaid to Fidelity. The Debtors do not pay Fidelity any custodial, administrative, or other professional fees for maintaining the 401(k) Plan, as Fidelity withdraws its fees from Employees' contributions.

119.    *Reimbursement Obligations*.  Certain Employees incur expenses in the course of performing their jobs, including travel, mobile phone, and meal expenses (the "**Business-Related Expenses**").  It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments for, Business-Related Expenses.  As has been the Debtors' custom and policy, no Employee travel will be reimbursed without advance approval from the Debtors' management.  The Debtors pay a monthly average of approximately $80,000 for Business-Related Expenses.  I understand that the Debtors cannot estimate the amount of Business-Related Expenses outstanding as of the Petition Date because the time for submission for required reports has not come due as of the Petition Date.

120.    I believe that paying Prepetition Employment Obligations will benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations to continue during these chapter 11 cases.  Indeed, I believe that without the requested relief, the Employees may seek alternative opportunities, perhaps with the Debtors' competitors.  Such a development would deplete the Debtors' workforce and hinder the Debtors' ability to continue to operate its Core Business.  The loss of valuable Employees would be distracting and counterproductive at this critical juncture.  Accordingly, I believe that the relief requested in the Wages and Benefits Motion is necessary to avoid irreparable harm to the Debtors and to preserve the value of their estates throughout these chapter 11 cases and, therefore, is in the best interests of the Debtors, their estates, and all of their stakeholders.

**J.        Critical Vendor Motion**

121.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition obligations of certain vendors, suppliers, service providers, and similar entities that provide goods or services critical to the ongoing operation of the Debtors' businesses (the "**Critical Vendors**," whose claims are the "**Critical Vendor Claims**") in the ordinary course in an amount not to exceed $2,600,000 on an interim basis and $8,700,000 on a final basis.

122.    As discussed above, the Debtors operate in a highly specialized industry that requires them to maintain and develop relationships with certain vendors to supply goods and services on which both the diving business and construction business depend.  Without these goods and services, I believe the diving business would suffer severe disruption, jeopardizing the Debtors' ability to continue operating, and the construction business would halt immediately, preventing the Debtors from completing projects for which they stand to be paid millions of dollars.

123.    With the assistance of their advisors, the Debtors thoroughly analyzed their suppliers and service providers, along with the needs of their businesses during these cases, to identify the Critical Vendors.  In examining their vendor relationships, the Debtors considered whether:

- the vendor is a sole-source or limited-source supplier or service provider;
- the vendor has the ability to exercise remedies against property belonging to the Debtors' customers;
- the vendor has a maritime or other statutory lien against property of the Debtors for unpaid obligations;
- the vendor provides services that are so vital to, or so commingled with, the Debtors' businesses that even brief disruption would harm the Debtors' operations;
- the Debtors would be able to cost-effectively obtain comparable products or services from alternative sources within a reasonable timeframe;
- the vendor is able or likely to refuse providing essential supplies or services to the Debtors if prepetition balances are not paid; and
- the business relationship between the Debtors and the vendor is governed by a long-term contract.

124.    Based on this criteria, the Debtors identified a limited roster of Critical Vendors whose services generally fall into one or more of the following categories: (i) specialized labor providers; (ii) crew providers; (iii) vessel providers; and (iv) supplies and necessaries providers.

125.    *Specialized Labor Providers*.  A number of Critical Vendors supply the Debtors with labor services, from underwater welding to surface diving, essential to completing the Debtors' diving and construction projects (the "**Labor Providers**").  I understand that in light of the scale and nature of the Debtors' diving and construction projects, a particular Labor Provider is often the only supplier, or one of a very few, with the special skills to perform required tasks.  Furthermore, I believe that Labor Providers owed for prepetition work might not only withhold future services to the Debtors, but also assert statutory liens under applicable state law against property they have serviced.  That property often belongs to the Debtors' customers.

Labor Providers placing liens on customer-owned property could delay payments from customers to the Debtors and jeopardize relationships the Debtors must preserve to continue operating and collect amounts due from such customers. The Debtors, having just entered chapter 11, cannot bear customers withholding payment or afford to risk tarnishing relationships with key customers. Thus I believe that payment of the Labor Providers is integral to the Debtors' efforts in these cases.

126. *Crew Providers*. To complement their workforce, the Debtors also retain maritime service companies that provide crews to operate and support the Debtors' fleet of vessels. The service companies the Debtors retain are industry leaders in vessel support services and employ individuals with highly specialized skills who constitute a majority of the crews on certain of the Debtors' more specialized vessels. By using them, the Debtors are able to maintain headcount flexibility, reducing overhead costs associated with, among other things, the Employee Benefit Obligations. This enables the Debtors to manage costs and more efficiently respond to fluctuations in workload and vessel activity. In addition, the Debtors believe that replacing these maritime service companies, and the personnel they provide, would impair the Debtors' ability to deploy their vessels, damaging the Debtors' businesses and the estates.

127. *Vessel Providers*. The Debtors do business with suppliers of specialized vessels, such as tugboats, cargo barges, utility boats, dive support vessels, and remotely operated vehicles (the "**Vessel Providers**"). These chartered vessels perform functions required for projects that the Debtors' vessels generally cannot. To complete certain upcoming projects, for example, the Debtors must charter specialized vessels that support specific cranes designed to lift and place platforms, structures, or other equipment into position for offshore installation. I understand that the Vessel Providers are often the only vendors able to provide vessels meeting

the Debtors' needs.  Indeed, for certain vessels, the Debtors already contract with every possible vendor.  In other cases, a replacement source, if available, would result in significantly increased costs to the Debtors.  Like the Labor Providers, some Vessel Providers can also assert liens on property—including customer property—on account of amounts owing for vessel services.  I believe that continuing to charter vessels of the same quantity and quality, and on the same favorable terms, is essential to the Debtors' operations and, therefore, to the success of these chapter 11 cases.

128.    *Supplies and Necessaries Providers*.  To operate their vessels, the Debtors purchase equipment, materials, supplies, goods, and other "necessaries" from a variety of vendors (the "**Supplies and Necessaries Providers**").  The Supplies and Necessaries Providers furnish the Debtors with products fundamental to their operations, without which the Debtors would be unable to operate their vessels, service their diving customers, or complete their construction projects.  For certain items, only a limited number of vendors can meet the Debtors' volume and quality requirements on a timely, cost-efficient basis.  With respect to other items, particularly specialty equipment and materials required to operate the vessels, only a single source can provide these.  For example, in several regions where the Debtors operate, only a single source can provide the fuel required to operate the vessels.  I believe that any loss of the Supplies and Necessaries Providers following the commencement of these cases would impair the Debtors' ability to preserve and maximize the value of their estates.

129.    Moreover, providers of "necessaries" to a Cal Dive vessel—which often include not only Supplies and Necessaries Providers but Labor Providers and Vessel Providers— may hold a maritime lien against that vessel and its equipment.  Accordingly, I believe that satisfaction of the Critical Vendor Claims is further warranted because multiple Critical Vendors

potentially have liens against the Debtors' vessels for securing the payment of outstanding obligations.

130.    The Debtors plan to use reasonable efforts where appropriate and practicable to condition payments to Critical Vendors on each Critical Vendor's agreement to (i) accept such payment in satisfaction of all or a part of its Critical Vendor Claim; (ii) continue to provide supplies or services to the Debtors during these chapter 11 cases consistent with those practices and programs (including credit limits, pricing, timing of payments, and availability) in place in the 12 months before the Petition Date ("**Customary Trade Terms**"); and (iii) waive lien rights it may hold in respect of prepetition obligations against a Debtor-owned vessel or property of the Debtors' customers.    To this end, the Debtors may elect to execute Trade Agreements evidencing these terms.

131.    I believe that the relief requested in the Critical Vendor Motion is narrowly tailored to facilitate the Debtors' restructuring efforts.    Moreover, I believe that any interruption in the goods or services supplied by the Critical Vendors—however brief—would disrupt the Debtors' operations and cause irreparable harm to the Debtors' estates.    Therefore, I believe that the relief requested in the Critical Vendor Motion is necessary to preserve the value of their estates throughout these chapter 11 cases and is in the best interests of the Debtors, their estates, and all of their stakeholders.

**K.    Cash Management Motion**

132.    The Debtors seek entry of interim and final orders (i) authorizing the Debtors to continue to use their centralized cash management system (the "**Cash Management System**") and bank accounts; (ii) waiving certain bank account and related requirements of the Office of the United States Trustee; (iii) authorizing the Debtors to continue their existing deposit practices under the Cash Management System (subject to certain reasonable changes to

the Cash Management System that the Debtors may implement); (iv) extending time to comply with Bankruptcy Code section 345(b); and (v) authorizing Intercompany Transactions consistent with historical practice and granting administrative expense priority to Intercompany Transactions.

133.    The Cash Management System is an integrated, global network of bank accounts that, I believe, is critical to the Debtors' operations during these cases and, in turn, maximizing the value of the Debtors' estates.  The Debtors use the Cash Management System to collect cash from operations and to make cash disbursements—primarily payroll and payments to vendors—to manage their businesses.  The Cash Management System also serves a strategic function, facilitating the Debtors' cash monitoring, forecasting, and reporting, and enabling the Debtors to control administration of their bank accounts.  The Debtors take care to record all collections, transfers, and disbursements made through the Cash Management System as and when made.

134.    The bank accounts held by Cal Dive and CDOCI ( the "**Debtor Bank Accounts**") are the hub of the Cash Management System.  However, the Non-Debtor Affiliates also maintain bank accounts integral—and even directly linked—to the Debtors' business (the "**Non-Debtor Affiliate Bank Accounts**").  I describe the Debtor Bank Accounts and Non-Debtor Affiliate Bank Accounts, as well as the Intercompany Transactions, below.

a.    The Debtor Bank Accounts

135.    There are seven Debtor Bank Accounts: five at Amegy Bank of Texas ("**Amegy**") and two at Wells Fargo Bank, N.A ("**Wells Fargo**").  Each Debtor Bank Account is insured by the Federal Deposit Insurance Corporation ("**FDIC**").

136.    *The Holding Account*.  The Debtors' main deposit account (the "**Holding Account**"), held by Debtor Cal Dive, is maintained at Amegy.  The Holding Account funds each

of the three zero balance accounts maintained at Amegy that the Debtors use to operate their day-to-day business:   the Operating Account, the Checking Account, and the Domestic Payroll Account.   From the Holding Account, the Debtors pay Bank Fees (defined below), 401(k)-related payments, insurance premiums, and principal payments on debt.   Cash receipts, other than sweeps from the Operating Account, are limited to deposits from longstanding customers who historically made deposits into this account.   I understand from my staff that as of the Petition Date, the Holding Account contains approximately $50,000.

137.   *The Operating Account*.   The Debtors' primary operating account (the "**Operating Account**"), held by Debtor CDOCI, is a zero-balance account that serves three critical functions.  First, the Debtors use the Operating Account to make nearly all domestic non-payroll-related payments and disbursements related to their business operations (including interest on indebtedness).  Electronic payments are made directly from the Operating Account; where vendors or suppliers present hard-copy checks issued by the Debtors, those checks are honored via funds transferred from the Operating Account to a linked Amegy zero-balance checking account (the "**Checking Account**").   Second, the Operating Account receives as deposits most revenue the Debtors generate.   These deposits largely consist of customer payments received as wires, checks, or transfers from automated clearinghouses.[5]   Third, the Debtors use the Operating Account to make Intercompany Transactions to and from the Non-Debtor Affiliates.

138.   *The Domestic Payroll Account*.   The Debtors fund domestic payroll and payroll taxes from a dedicated zero-balance account maintained by CDOCI at Amegy (the "**Domestic Payroll Account**").   To make these payments, CDOCI initiates electronic transfers or

---

[5] In a few cases, customers deposit funds into the Holding Account.

issues manual disbursements to employees and taxing authorities from the Domestic Payroll Account.  Funds are automatically transferred from the Holding Account to the Domestic Payroll Account as requests for payment are presented.

139.    *Cash Purchase Accounts*.  Cal Dive maintains two related accounts at Wells Fargo to facilitate cash purchases to support the Debtors' administrative and operational functions.  One is a purchase-card account.  Only three employees are authorized signatories on the purchase card account, which contains no funds as of the Petition Date.  The other is a cash collateral account securing the purchase-card account.  I understand that this account has a balance of $100,000 as of the Petition Date.

140.    *Inactive Deposit Account*.  Finally, Debtor Gulf Offshore Construction, Inc. ("**GOCI**") also maintains an inactive deposit account at Amegy.

141.    *Bank Fees*. The Debtors pay, honor, or allow the deduction from the Debtor Bank Accounts service charges and other fees, costs, and expenses arising in the ordinary course (collectively, the "**Bank Fees**").  I understand from my staff that the Debtors estimate that they pay on average monthly Bank Fees of approximately $7,000 and that they owe prepetition Bank Fees of approximately $4,000.  I believe that the Debtors' inability to pay prepetition or postpetition Bank Fees in the ordinary course could disrupt the Cash Management System and harm the Debtors' estates.

b.    Key Non-Debtor Affiliate Bank Accounts

142.    The Non-Debtor Affiliates maintain their international and domestic accounts at Amegy, HSBC Holdings plc and its international affiliates ("**HSBC**"), Citibank and its international affiliates, including Banco Nacional de México ("**Banamex**"), and Santander Bank ("**Santander**").  By and large, the Non-Debtor Affiliates maintain the Non-Debtor Affiliate Bank Accounts to facilitate deposits and disbursements for the Cal Dive Group's foreign

operations.  Some serve simple yet important functions.  For example, Cayman-based Cal Dive Offshore Contractors Ltd. maintains an international payroll account at Amegy, funded from the Operating Account, to pay Debtor employees serving in expatriate positions.  Others connect the Debtors with the Non-Debtor Affiliates.  Although the Non-Debtor Affiliates collect their own revenue and are largely responsible for meeting their own obligations, in some circumstances the Debtors transfer funds to the Non-Debtor Affiliates to ensure sufficient liquidity for working capital needs.  And, from time to time, where they hold excess cash, the Non-Debtor Affiliates transfer funds to the Debtors to repay intercompany balances advanced by the Debtors.

143.    An account held by Cayman-based Non-Debtor Affiliate Cal Dive Offshore International Ltd. is central to transfers between the Debtors and Non-Debtor Affiliates. Maintained at Amegy, this holding account (the "**International Holding Account**") facilitates payments between the Debtors and the Non-Debtor Affiliates based in Singapore, Mauritius, Malaysia, Indonesia, and Australia.  Where a Non-Debtor Affiliate holds excess cash based on forecasted needs, the Non-Debtor Affiliate transfers funds from its local Non-Debtor Affiliate Bank Account to the International Holding Account.  The funds are then manually transferred to the Operating Account.  Once in the Operating Account, the funds are swept to the Holding Account for the Debtors' use.  Where Non-Debtor Affiliates lack sufficient liquidity to meet short-term working capital needs, the reverse occurs: funds move from the Holding Account to the Operating Account, on to the International Holding Account, and then to the target local Non-Debtor Affiliate Bank Account.

144.    For tax-related reasons, the Mexican and United Kingdom ("**U.K.**") Non-Debtor Affiliates do not use the International Holding Account to transfer funds to or receive funds from the Debtors.  The Mexican Non-Debtor Affiliates maintain both U.S. dollar ("**USD**")

and Mexican peso ("**MXN**") accounts.  Their MXN-denominated customer deposits are made into an account maintained at Banamex (MXN).  The cash is then transferred to one of three operating accounts at Santander (MXN) for use in operations.  The Mexican Non-Debtor Affiliates' USD-denominated customer deposits are made into accounts maintained at Santander (USD) and Amegy (USD) (collectively, with the Santander (MXN) accounts, the "**Mexican Operating Accounts**").  In some cases, upon receipt of these USD-denominated deposits, MXN are purchased through a third-party exchange and transferred to the relevant Santander (MXN) account.

145.    At times, a Mexican Non-Debtor Affiliate's cash on hand may exceed its forecasted needs.  In these circumstances, the Mexican Non-Debtor Affiliate transfers cash to the Operating Account (via direct USD transfers or MXN foreign currency exchanges flowing through the Amegy (USD) account).  Conversely—where Mexican Non-Debtor Affiliates lack liquidity to meet short-term working capital needs—the Debtors transfer funds from the Holding Account to the Operating Account, and then manually to the Mexican Non-Debtor Affiliates' Amegy (USD) account.  Once in the Amegy (USD) account, the funds are used in operations (for payments to vendors in USD) or further transferred to the Santander Bank (MXN) accounts through a third-party exchange (for disbursements in MXN).

146.    Similarly, the U.K. Non-Debtor Affiliate makes transfers to, and receives transfers from, the Debtors directly via the Operating Account instead of the International Holding Account.  Third-party cash—in British pounds—comes into and out of the U.K. Non-Debtor Affiliate through a local Non-Debtor Affiliate Bank Account at HSBC.  The U.K. Non-Debtor Affiliate holds its cash in that account.  When it has excess cash, the U.K. Non-Debtor Affiliate transfers funds to the Operating Account through a third-party exchange.  When the

U.K. Non-Debtor Affiliate requires liquidity, the Debtors transfer funds from the Holding Account to the Operating Account, and then to the U.K. Non-Debtor Affiliate Bank Account (through a third-party exchange).

### c.    Intercompany Transactions

147.    Historically, the Debtors have engaged in Intercompany Transactions largely to centralize cash management and maintain control over the funds moving within the Cal Dive Group.  As their financial position has deteriorated and consistent with requirements in their credit documents, however, the Debtors have borrowed excess cash from the Non-Debtor Affiliates to fund the Debtors' critical operating needs and meet the Debtors' debt obligations.  I understand that these cash sweeps have depleted the Non-Debtor Affiliates' cash on hand, which, in turn, has required the Debtors to routinely provide the Non-Debtor Affiliates liquidity for operations.

148.    I believe that continuing these Intercompany Transactions is necessary to preserve the Debtors' equity interests in the Non-Debtor Affiliates.[6]  If the Debtors do not replenish the funds they have swept, the Non-Debtor Affiliates' businesses will be disrupted, damaging one of the estates' valuable assets.  Moreover, should any Non-Debtor Affiliate cease operations, the Debtors, which guarantee some Non-Debtor Affiliates' obligations, may face claims or causes of action.  In any event, not only would continuing the Intercompany Transactions during these cases preserve the Debtors' equity interests in the Non-Debtor Affiliates, but over the course of these cases the estates would likely benefit from anticipated cash inflows from the Non-Debtor Affiliates (including the Mexican Non-Debtor Affiliates'

---

[6] Historically, the Debtors have only intermittently netted or partially repaid the intercompany balances created by these Intercompany Transactions.

anticipated receipts). Accordingly, I believe that continuing the Intercompany Transactions in the ordinary course is critical to preserving value.

149.    The Debtors also engage in Intercompany Transactions with a Non-Debtor Affiliate through vessel-leasing, or "charterparty," agreements. Under these agreements, Debtor Affiliated Marine Contractors, Inc. ("**AMC**") charters vessels owned by CDOCI to HOC Offshore S de RL de CV ("**HOC**"), the Cal Dive Group's Mexican operating entity. In exchange, HOC pays a charter fee to CDOCI (for the benefit of AMC). I believe that this arrangement is beneficial to the estates because it compensates CDOCI for the use of its vessels while supporting the business operations of a critical subsidiary.

150.    The charterparty agreements between HOC and AMC also require Intercompany Transactions for foreign tax compliance. The charterparty agreements create income tax obligations from AMC to the Mexican government, but because AMC is not a Mexican taxpayer, HOC pays the taxes on AMC's behalf. HOC receives the funds to pay those tax obligations from the Debtors only as those tax obligations come due. The failure to permit the Debtors to continue remitting payments to fund these foreign tax liabilities (and similar arrangements with Australian Non-Debtor Affiliates) could result in penalties against the Non-Debtor Affiliates, which might in turn assert claims against the Debtors.

151.    Just as the Debtors can ascertain, trace, and account for all external fund transfers in their accounting system, they also carefully and accurately track Intercompany Transactions. Indeed, during these cases, the Debtors intend to segregate and separately track postpetition Intercompany Transactions and include a detailed accounting of such Intercompany Transaction in the Debtors' monthly operating reports.

152.    I believe that maintaining the Cash Management System is essential given the volume of transactions the Debtors, as well as the Non-Debtor Affiliates, manage each day. The burden of, among other things, closing the Debtors Bank Accounts, opening new accounts, printing new checks, and revising the Cash Management System would severely hamper the Debtors' ability to serve customers and meet postpetition obligations.  Furthermore, I believe that it is imperative that the Debtors be able to engage in Intercompany Transactions during these chapter 11 cases.  If the Intercompany Transactions were discontinued, the Cash Management System and the operations of the Debtors and Non-Debtor Affiliates alike would be harmed, all to the detriment of the Debtors and their estates.  Accordingly, I believe that the relief requested in the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates and is in the best interests of all stakeholders.

**L.    DIP Motion**

153.    In the DIP Motion, the Debtors request entry of interim and final orders (each, as applicable, the "**DIP Order**") authorizing them to enter into the DIP Facility under the terms and conditions of that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement among Cal Dive, the DIP Agent, and the DIP Lenders (the "**DIP Facility Agreement**") and perform under the DIP Facility Documents.  The Debtors also request in the DIP Motion that the Court authorize related relief, including the consensual use of the Pre-Petition Secured Parties' Cash Collateral.

154.    *The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates.*  The DIP Facility, if approved, will provide working capital critical to funding the Debtors' day-to-day operations.  Without access to the DIP Facility, the Debtors would be forced to immediately cease operating, which would result in immediate and irreparable harm to their businesses and assets by depleting going concern value.  Because the Debtors' available and

projected liquidity is insufficient to fund their operations, the credit provided under the DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

155.   *Approval of the Use of Cash Collateral.*   The Debtors urgently need immediate use of the Pre-Petition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the DIP Facility Documents. The Debtors need the Cash Collateral to pay operating expenses, including payroll, taxes, and vendors, and to ensure a continued supply of supplies and services essential to the Debtors' businesses.  The Debtors' businesses otherwise will grind to an immediate halt, with damaging consequences for the Debtors and their estates.  The Pre-Petition Secured Parties have consented to terms allowing the Debtors to continue using Cash Collateral to operate.

156.   I believe that it is essential that the Debtors obtain sufficient credit and cash availability to finance these chapter 11 cases and instill employees, suppliers and customers—along with those of the Non-Debtor Affiliates—with confidence in the Debtors' ability to maximize the value of their estates and to successfully navigate these chapter 11 cases. Without these financial arrangements and the confidence they will provide, the Debtors will not have the resources necessary to do so.

157.   The Debtors seek immediate interim approval of the DIP Motion.  This is because without the use of Cash Collateral and credit under the DIP Facility, the Debtors will be unable to continue operating, and will therefore suffer immediate and irreparable harm.  I believe that prompt approval of the DIP Facility not only will permit the Debtors to operate in the ordinary course during the first month of these cases, but also will signal to the Debtors' and

Non-Debtor Affiliates' creditors, customers, and employees that these chapter 11 cases will allow the Debtors to achieve orderly restructuring.

### M.      Motion to Seal

158.    The Debtors seek entry of an order allowing them to file under seal schedules 1.01(c), 1.01(d), 1.01(e), and 1.01(n) (the "**Commercially Sensitive Information**") to the DIP Facility Agreement.  The Commercially Sensitive Information that the Debtors seek to protect includes highly confidential information related to the Debtors' plans to divest certain assets during these chapter 11 cases, including information revealing the Debtors' classification of those assets as core or non-core to the Debtors' business, the minimum sale price that the Debtors must realize for a given vessel in order to avoid a disproportionate reduction in the DIP Facility borrowing base, and the timing specific assets are scheduled to be sold under the DIP Facility Agreement.  I believe that disclosure of the Commercially Sensitive Information would undermine the Debtors' ability to attract the highest and best prices for their vessels and related assets, thereby damaging the value of the Debtors' estates to the detriment of their creditors and other parties in interest.

## **CONCLUSION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

March 3, 2015
       Houston, Texas

Quinn J. Hébert
President and CEO
Cal Dive International, Inc.

<u>**Exhibit A**</u>

**Organizational Chart**



**US Entities**

Cal Dive International, Inc.
Page 1 of 3
as of March 3, 2015

Entities are 100% owned unless otherwise indicated.

Cal Dive International, Inc.
(Delaware)

Cal Dive Offshore Contractors, Inc.(CDOCI)
(Delaware)

Affiliated Marine Contractors, Inc.
(Delaware)

Fleet Pipeline Services, Inc.
(Delaware)

Gulf Offshore Construction, Inc.
(Delaware)

CDI Renewables, LLC
(Delaware)
Inactive

19.9%
Deepcor Marine Inc.
(Delaware)

CDOCI-Owned
Non-Debtor Affiliates, page 2 of 3

49%
CDI Vessels Mexico
S. de R.L. de C.V.
(Mexico)



**Legend**

Borrower
Guarantor/100% Pledged Equity
Joint Venture



**CDOCI-Owned Non-Debtor Affiliates**

Cal Dive International, Inc.
Page 2 of 3
as of March 3, 2015

Entities are 100% owned unless otherwise indicated.

CDOCI Trinidad Tax Registration

Cal Dive Offshore Contractors, Inc. (CDOCI) (Delaware)

Affiliated Marine Contractors, Inc. (Delaware)

1% — 99% Tiburon Ingenieria y Construccion, S. de R.L. de C.V. (Mexico)

52% Horizon-C-Bay - Costa Afuera, S. de R.L. de C.V. (Mexico)

34% — 66% HOC Offshore, S. de R.L. de C.V. (Mexico)

34% — 66% CDI Offshore Construction S. de R.L. de C.V. (Mexico)

Cal Dive Offshore International, Ltd. (CDOIL) (Cayman)
(See also CDOIL-Owned Non-Debtor Affiliates, page 3 of 3)

Horizon Marine Construction Ltd. (Cayman)

Cal Dive International, Pte Ltd (Singapore)

97% — 3% Mojarra Costa Afuera, S. de R.L. de C.V. (Mexico)

51% ECH Offshore, S. de R.L. de C.V. (Mexico) 49%

99% Horizon Offshore Nigeria, Ltd.

Cal Dive International (Australia) Pty Ltd.

Cal Dive Arabia Company Ltd. (Saudi Arabia) 50%

**Legend**
- Guarantor/100% Pledged Equity
- 66% Pledged Equity
- Joint Venture



**CDOIL-Owned Non-Debtor Affiliates**

Cal Dive International, Inc.
Page 3 of 3

as of March 3, 2015

Entities are 100% owned unless otherwise indicated.

Cal Dive Offshore International, Ltd. (CDOIL) (Cayman)

- CDI Europe Ltd. (UK)
- Cal Dive Offshore Services, Ltd. (Cayman)
  - 95% Marine Leasing Labuan Pte, Ltd.
  - 5%
- Cal Dive Offshore Contractors, Ltd. (Cayman)
  - 5%
- Cal Dive Vessels Int'l, Ltd. (Cayman)
  - PT Cal Dive Offshore Indonesia
- Cal Dive Marine Construction (Mauritius), Ltd.
  - 95% Cal Dive Marine Contractors (Malaysia) Sdn Bhd
- Cal Dive Offshore Contractors (Mauritius), Ltd.
- Cal Dive West Africa, Ltd. (Cayman)
  - 60% Petrolog Cal Dive West Africa, Ltd. (Cayman)
    - 40% Petrolog Cal Dive Nigeria, Ltd.

**Legend**
66% Pledged Equity
Joint Venture

**Exhibit B**

**CDOCI Vessels**

## Cal Dive Vessel Fleet

| Vessel Name | Ownership | Flagged | Type |
|---|---|---|---|
| **Domestic Vessels** | | | |
| Lone Star | CDOCI | Vanuatu | Lay/Bury Barge |
| Pacific | CDOCI | USA | Derrick Barge |
| Rider | CDOCI | USA | Lay/Bury Barge |
| Sea Horizon | CDOCI | Vanuatu | Derrick/Lay Barge |
| Atlantic | CDOCI | USA | Derrick Barge |
| Brave | CDOCI | USA | Lay/Bury Barge |
| Pecos | CDOCI | USA | Lay/Bury Barge |
| Midnight Star | CDOCI | Vanuatu | 4-Point DSV |
| Texas | CDOCI | Vanuatu | DSV-DP2 |
| Uncle John | CDOCI | Bahamas | Semi-Sub. Multi-purpose |
| American Constitution | CDOCI | Panama | 4-Point DSV |
| Cal Diver I | CDOCI | USA | 4-Point DSV |
| Cal Diver II | CDOCI | USA | 4-Point DSV |
| Kestrel | CDOCI | Vanuatu | DSV-DP2 |
| Mystic Viking | CDOCI | Bahamas | DSV-DP2 |
| **Subtotal - Domestic Vessels (15)** | | | |
| **Foreign Vessels** | | | |
| Utah II | CDIA | Australia | Shallow Water DSV |
| Omaha | CDIA | Australia | Shallow Water DSV |
| Sword | CDIA | Australia | Shallow Water DSV |
| **Subtotal - Foreign Vessels (3)** | | | |
| **Total Vessels (18)** | | | |