# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
: 
In re: : Chapter 11
: 
: Case No. 15-10458 (   )
CAL DIVE INTERNATIONAL, INC., *et al.*,[1] :
: 
Debtors. : Joint Administration Requested
: 
-------------------------------------------------------------x

**DECLARATION OF JOHN D. BITTNER IN SUPPORT OF
DEBTORS' MOTION (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
AND 507 AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING, (B) GRANT SENIOR LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, AND (C) UTILIZE CASH
COLLATERAL OF PRE-PETITION SECURED PARTIES; (II) GRANTING
ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES
PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; (III) SCHEDULING A
FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

I, John D. Bittner, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am a Partner at PricewaterhouseCoopers LLP ("**PwC**") in the Business Recovery Services Group and one of the lead restructuring advisors involved in this case. PwC is a proposed financial advisor to Cal Dive International, Inc. ("**Cal Dive**" or the "**Borrower**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"). PwC began working with the Debtors during July 2014. I understand that the Debtors plan to file the *Debtors' Application for Entry of an Order Authorizing the Employment and Retention of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Cal Dive International, Inc. (0501), Cal Dive Offshore Contractors, Inc. (4878), Affiliated Marine Contractors, Inc. (8678), Fleet Pipeline Services, Inc. (2104), Gulf Offshore Construction, Inc. (2106), and CDI Renewables, LLC (4985). The Debtors' corporate headquarters is at 2500 CityWest Boulevard, Suite 2200, Houston, TX 77042.

*PricewaterhouseCoopers LLP as Financial Advisor for the Debtors,* Nunc Pro Tunc *to the Petition Date* in the coming days.

2.  I submit this declaration in support of the *Debtors' Motion (i) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 Authorizing the Debtors to (a) Obtain Postpetition Financing, (b) Grant Senior Liens and Superpriority Administrative Expense Status, and (c) Utilize Cash Collateral of Pre-Petition Secured Parties; (ii) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, And 364; (iii) Scheduling a Final Hearing; and (iv) Granting Related Relief* (the "**DIP Motion**").[2]

3.  Unless otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' senior management, members of the PwC team, or other interested parties, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. To the extent any information discussed below requires amendment or modification, I will submit a supplemental declaration to the Court. If I were called to testify, I would testify competently to the facts in my declaration.

### Qualifications

4.  I received my Bachelor of Business Administration in finance and accounting from Texas A&M University in 1990 and my Master of Business Administration from the University of Michigan in 1997. After graduating from Texas A&M, I joined Arthur Andersen & Co. where I served as a Staff Auditor and Senior Staff Auditor from 1990 to 1993. I then joined AppleTree Markets Inc. where I served as Assistant Controller and Vice President – Corporate Controller. I served as the Business Recovery Services Senior Associate and later

---

[2] Capitalized terms not otherwise defined herein have the meanings set forth in the DIP Motion.

Manager and Director at Coopers & Lybrand / PwC from 1997 through 2002. Over the last thirteen years, I have served in various executive positions in the restructuring and corporate workout divisions of FTI Consulting, Inc., KPMG LLP, Mesirow Financial Consulting, and Grant Thornton LLP's Corporate Advisory & Restructuring Services. I have been a partner in PwC's Business Recovery Services since rejoining PwC in 2013. In all of my positions since 1997, I have specialized in turnaround and restructuring advisory work and have assisted in providing strategic, operational, managerial, and financial solutions to a number of companies. I have specific experience relevant to this case, as several of my engagements have been in the on- and off-shore oil and gas and oilfield services industries. The matters I have worked on range from bankruptcy planning and process oversight, financing, and valuation advice, as well as other general reorganization strategy matters, to procuring, assessing, and negotiating debtor-in-possession financing. I have served as advisor to debtors in multiple large chapter 11 engagements.

## The Proposed DIP Facility

5. The Debtors seek authority to obtain secured postpetition financing in an aggregate principal amount of up to $120,000,000 (the "**DIP Facility**") pursuant to the terms and conditions of that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement among the Borrower, Bank of America, N.A., as administrative agent (the "**DIP Agent**"), and each of the Lenders (the "**DIP Lenders**") party to a Credit Agreement, dated April 26, 2011 (as amended, and in effect on the date hereof, the "**Pre-Petition Senior Loan Agreement**").

6. The DIP Lenders and the Pre-Petition Lenders (defined below) have consented to the Debtor's use of cash collateral (as defined in Bankruptcy Code section 363(a), "**Cash Collateral**") and entry into the DIP Facility.

**Marketing Process and the Debtors' Consideration of
Alternative DIP Facility Proposals**

7. The DIP Facility is the result of a long process that began in 2014, when the Debtors determined that they needed to address their liquidity constraints and overleveraged capital structure.[3] In a good-faith effort to address these challenges, the Debtors attempted to refinance their existing debt to secure the liquidity necessary to complete work on new and existing contracts and to provide them with a more sustainable capital structure.

8. This led the Debtors, in the fall of 2014, to focus their efforts on refinancing the $99.8 million debt remaining under their originally $125.0 million revolving credit facility (the "**Pre-Petition Senior Revolver**"), which matures on April 26, 2016, under the Pre-Petition Senior Loan Agreement. The Debtors received indications of interest from approximately six potential lenders that were considering refinancing the Pre-Petition Senior Revolver and providing additional liquidity to fund the Debtors' operational needs. These proposed new loans had higher fees and interest rates than the Debtors' existing secured debt obligations; however, the new loans would have provided the Debtors with incremental liquidity. Ultimately, however, as oil prices dropped sharply in November 2014 and faced with uncertainty in the capital markets, those potential lenders withdrew their indications of interest for an out-of-court refinancing of the Pre-Petition Senior Loan Agreement. As a result, the Debtors were unable to refinance their existing debt.

9. Serious discussions with lenders for debtor-in-possession financing alternatives commenced in early 2015. During that time, the Debtors received term sheets from five lenders interested in providing $20–$30 million in incremental liquidity under debtor-in-possession loans that would prime the Debtors' existing secured debt obligations. Ultimately,

---

[3] The circumstances that led to the filing of these cases are described in greater detail in the First Day Declaration.

however, the Debtors rejected these alternative financing arrangements because they believed the proposal from their existing secured lenders was in the Debtors' best interest. The terms of alternative proposals the Debtors received generally had higher interest rates and/or higher fees than what the Debtors' existing lenders were offering for refinancing options. Moreover, given the very volatile market conditions in the oil and gas industry (as well as the Debtors' limited liquidity), the Debtors believed a priming dispute with the Pre-Petition Lenders would be very destructive.

10. At the same time that they were negotiating with other lenders in early 2015, the Debtors also focused on obtaining a financing commitment from the existing lenders under the Pre-Petition Senior Loan Agreement (the "**Pre-Petition Senior Lenders**") as well as use of cash collateral with the lenders under the Debtors' Amended and Restated Credit Agreement, entered into on May 9, 2014 (the "**Pre-Petition Junior Lenders**" and together with the Pre-Petition Senior Lenders, the "**Pre-Petition Lenders**," and the agreement the "**Pre-Petition Junior Loan Agreement**"). Negotiations with the Pre-Petition Lenders lasted over two months and included numerous term sheets and drafts. Both sides, represented by experienced counsel and financial advisors, made numerous compromises to reach agreement on the terms of the DIP Facility. The Debtors ultimately reached agreement with the DIP Agent and DIP Lenders over the terms of the DIP Facility shortly before the commencement of these cases.

**Approval of the DIP Facility Is in the Best Interests of the Estates and the Terms of the Debtors' Use of Cash Collateral and DIP Facility Are Commercially Reasonable**

11. Given the Debtors' urgent need to obtain financial stability, as well as my analysis of the DIP Facility's terms, I believe approval of the DIP Facility is necessary to preserve the value of the estates. Without the incremental liquidity the Debtors will receive under the DIP Facility, the Debtors could lose the ability to complete certain critical projects that

will generate substantial postpetition revenues. In addition, the Debtors require incremental liquidity to facilitate the sale of their Non-Core Assets at the highest and best price and maximize the likelihood of a successful reorganization or going-concern sale of the Core Business.

12. Moreover, in my opinion, the terms of the DIP Facility are fair and reasonable, and approval of the DIP Facility is in the best interests of the Debtors, their estates, and their creditors. For example, the DIP Facility's interest rate of the Base Rate[4] plus 6.25% is reasonable when compared to the other financing proposals the Debtors considered when market conditions were more favorable. In addition, the DIP Facility's milestones provide the Debtors with sufficient time to achieve their goals in these cases while not unduly running the risk of tripping a default under the DIP Facility. The fees and other terms are commercially reasonable based on my experience and knowledge of the Debtors' business affairs, the market for loans of similar sizes and types, and the Debtors' industry generally.

13. In addition, the Pre-Petition Lenders' consent to the DIP Facility is beneficial to the estates because it avoids potentially costly and time-consuming litigation. Because substantially all of the Debtors' cash is encumbered by the liens securing the Pre-Petition Senior Revolver and the Pre-Petition Junior Facility, the Pre-Petition Lenders' consent to use this cash is necessary unless the Debtors can show they are adequately protected. Thus, by obtaining the Pre-Petition Lenders' consent to the DIP Facility and the use of Cash Collateral, the Debtors are able to preserve liquidity and avoid protracted and costly litigation at the outset of these cases.

---

[4] The "Base Rate" is a fluctuating rate equal to the highest of (a) the Federal Funds Rate plus 0.5%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," (c) the Eurodollar Rate plus 1.00%, and (d) 2.75% per annum.

14. Moreover, the DIP Facility's terms are the result of an extensive, good-faith, arms'-length negotiation between the Debtors, the DIP Lenders, and the Pre-Petition Junior Lenders, each of whom was represented by experienced counsel and financial advisors. The Debtors also considered numerous alternatives to the DIP Facility, ultimately rejecting all of them because they did not offer terms as attractive nor as beneficial as the DIP Facility's terms.

15. The DIP Facility will allow the Debtors to maximize recoveries for the Debtors' estates. The Debtors' projections show that the DIP Facility will be paid back and the balance under the Pre-Petition Junior Loan Agreement will be reduced, hopefully paving the way to an exit from bankruptcy. The Debtors' projections are the result of weeks of work and analysis of members of the Debtors' management working with PwC advisors. I find the projections to be reasonable because (i) they are conservative and take into account downside risks, (ii) are based on projections prepared by the Debtors' senior management, who have years of experience with the business, and (iii) have been reviewed by me and the rest of the PwC team, who have years of experience preparing such forecasts, generally, and specifically, as discussed above, with my own experience advising other debtors in the oil and gas industry.

16. Finally, the DIP Facility has the highest certainty of closing because, among other things, the Pre-Petition Lenders have consented to the DIP Facility and the Debtors were already indebted to the DIP Lenders, which incentivized them to provide financing to protect their economic interests. The DIP Agent and the DIP Lenders also have a substantial base of knowledge with respect to the Debtors' business, their capital structure and the Pre-Petition Collateral, increasing the certainty that the DIP Facility would close on the timetable necessary to maximize the value of the estates. As a result, I believe the Debtors' decision to enter into the DIP Facility is reasonable and appropriate.

**The Pre-Petition Junior Lenders Are Adequately Protected**

17. As discussed above, the Debtors' industry has experienced significant volatility over the past six months, impacting their efforts to secure their financing. During negotiations over the DIP Facility, the Pre-Petition Senior Lenders indicated that while the Pre-Petition Senior Revolver was oversecured, based on contemporaneous value indicators it was unclear whether the Pre-Petition Junior Loan would be adequately protected if the Debtors secured DIP financing that would prime the Pre-Petition Junior Collateral. Providing the Pre-Petition Junior Lenders replacement liens on the DIP Facility collateral as adequate protection was an important deal point to secure the Pre-Petition Junior Lenders' consent to the DIP Facility. Indeed, if the Debtors were forced to liquidate because the DIP Facility is not approved, I do not believe the Prepetition Junior Collateral would have any value based on current market conditions.

18. The DIP Facility is secured by a priming lien on all assets that previously served as collateral under the Pre-Petition Senior Loan Agreement as well as certain previously unencumbered assets. The collateral pledge of previously unencumbered assets consists of liens on three vessels, owned by one of the Non-Debtor Affiliates and the pledge of the remaining one-third of the equity in each of the Debtors' first-tier foreign subsidiaries pledged to the Pre-Petition Lenders. I understand that the Pre-Petition Junior Lenders will be granted a replacement lien on all of the liens secured by the DIP Facility, including previously unencumbered collateral.

**The Court Should Approve the Roll-Up**

19. The use of the proceeds of the term loan under the DIP Facility to repay in full the principal obligations under the Pre-Petition Senior Revolver on the Closing Date (the

"**Roll-Up**") is justified because the Debtors would not have been able to secure the DIP Facility needed to stabilize their business without such a condition.

20. Further, the rights of parties in interest to challenge the claims and liens of the parties to the Pre-Petition Senior Loan Agreement are not prejudiced by the Roll-Up because the Interim Order preserves the rights of identified parties to object to and challenge the amount, validity, enforceability, perfection, or priority of the Pre-Petition Senior Loan Obligations within the earlier of (a) 75 days from the Petition Date and (b) the date on which objections of the Debtors' chapter 11 plan of reorganization are due if no Statutory Committee has been appointed by the U.S. Trustee, or the earlier of (a) 60 days after the formation of the Statutory Committee and (b) 75 days following the Interim Hearing if a Statutory Committee has been appointed. Further, the Roll-Up is qualified in its entirety by the rights of those parties to bring a Challenge Proceeding and the recharacterization or reapplication by the Court of any transfers deemed improper because of such a Challenge Proceeding.

18. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 3, 2015

John D. Bittner