## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
                              :

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **CAL DIVE INTERNATIONAL, INC.,** *et al.*,[1] | : | **Case No. 15-10458(CSS)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtor.** | : | |
| | : | Hearing Date: June 22, 2015, at 11:00 a.m. (ET) |
| | : | Objection Deadline: June 15, 2015, at 4:00 p.m. (ET) |

------------------------------------------------------- x

**DEBTORS' MOTION FOR (I) ORDER APPROVING (A) BID PROCEDURES, (B) PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) PROCEDURES FOR ESTABLISHING LIEN RESERVES, AND (D) RELATED NOTICES AND RELIEF, AND (II) ORDER APPROVING (A) SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS UNDER BANKRUPTCY CODE SECTIONS 105, 363(b), (f), AND (m), (B) ASSUMPTION, ASSIGNMENT, AND SALE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER BANKRUPTCY CODE SECTIONS 363 AND 365, (C) LIEN RESERVES, AND (D) RELATED RELIEF**

Cal Dive International, Inc. ("**Cal Dive**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), request entry of (1) an order approving procedures for the Debtors' sale of their Assets (as defined below), for assumption and assignment of certain executory contracts and unexpired leases, and for establishing reserves for potential maritime liens against the Assets, and (2) orders authorizing the Debtors to sell their Assets, assume and assign such executory contracts and unexpired leases, and establish such lien reserves.  In support of this Motion, the Debtors respectfully represent:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Cal Dive International, Inc. (0501), Cal Dive Offshore Contractors, Inc. (4878), Affiliated Marine Contractors, Inc. (8678), Fleet Pipeline Services, Inc. (2104), Gulf Offshore Construction, Inc. (2106), and CDI Renewables, LLC (4985).  The Debtors' corporate headquarters is at 2500 CityWest Boulevard, Suite 2200, Houston, TX 77042.

## PRELIMINARY STATEMENT

1.      In keeping with the Debtors' yearlong efforts to maximize the value of their assets for the benefit of their stakeholders—efforts that began months before the commencement of these cases—the Debtors are pursuing a sale of substantially all their assets. The sale—or sales—of these assets, consisting primarily of the Debtors' marine vessels (each a "**Vessel**" and collectively, the "**Vessels**") and going-concern international and domestic business platforms (together with the Vessels, the "**Assets**"), is proceeding along two concurrent paths. First, the Debtors are conducting an extensive marketing process to sell their core diving and construction businesses, including the Vessels used in the ongoing operation of those businesses, as one or more going concerns.  Second, the Debtors are marketing individual Vessels and entertaining bids for them on a standalone basis.  The procedures proposed in this Motion facilitate this dual-path approach, which will allow the Debtors to explore the full range of opportunities for maximizing the value for the Assets.  The proposed procedures will also establish a framework enabling the Debtors to comply with their obligations under the sale procedure milestones contained in the Debtors' DIP Facility Agreement.[2]  The Debtors believe that implementing the Bid Procedures (as defined herein) and pursuing a sale, or series of sale transactions, in accordance with those procedures is the best course of action for the Debtors and will benefit all parties by providing for a prompt resolution of these cases.

---

[2] This Motion uses the following defined terms to refer to the Debtors' debtor-in-possession financing facility and lenders and prepetition junior secured financing facility and lenders:  (i) "**DIP Facility**" means the secured postpetitoin financing in an aggregate amount of up to $120,000,000 under the terms and conditions of the DIP Facility Agreement; (ii) "**DIP Facility Agreement**" means the Debtors' Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (as amended, modified, waived, or supplemented in accordance with the terms thereof,); (iii) "**DIP Agent**" means Bank of America, N.A., as administrative agent under the DIP Facility Agreement; (iv) "**DIP Lenders**" means the lenders from time to tim party to the DIP Facility Agreement; (v) "**Pre-Petition Junior Facility**" means the $100 million second lien term loan facility under the Pre-Petition Junior Loan Agreement; (vi) "**Pre-Petition Junior Loan Agreement**" means the Amended and Restated Credit Agreement dated May 9, 2014, among Cal Dive, as borrower, the Debtors other than Cal Dive as Guarantors, and the Pre-Petition Junior Agent; (vi)"**Pre-Petition Junior Agent**" means ABC Funding, LLC, as administrative agent under the Pre-Petition Junior Loan Agreement; and (vii) "**Pre-Petition Junior Lenders**" means the lenders from time to time party to the Pre-Petition Junior Loan Agreement.

2

2.      This Motion also seeks Court approval of two procedures intended to facilitate these sales while safeguarding certain creditors.  The first set of procedures—the Assumption and Assignment Procedures (as defined below)—will enhance the Debtors' ability to sell their businesses as going concerns while ensuring that contract counterparties receive appropriate cure.  The Debtors believe that their executory contracts represent valuable rights that underpin the Debtors' operations.  It is critical, therefore, that the Debtors establish procedures permitting them to assume and assign those contracts to any going-concern purchaser.  At the same time, the Assumption and Assignment Procedures afford contract counterparties the opportunity to obtain their entitled cure amounts.

3.      The second set of procedures—the Lien Reserve Procedures (as defined below)—will permit the Debtors to balance their obligations under the DIP Facility Agreement with the potential rights of certain trade creditors and personal injury claimants.  The DIP Facility Agreement requires the Debtors to pay down the DIP Facility (defined below) with the net cash proceeds of Asset sales.  The Debtors fully intend to honor that agreement, but they also recognize that some creditors—for example, those that have provided certain services or delivered certain goods to Vessels—might assert maritime liens against those Vessels.  The Debtors are not asking the Court to determine at this early stage of the proceedings whether any creditor holds a valid and enforceable maritime lien or, if so, the priority of that lien.  Instead, the Debtors propose procedures that preserve the status quo by establishing reserves to be funded from sale proceeds, thereby facilitating sale of the Assets without prejudicing either the Debtors' secured lenders or potential maritime lienholders.

## JURISDICTION & VENUE

4.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334, and venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b).[3]

## RELIEF REQUESTED

5.      *First*, the Debtors seek entry of an order (the "**Bid Procedures Order**")— as proposed in Exhibit A—pursuant to Bankruptcy Code sections 105, 363, and 365, Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rules 2002-1 and 6004-1:

(i) approving the bid procedures (the "**Bid Procedures**," substantially in the form attached to the Bid Procedures Order as Exhibit A) for (a) the sale of certain Assets (the "**Going Concern Assets**") as a going concern (a "**Going Concern Sale**") and (b) the sale of Vessels in standalone transactions (each a "**Vessel Sale**");

(ii) approving procedures for the assumption, assignment, and sale (including notice of proposed cure costs) of the executory contracts and unexpired leases that the Debtors may seek to assume and assign in connection with a Going Concern Sale (the "**Assumption and Assignment Procedures**");

(iii) establishing procedures for notifying creditors (the "**Vessel Creditors**") that, according to the Debtors' books and records, might assert claims against one or more of the Vessels (the "**Vessel Claims**") of the Lien Reserves (as defined below) that the Debtors intend to establish on account of such Vessel Claims upon the disposition of a Vessel, and providing an opportunity for Vessel Creditors to object to the Lien Reserves (the "**the Lien Reserve Procedures**");

(iv) setting (a) a hearing, on shortened notice, to approve the Debtors' selection of one or more stalking horse purchasers (the "**Stalking Horse Purchasers**"), if any, and the provision of Bid Protections (as defined herein) to such Stalking Horse Purchasers, if necessary (the "**Stalking Horse Hearing**"); (b) a date for an auction (for both Going Concern Sales and Vessel Sales) if the Debtors receive

---

[3] Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors hereby confirm their consent to the entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

one or more timely and acceptable Qualified Bids (as defined herein) (the "**Auction**"), and (c) a final hearing (the "**Sale Hearing**") to approve one or more sales of the Assets (the "**Sale Transaction(s)**"); and

(v) approving the form and manner of notice of the Stalking Horse Hearing, the Auction, the Sale Hearing, the Assumption and Assignment Procedures and the Lien Reserve Procedures.

6. *Second*, the Debtors seek entry of one or more orders (each, a "**Going Concern Sale Order**") pursuant to Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1 and 6004-1:

(i) approving the sale of Going Concern Assets free and clear of all liens, claims, encumbrances, and other interests;

(ii) approving the assumption, assignment, and sale of certain executory contracts and unexpired leases pursuant to Bankruptcy Code sections 363 and 365 and related cure amounts; and

(iii) granting related relief.

The Debtors intend to file and serve a proposed Going Concern Sale Order by July 1, 2015.

7. *Third*, the Debtors seek entry of one or more orders (each, a "**Vessel Sale Order**") pursuant to Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1 and 6004-1,  approving Vessel Sales free and clear of all liens, claims, encumbrances, and other interests and granting related relief.  The Debtors intend to file and serve a proposed Vessel Sale Order(s) by July 1, 2015.

## BACKGROUND

### A.  Chapter 11 Filings

8. On March 3, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has entered an order jointly administering these chapter 11 cases [D.I. 57].  The

5

United States Trustee has appointed an Official Committee of Unsecured Creditors (the "**Committee**") in these cases [D.I. 119].

**B.  Events Leading to the Sale Transaction(s)**

9.      As part of the Debtors' restructuring efforts, the Debtors attempted to market and sell certain Assets—both on a going concern and standalone basis—well before the commencement of these chapter 11 cases.  In August 2014, the Debtors retained an investment banker to explore strategic transactions, including managing the marketing and sale process. During the prepetition period, that investment banker focused primarily on selling the Debtors' construction business as a going concern, contacting more than 100 potential purchasers. Although the construction business elicited interest in the market, the precipitous decline in oil prices in the final quarter of 2014 ultimately hampered the Debtors' sale efforts, and the Debtors commenced these chapter 11 cases after they were unable to refinance their existing indebtedness.

10.      Since the Petition Date, the Debtors have redoubled their efforts, actively marketing their entire enterprise or any permutation of the enterprise for sale as a going concern. To this end, the Debtors' marketing and sale efforts have continued postpetition on two parallel fronts.

11.      First, the Debtors retained Carl Marks Advisory Group LLC ("**CMAG**") as their crisis managers to, among other things, conduct a process to sell the Assets as a going concern under Bankruptcy Code section 363 or a chapter 11 plan.  Beginning shortly after the Petition Date, CMAG has extensively canvassed the market, contacting to date over 170 potential purchasers.  As part of this process, CMAG contacted and sought to reengage with all parties contacted by the Debtors' prepetition investment banker.

6

12.     Second, the Debtors engaged Derrick Offshore Ltd. ("**Derrick**"), as the Debtors' shipbroker, to market for sale Vessels that the Debtors anticipate will not be part of a Going Concern Sale as well as those Vessels that constitute the Debtors' core assets in the event the Debtors do not complete a Going Concern Sale.  Since being engaged, Derrick has contacted over 75 potential purchasers.

13.     As the Debtors move forward with implementing the procedures outlined in this Motion, the Debtors will continue to market and solicit offers for the Assets to a wide range of potential purchasers and will work diligently with all parties that have expressed interest in all, or any portion, of the Debtors' business or Assets.  In this way, the Debtors intend to maximize the number of participants in the sale process.

## THE PROPOSED ASSET PURCHASE AGREEMENTS

14.     The Debtors have prepared two form asset purchase agreements: One for the sale of the Assets in a Going Concern Sale (the "**Going Concern APA**"),[4] the other for the sale of standalone Vessels (the "**Vessel APA**"[5] and together with the Going Concern APA, the "**APAs**"), which will be provided to all prospective bidders (each, a "**Potential Bidder**").  No later than July 17, 2015 at 5:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**"), Potential Bidders will be required to submit to the Debtors an executed Going Concern APA or Vessel APA (as applicable, an "**Executed APA**"), reflecting the terms on which the Potential Bidder would purchase all or any of the Assets and, in the case of a Going Concern APA, assume certain liabilities.

---

[4] The Going Concern APA is attached hereto as Exhibit B.

[5] The Vessel APA is attached hereto as Exhibit C.

## SELECTION OF A STALKING HORSE

**A.  Going Concern Sale(s)**

15.    The Debtors will entertain entering into agreements (each a "**Stalking Horse Agreement**" and, collectively, the "**Stalking Horse Agreements**") with one or more Stalking Horse Purchasers, as may be determined by the Debtors in their business judgment (and in consultation with the DIP Agent, the Pre-Petition Junior Agent, and the Committee), for all or any non-overlapping portion of the Assets, including individual Vessels.  The Debtors propose to designate any Stalking Horse Purchasers by June 29, 2015.

16.    Upon the selection of the Stalking Horse Purchasers, the Debtors will file and serve a notice (the "**Stalking Horse Notice**") that includes (i) the identity of each proposed Stalking Horse Purchaser, (ii) a summary of the key terms of each Stalking Horse Agreement, (iii) a summary of the type and amount of bid protections (the "**Bid Protections**"), if any, being offered to each proposed Stalking Horse Purchaser, and (iv) a copy of each Stalking Horse Agreement.  The Debtors will serve the Stalking Horse Notice on all parties that have expressed an interest in acquiring the Assets subject to the proposed sale contemplated by the Stalking Horse Agreements, as well as all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

17.    In the event that the Debtors designate one or more Stalking Horse Purchasers by June 29, 2015, the Debtors request that the Court schedule the Stalking Horse Hearing on shortened notice on or after July 7, 2015 to approve any such Stalking Horse Purchaser, Stalking Horse Agreements, and accompanying Bid Protections.

## THE BID PROCEDURES

18.    By this Motion, the Debtors request entry of the Bid Procedures Order, which will, among other things, establish the following timeline:[6]

| Proposed Sale Timeline | |
|---|---|
| Sale Notice Publication Deadline | **June 24, 2015, at 5:00 p.m. (EDT)** |
| Stalking Horse Designation Deadline (Going Concern Sales and Vessel Sales) | **June 29, 2015, at 5:00 p.m. (EDT)** |
| Deadline to Serve Sale Notice and Notice of Assumption and Assignment | **July 1, 2015, at 5:00 p.m. (EDT)** |
| Deadline to Serve Notice of Lien Reserves | **July 1, 2015, at 5:00 p.m. (EDT)** |
| Deadline to file proposed Going Concern Sale Order and Vessel Orders | **July 1, 2015, at 5:00 p.m. (EDT)** |
| Stalking Horse Hearing | **On or after July 7, 2015, if required and subject to the Court's availability** |
| Assumption and Assignment Objection Deadline | **July 17, 2015, at 4:00 p.m. (EDT)** |
| Lien Reserves Objection Deadline | **July 17, 2015, at 4:00 p.m. (EDT)** |
| Sale Objection Deadline | **July 17, 2015, at 4:00 p.m. (EDT)** |
| Bid Deadline (Going Concern Sales and Vessel Sales) | **July 17, 2015, at 5:00 p.m. (EDT)** |
| Deadline to Notify Qualified Bidders (Going Concern Sales and Vessel Sales) | **July 20, 2015, at 5:00 p.m. (EDT)** |
| Sale Reply Deadline | **July 22, 2015, at 12:00 p.m. (EDT)** |
| Auction (Going Concern Sales and Vessel Sales) | **July 22, 2015, at 9:30 a.m. (EDT)** |
| Deadline to Publish Auction Results | **July 23, 2015, at 5:00 p.m. (EDT)** |
| Sale Hearing | **July 24, 2015, at 10:00 a.m. (EDT)** |

---

[6] Capitalized terms used but not defined in this timeline have the meaning ascribed in the Bid Procedures.

19.     The Bid Procedures are designed to ensure an efficient and orderly sale process that will maximize value for the Debtors' estates.  The Bid Procedures describe, among other things, the procedures for parties to conduct due diligence, the requirements to constitute a qualified bid for a Going Concern Sale or Vessel Sale, the conduct of any auction, the selection and approval of any ultimately successful bidders, and related deadlines.  The Debtors submit that this bidding process affords them a sufficient opportunity to pursue a robust sale that will maximize the value of their Assets for the benefit of their estates.

20.     Certain of the key terms of the Bid Procedures are highlighted below, in accordance with Local Rule 6004-1(c):[7]

i.    **Diligence**:  Upon execution of a confidentiality agreement containing terms satisfactory to the Debtors, any prospective bidder identified by the Debtors as reasonably likely to be a Qualified Bidder that wishes to conduct due diligence on any of the Assets may be granted access to material information regarding such Assets, *provided that* if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Potential Bidder any trade secrets or proprietary information.

ii.   **Potential Stalking Horse Bids**

a.    The Debtors will entertain, in consultation with the Committee, the DIP Agent, and the Pre-Petition Junior Agent, the possibility of entering into one or more Stalking Horse Agreements with one or more of the Qualified Bidders for both Going Concern Sales and Vessel Sales.  Any and all Stalking Horse Purchasers must be so designated by the Debtors no later than June 29, 2015, at 5:00 p.m. (prevailing Eastern Time).

(i) If the Debtors enter into a Stalking Horse Agreement with one or more Stalking Horse Purchasers, the Debtors will file and serve the Stalking Horse Notice on the Sale Notice Parties (as defined herein).  The Stalking Horse Notice will include (i) the identity of the Stalking Horse Purchaser, (ii) a summary of the key terms of the Stalking Horse Agreement, (iii) a summary of the type and amount of Bid Protections, if any, being offered to each proposed Stalking Horse Purchaser, and (iv) a copy of the Stalking Horse Agreement.  In the event that the Debtors designate one or more

---

[7] This description is for the convenience of the Court and parties in interest.  All capitalized terms used in this summary but not otherwise defined here have the meaning ascribed to them in the Bid Procedures.

Stalking Horse Purchasers by June 29, 2015, the Debtors request that the Court schedule the Stalking Horse Hearing on or after July 7, 2015, if required and subject to the Court's availability any such Stalking Horse Purchaser, Stalking Horse Agreements, and accompanying Bid Protections.

(ii) The Debtors, in consultation with the Committee, the DIP Agent, and the Pre-Petition Junior Agent, reserve the right to provide some or all of the Stalking Horse Purchasers with Bid Protections, including a break-up fee or expense reimbursement. All Bid Protections will be negotiated at arm's length with Potential Bidders and with the intent of maximizing the value to be received by the Debtors' estates, and the Debtors shall provide evidence at the Stalking Horse Hearing to the extent necessary to prove that the Bid Protections are appropriate under the circumstances and should be approved by the Court.

(iii) Any and all Stalking Horse Purchasers approved at the Stalking Horse Hearing will be deemed Qualified Bidders, and any APA and the transactions contemplated thereby will be deemed Qualified Bids for all purposes.

iii. **Bid Deadline**:  Any person or entity interested in participating in the Auction must submit, in writing, a Qualified Bid on or before July 17, 2015, at 5:00 p.m. (prevailing Eastern Time) in writing, to the attorneys for the Debtors, O'Melveny & Myers LLP, 7 Times Square, New York, New York 10153 (Attn: George A. Davis, Esq., Suzzanne S. Uhland, Esq., and Andrew M. Parlen, Esq.).  The Debtors, in consultation with the Committee, the DIP Agent, and the Pre-Petition Junior Agent,  may extend the Bid Deadline, provided that they promptly notify the Stalking Horse Purchasers and all Potential Bidders of any such extension.

iv. **Auction Qualification Process**:  To be eligible to participate in the Auction, each Potential Bidder must be determined by the Debtors to satisfy each of the conditions set forth below:

a. <u>Identification of Assets and Liabilities, Purchase Price, and Acquired Contracts</u>:  Each Potential Bidder must submit a bid, in writing, that identifies: (i) the Assets, or the portion thereof, to be purchased, (ii) the liabilities, if any, to be assumed, (iii) the cash purchase price of its bid, and (iv) with respect only to a Going Concern Sale, a proposed list of Acquired Contracts (defined below) and proposed adequate assurance of future performance.

b. <u>Identification of Bidder</u>:  Each Potential Bidder must fully disclose the legal identity of each entity that will be bidding for the applicable Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, and must also disclose any connections

11

or agreements with the Debtors, any other known Potential Bidder or Qualified Bidder, and any officer or director of the foregoing.

c.  Executed APA:  Each Potential Bidder must submit to the Debtors an irrevocable offer in the form of a Going Concern APA or Vessel APA, including all exhibits and schedules contemplated thereby (other than exhibits and schedules that by their nature must be prepared by the Debtors) and a marked copy of the Executed APA reflecting the differences between the Executed APA and the Going Concern APA or Vessel APA, as applicable.  In the case of a Going Concern Sale, any bid that requires the assumption and assignment of executory contracts or unexpired leases, the Potential Bidder must identify which executory contracts or unexpired leases are to be assumed and assigned and provide evidence establishing its ability to provide adequate assurance of performance of such executory contracts or unexpired leases.  Any Potential Bidder that does not intend to be considered as a Stalking Horse Purchaser must delete all Bid Protection provisions from its Executed APA.

d.  Proof of Financial Ability to Perform:  Each Potential Bidder must expressly acknowledge and represent that the Bid is formal, binding, and not subject to any due diligence.  Each Potential Bidder must also state that it is financially capable of consummating the transactions contemplated by the Executed APA, detail the source(s) of funds that will be used to consummate the transactions, and include satisfactory evidence of committed financing or other financial ability to consummate the transactions in a timely manner (which may include current audited financial statements, current bank account and marketable securities holdings or such other form of financial disclosure and credit-quality support information or enhancement acceptable to the Debtors).  Bids must include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Executed APA and may not contain any condition to closing of the transaction based on the receipt of any third party approvals (excluding required Court approval and any required governmental and/or regulatory approval, if any) or any financing contingencies of any kind.

e.  Good Faith Deposit:  Each Potential Bidder must provide a good faith deposit (the "**Good Faith Deposit**") in the form of a certified or bank check (or other form acceptable to the Debtors in their sole and absolute discretion) payable to the order of Cal Dive International, Inc., in an amount equal to ten percent of the purchase price offered to purchase the applicable Assets.  All Good Faith Deposits shall be held in a segregated account by the Debtors until no later than ten days after the Sale Hearing and thereafter returned to the respective bidders in accordance with the

Bid Procedures, unless the bidder has been selected as the Back-Up Bidder (as defined below).

v. **Qualified Bidder**: For both a Going Concern Sale and Vessel Sale, the Debtors, in consultation with the Committee, the DIP Agent, and the Pre-Petition Junior Agent, will determine whether a bid is a Qualified Bid and will notify bidders, along with the advisors to the Committee, the DIP Agent, and the Pre-Petition Junior Agent, whether their bids are Qualified Bids by no later than July 20, 2015, at 5:00 p.m. (prevailing Eastern Time). Any Stalking Horse Purchaser will be deemed a Qualified Bidder, and any Stalking Horse Agreement will constitute a Qualified Bid for all purposes.

vi. **Auction, Auction Procedures, and Overbids**: In the event that the Debtors receive one or more timely Qualified Bids with an acceptable purchase price, the Debtors will conduct the Auction. The Auction, if required, will be conducted at the offices of the Debtors' counsel, O'Melveny & Myers, 7 Times Square, New York, New York 10036 on July 22, 2015, at 9:30 a.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualified Bidders and the advisors to the Committee, the DIP Agent, and the Pre-Petition Junior Agent. The Debtors will have the right to conduct any number of Auctions on that date to accommodate Qualified Bids for any combination of the Debtors' Assets that the Debtors, in their business judgment, determine is in the best interest of the Debtors' estates, in consultation with the advisors to the Committee, the DIP Agent, and the Pre-Petition Junior Agent. The Debtors, in consultation with the Committee, the DIP Agent, and the Pre-Petition Junior Agent, have the right to adjourn or cancel the Auction at or prior to the Auction. The Qualified Bidders must appear in person at the Auction or through a duly authorized representative. Only representatives of the Debtors, Qualified Bidders, the Committee, the DIP Agent, and Pre-Petition Junior Agent and their respective advisors will be entitled to attend the Auction, and only the Qualified Bidders will be entitled to make any subsequent bids at the Auction. Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

a. For both a Going Concern Sale and Vessel Sale, bidding will commence at the amount of the Qualified Bid or combination of Qualified Bids that the Debtors, in consultation with the advisors to the Committee, the DIP Agent, and Pre-Petition Junior Agent, determine in their business judgment to be the highest or best Qualified Bid (the "**Initial Highest Bid(s)**"). Qualified Bidders may then submit successive bids higher than the previous bid, based on and increased from the Initial Highest Bid(s), in increments of at least $50,000 for a Vessel Sale and at least $500,000 for a Going Concern Sale.

b. The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment, and in consultation with the

13

advisors to the Committee, the DIP Agent, and the Pre-Petition Junior Agent, to announce reductions or increases in minimum incremental bids at any time during the Auction. Each Qualified Bidder will have the right to submit additional bids and make additional modifications to the Executed APA at the Auction to improve its bids.

c.     The Debtors, in their discretion and in consultation with the advisors to the Committee, the DIP Agent, and the Pre-Petition Junior Agent, may conduct the Auction in stages. In the first stage, the Debtors may auction components of the Assets, including individual Vessels. In the second stage, the Debtors may auction combinations of Assets, including as a Going Concern Sale. The highest and otherwise best bid for an Asset in the first stage of such Auction will be subject to overbid in the second stage of such Auction.

d.     On or before July 23, 2015, the Debtors will cause the results of the Auction, including a copy of the Successful Bid(s) (as defined in the Bid Procedures), and, if applicable, each Successful Bidder's proposed form of adequate assurance of future performance, to be published on the website of the Debtors' Court-approved claims agent, Kurtzman Carson Consultants LLC ("**KCC**"), at https://www.kccllc.net/CalDive.

e.     At the completion of the Auction, the Debtors, in consultation with the DIP Agent, and Pre-Petition Junior Agent, and the Committee, will determine which Qualified Bidder(s) have submitted the Successful Bid(s) for the Assets. Such Qualified Bidder(s) will become the Successful Bidder(s) and will have such rights and responsibilities of a purchaser, as set forth in the Executed APA,(s), as it (or they) may have been modified during the Auction.

f.     The Debtors will request at the Sale Hearing that the Court authorize the Debtors to consummate the Sale Transaction(s) with each Successful Bidder (as defined in the Bid Procedures). All Qualified Bidders at the Auction will be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction.

vii.   **Going Concern Sale Back-Up Bidder**: For a Going Concern Sale, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise next best Qualified Bid for the Assets at the Auction (the "**Back-Up Bid**") will be required to serve as the back-up bidder (the "**Back-Up Bidder**") for such Assets and keep such Back-Up Bid open and irrevocable until the first to occur of (i) 45 days after the completion of the Auction, (ii) consummation of the transaction with the Successful Bidder, or (iii) the Back-Up Bidder's receipt of notice from the Debtors of the release by the Debtors of the Back-Up Bidder's obligations. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction because of a breach or

14

failure to perform on its part or otherwise, the Back-Up Bidder will be deemed the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

viii. **Return of Good Faith Deposits**:  Good Faith Deposits shall be returned without interest to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the tenth business day following the conclusion of the Auction.  The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until ten business days after the closing of the Sale Transaction with the Successful Bidder or termination of the Back-Up Bid as provided above.

ix. **Alteration of Procedures**:  The Debtors may, in their discretion and subject to the exercise of their business judgment and in consultation with the advisors to the Committee, the DIP Agent, and the Pre-Petition Junior Agent, make alterations to the Bid Procedures or terminate discussions with any and all prospective acquirers at any time and without specifying the reasons therefor, including changes so as to modify deposit amounts and to modify or eliminate the requirements with respect to Back-Up Bidders—but only to the extent not materially inconsistent with the Bid Procedures.  For the avoidance of any doubt, the Debtors reserve the right, in consultation with the advisors to the Committee, DIP Agent, and Pre-Petition Junior Agent, to adopt "blind bidding," and to require any bidder to submit its highest or otherwise best bid, during the final round of bidding.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

21.    To facilitate a Going Concern Sale, the Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts should the Debtors seek to assume and assign such contracts and leases:

i. **Notice of Assumption and Assignment**:  On or before July 1, 2015, the Debtors will file with the Court and serve via first class mail on all counterparties to any of the Debtors' executory contracts and unexpired leases that the Debtors believe they might seek to assume and assign in connection with a Going Concern Sale (the "**Designated Contracts**") and all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (collectively, the "**Contract Notice Parties**") a notice of assumption, assignment, and sale substantially in the form of the Notice of Assumption and Assignment attached to the Bid Procedures Order as Exhibit 3.

ii. The Notice of Assumption and Assignment will include the Debtors' calculation of the amount necessary to cure all monetary defaults (the "**Cure**

Costs") for each Designated Contract. The Debtors reserve the right to supplement the list of Designated Contracts and provide additional Notices of Assumption and Assignment for previously omitted Designated Contracts prior to the execution of a definitive agreement for a Sale Transaction in accordance with such agreement, and to remove a Designated Contract from the list of Acquired Contracts (defined below) at any time before the Sale Hearing.

iii. Although the Debtors have made a good-faith effort to identify all Designated Contracts that might be assumed and assigned in connection with a Sale Transaction, the Debtors may identify other executory contracts or unexpired leases that they desire to assume and assign in connection therewith. Accordingly, if at any time after the entry of the Bid Procedures Order, the Debtors identify additional executory contracts or unexpired leases to be assumed and assigned to the Successful Bidder(s), the Debtors will serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each supplemental Designated Contract at the last known address available to the Debtors by no later than ten days before the proposed effective date of the assignment. Each Supplemental Notice of Assumption and Assignment will set forth (i) the name and address of the Designated Contract counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the applicable Successful Bidder to withdraw such request for assumption and assignment of the Designated Contract prior to the closing of the applicable Sale Transaction), (iii) identification of the Designated Contract, (iv) the Cure Costs, if any, and (v) proposed adequate assurance.

iv. Each Supplemental Notice of Assumption and Assignment that identifies a Designated Contract that was not previously designated to be assumed, assigned, and sold or that reduces the Debtors' calculation of the Cure Costs will provide a deadline of not less than seven days from the date of service of such Notice of Assumption and Assignment by which the counterparty to any such Designated Contract may object to (a) its listing as a Designated Contract and (b) the Debtors' calculation of the Cure Costs.

v. The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not obligate the Debtors to assume such Designated Contract or the Successful Bidder(s) to take assignment of such Designated Contract. Only those Designated Contracts that constitute Acquired Contracts (defined below) pursuant to a Successful Bidder's Executed APA will be assumed, assigned, and sold to the Successful Bidder.

vi. **Objections to Assumption and Assignment**: Any counterparty to a Designated Contract must file and serve on the Objection Recipients (as defined herein) any objections to (a) the proposed assumption, assignment,

and sale of the applicable Designated Contract (and must state in its objection, with specificity, the legal and factual basis thereof) and (b) if applicable, the proposed Cure Costs (and must state in its objection, with specificity, what Cure Costs are required with appropriate documentation in support thereof) no later than July 17, 2015, at 4:00 p.m. (prevailing Eastern Time) (the "**Assumption and Assignment Objection Deadline**" and, together with the Sale Objection Deadline (as defined below) and the "Lien Reserves Objection Deadline, the "**Objection Deadlines**").

vii. If a counterparty to a Designated Contract files a timely objection asserting a higher cure than the maximum Cure Costs set forth in the Notice of Assignment and Assumption (or Supplemental Notice of Assumption and Assignment), and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing.  All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to and under a Designated Contract, if it is ultimately selected as a Designated Contract that a Successful Bidder proposes be assumed, assigned, and sold to it in connection with the Sale Transaction (an "**Acquired Contract**"), will be heard at the Sale Hearing or such later hearing date that the parties agree is acceptable.

viii. If the counterparty to a Designated Contract does not timely file and serve an objection, such counterparty will be deemed to have consented to the assumption, assignment and sale of the Designated Contract to a Successful Bidder as an Acquired Contract, notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract, and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale, except with respect to the adequate assurance of future performance by such Successful Bidder.  Any objections to a Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at the Sale Hearing.  The Cure Costs set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract, or any other document, and the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment and sale of the Designated Contract and the Cure Costs, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them.

## **LIEN RESERVE PROCEDURES**

22.     Under the DIP Facility Agreement, the Debtors are required to pay down

the DIP Facility with the Net Cash Proceeds (as defined in the DIP Facility Agreement) from the

sale of any Vessel.  The Net Cash Proceeds available to prepay the DIP Facility exclude "any reserves which are acceptable to the Administrative Agent and its financial advisor with respect to maritime Liens which have not yet been filed" (the "**Lien Reserves**").

23.     Accordingly, in the event that a Vessel is sold—whether in a Going Concern Sale or Vessel Sale—the Debtors propose to establish a Lien Reserve for that Vessel in the amount of all Vessel Claims as reflected in the Debtors' books and records in respect of such Vessel.  The Debtors propose to then pay proceeds from the Sale Transaction(s) in accordance with the DIP Facility Agreement.

24.     To provide Vessel Creditors with notice of the Lien Reserves and an opportunity to object to the Lien Reserves, the Debtors propose the following Lien Reserve Procedures:

i.     **Notice of Lien Reserves and Vessel Claims**:  On or before July 1, 2015, the Debtors will file with the Court and serve via first-class mail on all Vessel Creditors and all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002, a notice (the "**Notice of Lien Reserves**"), substantially in the form attached to the Bid Procedures Order as Exhibit 4, setting forth on a Vessel-by-Vessel basis (i) the aggregate amount of the Lien Reserves, and (ii) the specific Vessel Claims included in the Lien Reserves and the amount reserved on account of such Vessel Claim from the proceeds of any Sale Transaction that includes the applicable Vessel.

ii.    **Objections to the Lien Reserves**:  A Vessel Creditor must file and serve on the Objection Recipients (as defined herein) any objections to the Lien Reserve for its Vessel Claim (and must state in its objection, with specificity, the legal and factual basis thereof) no later than July 17, 2015, at 4:00 p.m. (prevailing Eastern Time) (the "**Lien Reserve Objection Deadline**").

iii.   If a Vessel Creditor files a timely objection, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be reserved from the proceeds of any Sale Transaction with respect to such objection will be determined at the Sale Hearing or such later hearing date that the parties agree is acceptable.  If no objection is timely filed and served, the Vessel Creditor will be deemed to have consented to the Lien Reserves and the sale of the Debtors' Assets free and clear of any and all liens, claims, encumbrances and other interests, with no liens attaching to the proceeds of

18

the Sale Transaction other than to the extent of the Lien Reserves, and will be forever barred from asserting any objection with regard to the Lien Reserves.

25.     The Debtors submit that the Lien Reserve Procedures are a prudent means of preserving potential rights of Vessel Creditors while permitting the Debtors to focus in the near term on their value-defining sale process. Indeed, the Debtors anticipate that the Lien Reserves may be over-inclusive: the Debtors intend to list all Vessel Creditors on the Notice of Lien Reserves and, subject to further proceedings in this Court, Vessel Claims will be reserved in the amount, as reflected in the Debtors' books and records, that the Debtors owe on account of such Vessel Claim.

26.     To be clear, however, in listing a Vessel Claim in the Notice of Lien Reserves, the Debtors do not admit or acknowledge that the Vessel Creditor in fact holds a claim against the Debtors or a maritime lien or any similar lien against a Vessel.  A Vessel Creditor may not hold a maritime lien because its Vessel Claim, though incurred in connection with providing goods or services to a Vessel, does not in fact give rise to such a lien.  And, even if a Vessel Creditor holds a maritime lien against a Vessel, that lien may be junior in priority to the preferred mortgage liens securing the DIP Facility and the Pre-Petition Junior Facility and, as a result, that Vessel Creditor likely has only an unsecured claim.

27.     For the avoidance of doubt, any Sale Transaction proceeds included in the Lien Reserves will remain property of the Debtors' estates, and the Debtors expressly reserve all rights, claims, causes of action and defenses with respect to all Vessel Claims and any liens that might be asserted with respect to such claims.

## **SALE NOTICE PROCEDURES**

28.     Within two business days after entry of the Bid Procedures Order, the Debtors will provide notice, substantially in the form of the Sale Notice attached to the Bid

Procedures Order as **Exhibit 2**, of the Bid Procedures Order, the Auction, the Objection Deadlines, and the Sale Hearing by first-class mail to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, NY 10036 (Attn: Michael Stamer, Esq., and Meredith Lahaie, Esq.); (iii) counsel to the DIP Agent, Morgan Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178-0060 (Attn: Glenn Siegel, Esq.); (iv) counsel to the Pre-Petition Junior Agent, Kirkland & Ellis, 300 North LaSalle, Chicago, Illinois 60654 (Attn: Patrick J. Nash, Jr., P.C., and Gregory Pesce, Esq.); (v) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Assets during the previous six months; (vi) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Assets (for which identifying information and addresses are available to the Debtors); (vii) all non-Debtor parties to the Designated Contracts; (viii) any governmental unit known to the Debtors to have a claim in these cases; (ix) the Office of the Attorney General in each state in which the Debtors operate; (x) the Office of the Delaware Secretary of State; (xi) the Delaware State Treasury; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue Service; (xiv) all parties that have requested notice in these cases under Bankruptcy Rule 2002; (xv) all of the Debtors' known creditors; and (xvi) all other persons as directed by the Court (collectively, the "**Sale Notice Parties**").

29.     By June 24, 2015, the Debtors shall cause a summary version of the Sale Notice to be published (a) in the *Houston Chronicle*, and, in the Debtors' discretion, certain local or trade publications and (b) on the website of the Debtors' Court-approved claims agent, KCC, at https://www.kccllc.net/CalDive.

30.     The Debtors submit that the proposed Sale Notice, along with the procedures for providing notice of this Motion, the Auction, the Assumption and Assignment

20

Procedures, the Lien Reserve Procedures, and the Sale Hearing as described herein, complies fully with Bankruptcy Rule 2002 and Local Bankruptcy Rule 2002-1 and constitutes good and adequate notice of the Sale Transaction(s) and the proceedings with respect thereto. Therefore, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

31.    Any and all objections, if any, to any Sale Transaction, including objections to the Auction and the selection of any Successful Bidder(s), must be filed by July 17, 2015, at 4:00 p.m. (prevailing Eastern Time) (the "**Sale Objection Deadline**") and be served on (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors, c/o Cal Dive International, Inc., 2500 CityWest Boulevard, Suite 2200, Houston, TX 77042 (Attn: Lisa M. Buchanan); (iii) co-counsel to the Debtors, O'Melveny & Myers LLP, 7 Times Square, New York, New York 10036 (Attn: George A. Davis, Esq., Suzzanne S. Uhland, Esq. and Andrew M. Parlen, Esq.); (iv) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq., and Michael J. Merchant, Esq.); (v) counsel to the Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, NY 10036 (Attn: Michael Stamer, Esq., and Meredith Lahaie, Esq.); (vi) counsel to the DIP Agent, Morgan Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178-0060 (Attn: Glenn Siegel, Esq.); (vii) counsel to the Pre-Petition Junior Agent, Kirkland & Ellis, 300 North LaSalle, Chicago, Illinois 60654 (Attn: Patrick J. Nash, Jr., P.C., and Gregory Pesce, Esq.); (viii) if applicable, any Stalking Horse Purchaser(s) (collectively, the "**Objection Recipients**"). All replies to such objections must be filed by July 22, 2015, at 12:00 p.m. (prevailing Eastern Time).

32.    Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction,

including the transfer of the Debtors' right, title, and interest in, to and under the Debtors' Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with a definitive agreement for a Sale Transaction.

<u>**LEGAL BASIS FOR RELIEF REQUESTED**</u>

**A.    Approval of the Sale and Bid Procedures Is Warranted Under Bankruptcy Code Section 363**

33.    Bankruptcy Code section 363 provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 does not provide a standard establishing the appropriate circumstances for bankruptcy courts to authorize the sale of a debtor's assets.  Courts, however, have held that such a sale may be authorized under Bankruptcy Code section 363 if the court finds a "sound business purpose" for the sale.  *See Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.*), 242 B.R. 147 (Bankr. D. Del. 1999) (citing *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983)).  The business judgment rule creates a "presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.  *Stanizale v. Nachtomi (In re Tower Air, Inc.*), 416 F.3d 229, 234 (3d Cir. 2005) (citations omitted); *see also Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware's business judgment rule principles have "vitality by analogy" in chapter 11).

34.    Once a court is satisfied that there is a sound business reason justifying the sale, the court must also determine that adequate and reasonable notice has been provided to interested parties, that the sale price is fair and reasonable, and that the purchaser is proceeding

22

in good faith. *In re Delaware & Hudson Ry Co.*, 124 B.R. 169, 176 (D. Del. 1991) (citing *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc*., 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987)).

35. The Debtors have sound business justifications for seeking to sell the Assets in accordance with the Bid Procedures. In the Debtors' judgment, the best opportunity to maximize value and recoveries for the Debtors' estates is to sell the Assets in one or more section 363 sales, as contemplated by this Motion and as required under the DIP Facility Agreement. The Debtors believe this summer is the opportune time to sell the Assets in light of the seasonality of the Debtors' business and the expenses associated with maintaining the Assets. Additionally, the Sale Transactions will allow the Debtors to receive values the market will bear for their Assets, maximizing return for the Debtors' estates.

36. At the Sale Hearing, the Debtors will provide evidence that the sale price for the Assets, whether sold in combination as a going concern or in component parts, is fair and reasonable by showing that the Successful Bidder(s) made the highest or best offer(s) for the Assets. CMAG and Derrick will ensure that any sale of the Assets reflects their fair market value by continuing to actively and robustly market the Assets until the Bid Deadline. Moreover, the Bid Procedures are designed to encourage as many bidders as possible to put forth their best offers, thus increasing the likelihood that the Debtors' Assets will be sold for the highest or best price possible.

37. At the Sale Hearing, the Debtors will also present evidence that all APAs were the product of fairly negotiated, arm's-length transactions in which the Successful Bidder(s) acted in good faith, and, therefore, that the protections of Bankruptcy Code section 363(m) should apply.

38.     Accordingly, the Debtors request that the Court approve the proposed Sale Transaction set forth herein.

**B.  Granting the Debtors Authority to Enter into Stalking Horse Agreements and Offer Bid Protections Is Appropriate**

39.     Under the Bid Procedures, the Debtors will entertain the possibility of entering into Stalking Horse Agreements with Stalking Horse Purchasers for both Going Concern Sales and Vessel Sales.  In certain circumstances, subject to approval by the Court, it may be appropriate—and necessary—to provide these Stalking Horse Purchasers with Bid Protections.

40.     The Debtors believe that their ability to offer Bid Protections to a potential Stalking Horse Purchaser will maximize the realizable value of the Assets for the benefit of their estates.  The Third Circuit has identified at least two instances in which bidding incentives may benefit the estate.  First, a breakup fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview LP)*, 594 F.3d 200, 206–07 (3d Cir. 2010).  Second, if the availability of a breakup fee and expense reimbursement were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *In re Reliant Energy*, 594 F.3d at 206-07; *In re O'Brien*, 181 F.3d at 537.

41.    In *In re O'Brien*, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a breakup fee:

  a.    the presence of self-dealing or manipulation in negotiating the breakup fee;

  b.    whether the fee harms, rather than encourages, bidding;

  c.    the reasonableness of the breakup fee relative to the purchase price;

  d.    whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

  e.    the ability of the request for a breakup fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

  f.    the correlation of the fee to a maximum of value of the debtor's estate;

  g.    the support of the principal secured creditors and creditors' committees of the breakup fee;

  h.    the benefits of the safeguards to the debtor's estate; and

  i.    the substantial adverse impact of the breakup fee on unsecured creditors, where such creditors oppose the breakup fee.

*See In re O'Brien*, 181 F.3d at 536.

42.    If the Debtors enter into one or more Stalking Horse Agreements, the Debtors will present evidence at the Stalking Horse Hearing that any and all proposed Bid Protections provide the types of benefits to the Debtors' estates identified by the Third Circuit in *O'Brien* and should thus be approved.  The Debtors will show that without the assurance of such Bid Protections, the applicable Stalking Horse Purchaser would not have entered into its Stalking Horse Agreement because, for example, it had to perform due diligence on the value of the Assets subject to its bid and similarly invested time and money in formulating an offer.

43.    In addition to increasing the likelihood of competitive bidding, Stalking Horse Purchasers would establish a floor for other bids, precluding the possibility that the

25

Debtors could receive less than is contemplated in any Executed APA.  The Bid Protections thus stand to encourage potential Stalking Horse Purchasers to invest resources in valuing the Assets, making it more likely that the Debtors receive the true value of their Assets.

## C.  The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Free and Clear Sale

44.    To attract the best offers for the Assets, the Debtors request authority to sell the Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale of the Assets.

45.    Under Bankruptcy Code section 363(f), a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied:

> (i)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (ii)    such entity consents;
>
> (iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

46.    Because section 363(f) is stated in the disjunctive, only one of the five listed conditions must be met when selling property of the estate.  *See Folger Adam Sec. Inc. v. De Matteis/MacGregor*, JV, 209 F.3d 252, 257 (3d Cir. 2000) (noting that a debtor is authorized to sell property free and clear of "any interest" if any one of the five prescribed conditions under section 363(f) is met); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002)

RLF1 12074125v.1

("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).

47.     The Debtors submit that the Sale Transaction(s) will satisfy one or more conditions of Bankruptcy Code section 363(f).  For example, the Sale will satisfy section 363(f)(2) with respect to any entity with an interest in the Assets that expressly consents to the Sale Transaction or does not object to the applicable Sale Transaction and thus is deemed to consent to it.  Alternatively, the Debtors may sell the Assets free and clear of any other interests under section 363(f)(1) because applicable nonbankruptcy law permits sale of the Assets free and clear of such interests or under section 363(f)(5) because entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.  And, depending on the price the Debtors receive for a particular Vessel and the nature and amount of interest in that Vessel, section 363(f)(iii) may be satisfied.

48.     Accordingly, the Debtors request authority to sell the Assets free and clear of all liens, claims, encumbrances, and other interests.

**D.    Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases Should Be Authorized**

49.     Under Bankruptcy Code section 365(a), a debtor in possession may, subject to the court's approval, assume or reject any executory contract or unexpired lease of a debtor.  11 U.S.C. § 365(a).  The standard governing approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's business judgment supports assumption or rejection.  *See, e.g., In re Stable Mews Assocs.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  In this context, the business judgment test "requires only that the trustee [or

debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assocs.*, 41 B.R. at 596).  Imposing more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, to assume an executory contract under Bankruptcy Code section 365(b), a debtor must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. 365(b)(1).

50.    Once an executory contract is assumed, the debtor may elect to assign the contract.  *See In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).

51.    Under Bankruptcy Code section 365(f), "[t]he trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr.

28

S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

52. To facilitate and effectuate the Sale Transaction, the Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption, assignment, and sale of the Acquired Contracts to the Successful Bidder(s). The Debtors further request that the Going Concern Sale Order provide that the Acquired Contracts be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s), notwithstanding any provisions in the Acquired Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3), that prohibit such assignment.

53. Any Successful Bidders are responsible for providing evidence of adequate assurance of future performance to the extent required in connection with the assumption and assignment of any Designated Contracts. Any objections to a Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at the Sale Hearing.

54. The counterparties to the Acquired Contracts will have sufficient opportunity to file an objection to the proposed Cure Costs. If there is no objection to particular Cure Costs, those Cure Costs will be binding on the applicable contract or lease counterparty. The payment of the Cure Costs will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to Bankruptcy Code section 365(b)(1), unless the Debtors determine that a particular contract is not truly executory and does not need to be cured to transfer the Assets to the Successful Bidder(s).

55.    Cure Costs disputed by any counterparties, with respect to any Acquired Contracts to be assumed and assigned to the Successful Bidder(s) at the Closing (as defined in the Bid Procedures), will be resolved by the Court at the Sale Hearing.

56.    In addition, the Debtors request that any party to a Designated Contract that does not timely file and serve an objection to the assumption, assignment, and sale of the Designated Contract, be deemed to consent to the treatment of its executory contract and/or unexpired lease under Bankruptcy Code section 365 of the Bankruptcy Code. *See In re Decora Indus.*, 2002 WL 32332377, at *4 (Bankr. D. Del. May 17, 2002) (parties in interest who did not object to sale were deemed to accept the sale pursuant to sections 362(f) and 365 of the Bankruptcy Code); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabeel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). The Debtors also request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assumption or assignment. *See* 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

**E.    The Lien Reserves and the Lien Reserves Notice Procedures Should Be Approved**

57.    To facilitate the Sale Transaction(s), the Debtors request that the Court approve the Lien Reserves.  The Lien Reserves are designed to ensure that the Debtors reserve proceeds from the sale of any Vessel—in a Going Concern Sale or Vessel Sale—sufficient to satisfy Vessel Claim giving rise to a maritime lien that might be senior in priority to the DIP Facility or the Pre-Petition Junior Facility.  As explained above, a Vessel Creditor may not hold a maritime liens against a Vessel and, even if a Vessel Creditor does hold such a lien, that lien may be junior to the liens of the DIP Lenders and the Pre-petition Junior Lenders (and, as such, likely

30

are unsecured).  But at this time, out of an abundance of caution, the Debtors propose to reserve for *all* Vessel Claims in the Lien Reserves.

58.    The priority of claims to proceeds of a marine vessel sale is determined by maritime law, *see In re Wamu Services, Inc.*, 322 B.R. 541, 546 (Bankr. D. Del. 2005), and turns, in part, on whether a claim is against a domestic vessel, one which is registered or documented in the United States (often referred to as a "U.S.-flagged" vessel) or a foreign vessel, one that is documented or registered in a foreign country (often referred to as a "foreign-flagged" vessel). For a U.S.-flagged vessel, preferred ship mortgages—like those held by the DIP Lenders and Pre-Petition Junior Lenders—have priority over all claims against the vessel, except expenses and fees imposed by the court selling the vessel and "preferred maritime liens."  46 U.S.C. § 31326(b)(1).  A "preferred maritime lien" is defined as:

> a maritime lien on a vessel—(A) arising before a preferred mortgage was [duly] filed . . . ; (B) for damage arising out of maritime tort; (C) for wages of a stevedore when employed directly by [an officer or agent of the vessel]; (D) for wages of the crew of the vessel; (E) for general average; or (F) for salvage.

46 U.S.C. § 31301(5)(A)-(F).  In other words, maritime liens, other than those specifically enumerated in the statute (*e.g.,* seaman wages and tort damages), are subordinate to a preexisting ship mortgage.

59.    For a foreign-flagged vessel, by contrast, a preferred mortgage lien is subordinate to a maritime lien for necessaries provided in the United States irrespective of when the necessary was provided and the lien arose.  46 U.S.C. § 31326(b)(2).[8]  Courts have defined "necessaries" generally as "things that a prudent owner would provide to enable a ship to

---

[8] Subject to certain exceptions not applicable here.

31

perform well the functions for which she has been engaged."[9] *Gulf Marine and Indus. Supplies, Inc. v. GOLDEN PRINCE M/V*, 230 F.3d 178, 180 (5th Cir. 2000). As a result, a preferred ship mortgage on a foreign-flagged vessel operating in the United States, as opposed to a U.S.-flagged vessel, is likely to be subordinate to a more expansive universe of maritime lien claims.

60.     Here, the DIP Facility and the Pre-Petition Junior Facility are secured by, among other things, preferred ship mortgages on all of the Debtors' Vessels, six of which are U.S.-flagged and eight of which are foreign-flagged. At this juncture, the Debtors are proposing to reserve from the proceeds of any Going Concern Sale or Vessel Sale the amount of all Vessel Claims against the Vessel being sold, based on the Debtors' books and records, regardless of whether such claims are against a U.S.- or foreign-flagged Vessel and regardless of whether such claims give rise to a maritime lien. By establishing the Lien Reserves and reserving for all Vessel Claims, the Debtors are ensuring that the rights of Vessel Creditors are preserved and the Vessel Creditors will not be prejudiced by the sale process.

61.     The Court should also approve the Lien Reserve Procedures. The Lien Reserve Procedures are designed to ensure that all Vessel Creditors receive notice of, and an opportunity to object to, the Lien Reserves, including identifying the aggregate amount of the Lien Reserves for each Vessel and the specific Vessel Claims included in the Lien Reserves and the amount reserved on account of such Vessel Claim. In addition, upon establishing the Lien Reserves, the Court should approve the Debtors' application of the proceeds from any Sale Transaction free and clear of all Vessel Claims in accordance with the DIP Facility Agreement, subject to the Lien Reserves.

---

[9] The Federal Maritime Lien Act —which governs the creation of maritime liens under U.S. law—defines "necessaries" as "includ[ing] repairs, supplies, towage, and the use of a drydock or marine railway." 46 U.S.C. § 31301(4).

**F.    Relief from Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

62.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."   To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Assets, it is critical that the Debtors close the sale of the Assets as soon as possible after all closing conditions have been met or waived.   Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

63.    The Debtors will provide notice of this Motion via first-class mail to: (i) Office of the United States Trustee for the District of Delaware; (ii) counsel to the DIP Agent; (iii) counsel to the Pre-Petition Junior Agent; (iv) Bank of New York Mellon Trust Company, N.A., as the Indenture Trustee for the Convertible Notes; (v) counsel to the Committee; (vi) the Internal Revenue Service; (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002(i); and (viii) all entities, according to the Debtors books and records and to the Debtors' knowledge, that might assert a lien, claim, encumbrance, or other interest in the Assets.  A copy of this Motion is also available on the Debtors' case website at https://www.kccllc.net/caldive.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, (ii) enter, upon conclusion of the Sale Hearing, (a) the Going Concern Sale Order and (b) the Vessel Sale Order(s), and (iii) grant the Debtors such other and further relief as is just and proper.

Dated:    June 1, 2015
           Wilmington, Delaware

           /s/ Amanda R. Steele
           **RICHARDS, LAYTON & FINGER, P.A.**
           Mark D. Collins (No. 2981)
           Michael J. Merchant (No. 3854)
           Amanda R. Steele (No. 5530)
           One Rodney Square
           920 North King Street
           Wilmington, Delaware 19801
           Telephone:  (302) 651-7700
           Facsimile:  (302) 651-7701

           - and -

           **O'MELVENY & MYERS LLP**
           George A. Davis (admitted *pro hac vice*)
           Andrew M. Parlen* (admitted *pro hac vice*)
           Daniel S. Shamah (admitted *pro hac vice*)
           Matthew P. Kremer (admitted *pro hac vice*)
           Times Square Tower
           Seven Times Square
           New York, NY 10036
           Telephone:  (212) 326-2000
           Facsimile:  (212) 326-2061

           Suzzanne S. Uhland (admitted *pro hac vice*)
           Two Embarcadero Center
           28th Floor
           San Francisco, CA 94111
           Telephone:  (415) 984-8700
           Facsimile:  (415) 984-8701

           Attorneys for the Debtors and Debtors in Possession

           *Admitted in CA; Not Admitted to Practice in NY